**GREENBAUM, ROWE, SMITH & DAVIS LLP**
75 Livingston Avenue, Suite 301
Roseland, New Jersey 07068
(973) 535-1600
Attorneys for GF Princeton, LLC.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **TEXTRON FINANCIAL-NEW JERSEY, INC.**<br><br>        Plaintiff,<br><br>vs.<br><br>**HERRING LAND GROUP, LLC.**<br><br>Defendant. | CASE NO.:  06-2585 (MLC)<br><br>Civil Action<br><br><br>**CERTIFICATION OF ROBERT FREEMAN** |

I, Robert Freeman, of full age, do hereby certify and say:

1.  I am the managing member of GF Princeton, LLC the proposed Substituted Plaintiff in this matter. I make this Certification in support of GF Princeton's motion to Substitute as Plaintiff or in the alternative to Intervene in this matter.

2.      This case involves a dispute over the rent to be charged with respect to a ground lease wherein Defendant Herring Land Group, LLC is the owner of the land. At the time of the filing of the Textron-Financial New Jersey, Inc. was the lessor of the land where commercial improvements are located.

3.      On or about December 21, 2007, GF Princeton, LLC bought the "improvements" (buildings) and assumed the Ground Lease from Plaintiff Textron Financial. As of December 21, 2007, GF Princeton became the real Plaintiff in interest in this matter and should be

1038903.01

substituted as Plaintiff.  (A copy of the December 21, 2007 Improvements Deed and Assignment are annexed hereto as **Exhibit A).**

4.       Therefore, GF Princeton, LLC clearly has an interest in the subject matter of the dispute as of December 21, 2007 and additionally our interest may be affected or impaired by the disposition of the action. The December 21, 2007 purchase and sale agreement also requires GF Princeton to fully fund this litigation and assume responsibility for (or take of the benefit of) any judgments or awards.  (A copy of the December 21, 2007 Purchase and Sale Agreement is annexed hereto as **Exhibit B)**. The Plaintiff does not adequately represent our interests because they have no interest in the determination of the amount of rents due subsequent to the purchase and GF Princeton is responsible to manage, fund and obtain the awards or responsibility for any judgment in this matter.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I may be subject to punishment.

ROBERT FREEMAN

Dated:    September 25, 2008

E

X

H

I

B

I

T

A

**Exhibit "A"**



Mercer County Clerk's Office

**Return To:**

JOSEPH F WHINERY JR
CAMERON & MITTLEMAN
56 EXCHANGE TERRANCE
PROVIDENCE  RI  02903

TEXTRON FINANCIAL — N J INC

GF PRINCETON

| | |
|---|---|
| Index | DEEDS |
| Book | 05789    Page   0001 |
| No. Pages | 0010 |
| Instrument | REGULAR EXCESS |
| Date : | 1/10/2008 |
| Time : | 2:19:26 |
| Control # | 200801100460 |
| INST# | RD 2008 001184 |
| Employee ID | JANGOTTI |

| | | |
|---|---|---|
| RECORDING | $ | 34.00 |
| RECORDING | $ | 36.00 |
| DARM $3 | $ | 27.00 |
| DARM $3 | $ | 3.00 |
| NMD1PA | $ | 18.00 |
| NJPRPA | $ | 2.00 |
| GRANTEE TX | $ | 42,500.00 |
| DD7 T1 CO | $ | 150.00 |
| DD7 T1 ST | $ | 375.00 |
| All Other | $ | 48,375.00 |
| Total: | $ | 91,520.00 |

STATE OF NEW JERSEY
Mercer County Clerk's Office

*********PLEASE NOTE:*********************
* DO NOT REMOVE THIS COVER SHEET -       *
* IT CONTAINS ALL RECORDING INFORMATION  *
******************************************

Paula Sollami-Covello
Mercer County Clerk



D057890001DD7EWT

VOL5789 PG0001

707- 1070346- New JERSEY (Mercer County)

DD7 9P *150.00
RTF = 48,900.00
mt 42,500.00
clt 3023
81b
817
EWT

Block-371
P/0 LOT- 3.02

Prepared By: *(signature)*
Sharon L. Wynn, Esquire

## IMPROVEMENTS DEED

This Deed is made ~~on~~ *as of* December 21, 2007

BETWEEN TEXTRON FINANCIAL - NEW JERSEY, INC., a Delaware corporation, with an address of 40 Westminster Street, Providence, Rhode Island 02903, hereinafter referred to as the Grantor,

AND GF PRINCETON LLC, a Delaware limited liability company, with an address c/o Greyfields Investors LLC, 551 Fifth Avenue, 31st Floor, New York, New York 10176, hereinafter referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

**Transfer of Ownership.** The Grantor grants and conveys (transfers ownership of) the property described below to the Grantee. This transfer is made for the sum of Four Million Two Hundred Fifty Thousand and 00/100 ($4,250,000.00) Dollars. The Grantor acknowledges receipt of this money.

**Tax Map Reference.** (N.J.S.A. 46:15-1.1) Improvements only located on land designated as a portion of Block 371, Lot 3.02 on the tax map of Ewing Township, Mercer County, New Jersey.

**Property.** The property conveyed consists of all buildings, fixtures and other improvements (the "Improvements") situated on or under the land described in Exhibit A attached hereto, but not the fee estate of such land..

Being the same Improvements conveyed to the Grantor by New Jersey National Bank by Deed recorded in the Mercer County Clerk's Office on December 30, 1985 in Book 2321 of Deeds for said County at Page 277. Concurrently with the conveyance of the Improvements to the Grantor, the Grantor entered into a ground lease (the "Ground Lease") with New Jersey National Bank as ground lessor. A Memorandum of the Ground Lease dated December 27, 1985, was recorded on December 30, 1985 in the Mercer County Clerk's Office in Deed Book 2321 Page 258. The Ground Lease was subsequently amended, the last amendment being the Sixth Amendment to Ground Lease dated January 13, 2006, recorded on February 3, 2006 in the Mercer County Clerk's Office in Deed Book 5275 Page 192. Exhibit A constitutes the leasehold estate covered by the Ground Lease.

This conveyance is made subject to existing easements, covenants, conditions and restrictions of record, zoning laws and such other applicable municipal and governmental regulations.

Exhibit "A"

Property with respect to which the Ground Lease remains in Full Force and Effect

All that certain parcel of land situate in the Township of Ewing, County of Mercer and State of New Jersey, across part of Tax Lot 3, Block 371, (all tax lot information was taken from the Ewing Township Tax Atlas Data), and being more particularly bounded and described as follows:

BEGINNING at a point, said point being a southeasterly corner of Tax Lot 13, Block 371, lands now or formerly of Sierra Office Park, said point being distant N 85° 23' 54" E, 1,300.00 feet as measured along a southerly line of said Lot 13, from the easterly line of Scotch Road, and from said point of Beginning running, thence

1)   N 40° 08' 06" E, 251.21 feet across Tax Lot 3 to an angle point, thence

2)   N 89° 58' 44" E, 607.36 feet across same to an angle point, thence

3)   S 45° 01' 16" E, 490.70 feet across same to an angle point, thence

4)   S 00° 36' 40" W, 333.18 feet across same to a point in a southerly line of Tax Lot 3, said point also being in a northerly line of Tax Lot 2, Block 371, lands now or formerly of County of Mercer, thence

5)   N 89° 23' 20" W, 1,194.35 feet along the northerly line of said Lot 2 to a point, thence

6)   N 00° 36' 40" E, 383.27 feet across Tax Lot 3 to an angle point, thence

7)   N 40° 08' 06" E, 120.00 feet across same to a point, being the first mentioned point and place of Beginning.

Containing 16.302 acres of land, more or less.

Subject to an existing 100' wide Public Service Electric and Gas Company Easement.

The above is intended to describe all that parcel of land shown as "Proposed Lease Area" Across Tax Lot 3, Block 371 (Ewing Township Tax Atlas Data), on a plan entitled, "Plan of Survey of Tax Lot 3, Block 371 in Ewing Township and Tax Lot 21, Block 91 in Hopewell Township, Situate in Mercer County, New Jersey", prepared by Thomas Tyler Moore Associates, dated December 19, 1985 and revised to February 28, 1986, and marked as File No. 42-266.

# 3515233_v1



Mercer County Clerk's Office

Return To:

    JOSEPH F WHINERY JR
    CAMERON & MITTLEMAN
    56 EXCHANGE TERRANCE
    PROVIDENCE  RI  02903

TEXTRON FINANCIAL – NJ INC

GF PRINCETON

Index  DEEDS

Book    05789    Page   0011

No. Pages    0007

Instrument   MISC DEEDS

Date :    1/10/2008

Time :    2:23:00

Control #    200801100463

INST#        RD 2008 001185

Employee ID    JANGOTTI

| | | |
|---|---|---|
| RECORDING | $ | 25.00 |
| RECORDING | $ | 25.00 |
| DARM $3 | $ | 18.00 |
| NMD1PA | $ | 12.00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| Total: | $ | 80.00 |

STATE OF NEW JERSEY
Mercer County Clerk's Office

**********PLEASE NOTE***********************
* DO NOT REMOVE THIS COVER SHEET -         *
*IT CONTAINS ALL RECORDING INFORMATION     *
*******************************************

       Paula Sollami-Covello
       Mercer County Clerk



D057890011DD5EWT

VOL5789 PG0011

707-107 0346 - New Jersey (Mercer County)        DDS GP #80.00
                                                     CLK# 3023
Block - 371                                             EWT
P/O Lot - 3.02

## ASSIGNMENT OF GROUND LEASE

THIS ASSIGNMENT is made as of the 21st day of December, 2007, between TEXTRON FINANCIAL - NEW JERSEY, INC., a Delaware corporation, with an address of 40 Westminster Street, Providence, Rhode Island 02903 (hereinafter referred to as "Assignor") and GF PRINCETON LLC, a Delaware limited liability company, with an address of c/o Greyfields Investors LLC, 551 Fifth Avenue, 31st Floor, New York, New York 10176 (hereinafter referred to as "Assignee").

WHEREAS, pursuant to that certain Ground Lease (the "Ground Lease") made by New Jersey National Bank as Ground Lessor to Assignor, dated December 27, 1985, a Memorandum of which dated December 27, 1985 was recorded on December 30, 1985 in the Mercer County Clerk's Office in Deed Book 2321 Page 258, and which was subsequently amended by various amendments, the last of which, the Sixth Amendment was dated January 13, 2006, and recorded on February 3, 2006 in the Mercer County Clerk's Office in Deed Book 5275 Page 192, Assignor is the Ground Lessee of the premises described in Exhibit A (hereinafter referred to as the "Premises"); and

WHEREAS, Assignee desires to take an assignment of all of Assignor's interest in the Ground Lease;

NOW, THEREFORE, in consideration of the payment of Seven Hundred Fifty Thousand and 00/100 ($750,000.00) Dollars, the receipt of which is hereby acknowledged, Assignor and Assignee hereby agree as follows:

1. Assignment. Assignor does hereby grant and assign unto Assignee all its right, title and interest in and to the Ground Lease and the Premises.

2. Performance of Ground Lease Duties. From and after the date hereof, Assignee hereby covenants and agrees to perform all of Assignor's duties and obligations required under the terms, covenants and conditions of the Ground Lease.

3. Successors and Assigns. This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their successors and assigns.

4. New Jersey Laws. This Assignment shall be interpreted and construed in accordance with laws of the State of New Jersey.

The Assignor and Assignee execute this Assignment as of the date set forth at the beginning of the Assignment.

TEXTRON FINANCIAL - NEW JERSEY, INC.

By: _____
    President            Shanuah Y Brannon

GF PRINCETON LLC

By: _____
    Director of Finance      Kevin S. Reardon

Record & Return to:
Joseph F. Whinery, Jr.
Cameron & Mittleman LLP
56 Exchange Terrace
Providence, R.I. 02903

VOL5789 PG012

Exhibit "A"

Property with respect to which the Ground Lease remains in Full Force and Effect

All that certain parcel of land situate in the Township of Ewing, County of Mercer and State of New Jersey, across part of Tax Lot 3, Block 371, (all tax lot information was taken from the Ewing Township Tax Atlas Data), and being more particularly bounded and described as follows:

BEGINNING at a point, said point being a southeasterly corner of Tax Lot 13, Block 371, lands now or formerly of Sierra Office Park, said point being distant N 85° 23' 54" E, 1,300.00 feet as measured along a southerly line of said Lot 13, from the easterly line of Scotch Road, and from said point of Beginning running, thence

1)      N 40° 08' 06" E, 251.21 feet across Tax Lot 3 to an angle point, thence

2)      N 89° 58' 44" E, 607.36 feet across same to an angle point, thence

3)      S 45° 01' 16" E, 490.70 feet across same to an angle point, thence

4)      S 00° 36' 40" W, 333.18 feet across same to a point in a southerly line of Tax Lot 3, said point also being in a northerly line of Tax Lot 2, Block 371, lands now or formerly of County of Mercer, thence

5)      N 89° 23' 20" W, 1,194.35 feet along the northerly line of said Lot 2 to a point, thence

6)      N 00° 36' 40" E, 383.27 feet across Tax Lot 3 to an angle point, thence

7)      N 40° 08' 06" E, 120.00 feet across same to a point, being the first mentioned point and place of Beginning.

Containing 16.302 acres of land, more or less.

Subject to an existing 100' wide Public Service Electric and Gas Company Easement.

The above is intended to describe all that parcel of land shown as "Proposed Lease Area" Across Tax Lot 3, Block 371 (Ewing Township Tax Atlas Data), on a plan entitled, "Plan of Survey of Tax Lot 3, Block 371 in Ewing Township and Tax Lot 21, Block 91 in Hopewell Township, Situate in Mercer County, New Jersey", prepared by Thomas Tyler Moore Associates, dated December 19, 1985 and revised to February 28, 1986, and marked as File No. 42-266.

# 2515223_v1

E

X

H

I

B

I

T


B


# Exhibit "B"

## PURCHASE AND SALE AGREEMENT

AGREEMENT made as of December 21, 2007 among TEXTRON FINANCIAL - NEW JERSEY INC., a Delaware corporation ("Seller") and GF PRINCETON LLC, a Delaware limited liability company ("Buyer").

### W I T N E S S E T H:

For and in consideration of the amounts paid by Buyer to Seller as set forth herein, and in consideration of the agreements of Seller and Buyer contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, Seller and Buyer agree as follows:

1.  PURCHASE AND SALE. Seller agrees to sell and convey to Buyer or its assignee or nominee, and Buyer agrees to purchase (or cause such nominee to purchase) from Seller, upon and subject to the terms and conditions contained in this Agreement:

1.1  All of Seller's right, title and interest in, to and under a certain Ground Lease dated as of December 27, 1985 between Herring Land Group L.L.C., a New Jersey limited liability company (as successor in interest to New Jersey National Bank) ("Ground Lessor") and Seller as amended January 14, 1986, December 23, 1986, November 1, 1988, September 20, 1991, July 26, 1994 and January 13, 2006 (as amended, the "Ground Lease"), pursuant to which Seller leases approximately 16.3 acres of land in Ewing Township, New Jersey, described in Exhibit A hereto (the "Land");

1.2    All buildings and other improvements (the "Improvements") located on the Land;

1.3    Seller's right, title and interest in and to all approvals, licenses and permits relating to the Improvements, if any (the "Permits");

1.4    All fixtures and equipment and other tangible personal property located on or in the Improvements associated with or useful in their operation (the "Personal Property"), including, without limitation, any and all furnaces, heaters, heating equipment, hot water heaters, plumbing and bathroom fixtures, electric and other lighting fixtures, trees, shrubs, plants, air conditioning equipment and ventilators;

1.5    The guaranties, warranties and similar agreements, if any, listed on Exhibit B hereto relating to the performance, quality of workmanship and quality of materials supplied in connection with the construction, manufacture, development and installation and operation of the Land and Improvements, together with all operating manuals relating to the maintenance and operation of the Land and Improvements (collectively, the "Warranties");

1.6    All claims, causes of action and other rights of Seller arising under or in connection with the Ground Lease; and

1.7    All claims, causes of action and other rights of Seller, if any, arising under or in connection with a certain Lease Agreement dated as of December 27, 1985, as amended (the "Improvements Lease") between Seller and New Jersey National Bank; (all of the foregoing listed in Section 1.1 through 1.7 being referred to collectively as the "Property").

2.    TITLE.  Seller shall convey good and clear record, marketable leasehold title to the Land and good and clear record, marketable fee simple title to the Improvements by good and sufficient assignment (the "Assignment") and bargain and sale deed with covenants against grantor's acts (the "Deed"), respectively, (together, the "Conveyance Documents"), insurable (at Buyer's expense at regular rates) by a recognized national title insurance company acceptable to Buyer (the "Title Company"), free from all mortgages, liens, claims and encumbrances, except the following (the "Permitted Encumbrances"):

2.1    Provisions of existing building and zoning laws, restrictions and regulations of all governmental authorities having jurisdiction and all zoning variances and special exceptions, if any;

2.2    Such real estate taxes assessed as are not due and payable on the Closing Date (as that term is defined below);

2.3    The terms and provisions of the Ground Lease;

2.4    Easements and restrictions of record as of the date hereof; and

2.5    The Litigation (as that term is defined in Section 23 thereof).

3.    PURCHASE PRICE AND PAYMENT.

3.1    The purchase price for the Property shall be Five Million Dollars ($5,000,000) (the "Purchase Price") payable as follows:

(a)    Two Hundred Fifty Thousand Dollars ($250,000) (the "Deposit") shall be paid within three (3) business days of the date hereof to the Escrow Agent (defined below) to be held pursuant to the provisions of Section 11 hereof; and

- 3 -

(b)     The balance of Four Million Seven Hundred Fifty Thousand Dollars ($4,750,000), subject to adjustments as provided in Section 10 hereof, shall be paid at the Closing together with the Deposit by wire transfer of funds for disbursement pursuant to the Closing Statement (defined below).

4.     CLOSING; EXPENSES.

4.1     Closing.     The closing of the transactions contemplated hereby (the "Closing") shall take place at eleven o'clock a.m. on December 31, 2007 (the "Closing Date") at the offices of Wolf-Block, Schorr & Solis-Cohen, 101 Eisenhower Parkway, Roseland, New Jersey 07068, TIME BEING OF THE ESSENCE FOR CLOSING ON SUCH DATE, or at such earlier time and/or location as Seller and Buyer may agree.

4.2     Expenses.  Buyer shall be responsible for payment of its own attorneys' fees, title insurance premiums, transfer taxes customarily payable by Buyer, if applicable and costs of recording the Conveyance Documents.     Seller shall be responsible for payment of its own attorneys' fees, all Seller's transfer taxes and recording costs relating to any mortgage or lien required to be discharged by Seller under the terms of this Agreement.

5.     CONDITION OF PREMISES AT CLOSING.     Full possession of the Property, free of all tenants and occupants, except as provided herein, shall be delivered at the time of the Closing.  The Property is being transferred in AS IS condition and Seller makes no representations concerning the condition of the Property except as expressly provided herein.

6.     [RESERVED]

- 4 -

7.    <u>FAILURE OF TITLE OR CONDITION</u>.  If Seller shall have failed to remove any defects in title, deliver possession, or make the Property conform to the terms hereof within the time permitted hereunder, or if any condition set forth in Section 20 hereof has not been satisfied or waived in writing within the time provided therein, Buyer, by written notice to Seller, may elect (a) to terminate and cancel this Agreement, in which case the Deposit (together with all interest required to be paid thereon) shall be promptly returned to Buyer, (b) to close this transaction, paying for the Property the full Purchase Price or (c) if such failure is the result of the failure of Seller to pay or perform its obligations hereunder, to elect to exercise its remedies under the provisions of Section 12 hereof.  Buyer shall have the election, at the Closing Date or any extension thereof agreed by the parties, to accept such title to the Property in its then condition as Seller can deliver and to pay therefor the Purchase Price without deduction, in which case Seller shall convey such title, but without warranties against such defects.

8.    <u>USE OF PURCHASE PRICE TO CLEAR TITLE</u>.  To enable Seller to make conveyance as herein provided, Seller may at the Closing use the Purchase Price, or any part thereof, to clear title of any or all encumbrances or interests which are to be discharged, removed or eliminated by the terms hereof, and all instruments discharging the same shall be recorded concurrently with the recording of the Deed.

9.    <u>INSURANCE; INTERIM DAMAGE BY FIRE OR OTHER CASUALTY</u>. Until the Closing, Seller shall keep the Improvements insured at its expense with standard all-risk coverage, including flood insurance if any of the Property is located in a flood plain, in an amount not less than the full replacement cost thereof.  In case of any loss prior to the Closing, Seller shall promptly notify Buyer of the same and, at Buyer's

- 5 -

option, (a) Seller shall assign to Buyer all its right, title and interest in and to the insurance policy or policies and/or insurance proceeds, and Buyer shall be obligated to purchase the Property AS IS and pay the Purchase Price but with a credit in the amount of any insurance deductible or (b) Buyer may terminate this Agreement and the Deposit (together with all interest earned thereon) shall be immediately returned to Buyer.

10.    ADJUSTMENTS.

10.1    The following items shall be adjusted as of the Closing Date and the net amount thereof shall be added to or deducted from the Purchase Price as the case may be:

(a)    Real estate taxes and betterment assessments in each case assessed against the Improvements and the Land and water and sewer use charges on the basis of the fiscal year or period for which assessed, with Buyer assuming and being responsible for the payment of all taxes for periods from and after the Closing;

(b)    Charges for electricity, gas and other utilities supplied to the Improvements.  Seller shall obtain utility meter readings and bills as of the day immediately preceding the Closing Date; and

(c)    The amount of the Deposit plus any interest earned thereon which is in escrow on the Closing Date.

10.2    If within six (6) months following the making of any of the foregoing adjustments the amount thereof shall prove to be incorrect, the party in whose favor the error was made shall pay the sum necessary to correct such error to the other party promptly following receipt of notice of such error from such other party.

- 6 -

10.3    Notwithstanding the provisions of Section 10.2, if the amount of real estate taxes for the current year is not known on the Closing Date, then the taxes shall be apportioned on the basis of the taxes (as abated, if applicable) assessed for the preceding year, with a reapportionment as soon as the new tax rate and valuation can be ascertained.

10.4    Buyer expressly acknowledges that it shall be responsible for the payment of Rent payable under the Ground Lease for periods from and after January 14, 2006.

11.    DEPOSIT; ESCROW AGENT.

11.1    Vista Abstract, Inc. d/b/a Vista Land Services (the "Escrow Agent") acknowledges receipt of the Deposit and agrees to hold the Deposit in escrow and to invest and apply the Deposit in accordance with Sections 11.2 and 11.3.

11.2    The Deposit shall be held in an account in Astoria Federal Savings Bank, 180 West Main Street, Babylon, New York, standing in the Escrow Agent's name and shall be duly accounted for as provided in this Agreement.   Interest earned on the Deposit shall remain the property of Buyer and shall be withdrawn from escrow and paid to Buyer from time to time upon Buyer's request.   Notwithstanding anything to the contrary in this Agreement, except (a) payment of the Deposit to Buyer, termination of this Agreement by Buyer pursuant to the provisions of Section 13.2 hereof or (b) payment of the Deposit to Seller as a credit against the Purchase Price upon delivery of the Conveyance Documents, the Deposit shall not be released to Seller or Buyer until the fifth business day following written notice to the other party from the Escrow Agent of such impending release.

- 7 -

11.3   The Escrow Agent shall be subject to the following terms and conditions and no others:

(a)   The Escrow Agent shall not be liable to anyone by reason of any error of judgment, or for any act done or step taken or omitted by the Escrow Agent in good faith, or for any mistake of fact or law, or for anything which the Escrow Agent may do or refrain from doing in connection herewith, unless caused by or arising out of the Escrow Agent's actual and intentional misconduct;

(b)   The Escrow Agent shall be entitled to rely, and shall be protected in acting in reliance, upon any writing furnished to the Escrow Agent by either Buyer or Seller and shall be entitled to treat as genuine, and as the document it purports to be, any letter, paper or other document furnished to the Agent in connection with its role as Escrow Agent.  The Escrow Agent may rely on any affidavit of either Buyer or Seller or any other person as to the existence of any facts stated therein to be known by the affiant;

(c)   In the event of any disagreement between Buyer and Seller resulting in adverse claims and demands being made in connection with or against the funds held in escrow, the Escrow Agent shall be entitled, at the Escrow Agent's option, to refuse to comply with the claims or demands of either party until such disagreement is finally resolved (i) by a court of competent jurisdiction (in proceedings which the Escrow Agent or any other party may initiate, it being understood and agreed by Buyer and Seller that the Escrow Agent has authority [but no obligation] to initiate such proceedings), (ii) by an arbitrator in the event that Buyer and Seller determine to submit the dispute to arbitration pursuant to the rules of the American Arbitration Association,

- 8 -

and in so doing, the Escrow Agent shall not be or become liable to any party or (iii) by written settlement between Buyer and Seller; .

(d)     Buyer and Seller each agree to indemnify and hold harmless the Escrow Agent against any and all losses, liabilities, costs (including legal fees) and other expenses (collectively, "Losses") in any way incurred by the Escrow Agent in connection with or as a result of any disagreement between Buyer and Seller under this Agreement or otherwise incurred by the Escrow Agent in any way on account of its role as escrow agent, except (i) to the extent Losses are caused by the gross negligence or willful misconduct of the Escrow Agent and (ii) that neither Buyer nor Seller shall have any obligation to pay the Escrow Agent any fee for escrow services hereunder;

(e)     Buyer and Seller hereby authorize the Escrow Agent to invest the Deposit in any federally-insured so-called "money market" type account at any state or federally chartered bank or savings and loan association, or in any other type of account or investment which Buyer and Seller may direct in writing; and

(f)     The Escrow Agent may resign at any time upon five (5) business days' written notice to Seller and Buyer. Concurrently with such resignation, the Escrow Agent shall cause the Deposit to be transferred to a successor escrow agent designated in writing by Seller and Buyer, and failing such designation, may transfer the Deposit to a bank account in the joint names of Seller and Buyer.

12.     DEFAULT; DAMAGES; ETC.

12.1   If Buyer shall default in the payment or performance of any of its obligations under this Agreement, the Deposit shall be paid over to Seller by the Escrow Agent as liquidated damages, and such payment shall constitute the sole and exclusive

- 9 -

remedy available to Seller at law or in equity, including but not limited to a suit for specific performance, arising from or in connection with such default.

12.2   If Seller shall default in the payment or performance of any of its obligations under this Agreement or if any representation by Seller shall be false or incorrect in any material respect as of the date made the Deposit (together with interest earned thereon) shall be promptly returned to Buyer, and Buyer may pursue any and all remedies available to it at law or in equity, including but not limited to a suit for specific performance, arising from or in connection with such default or misrepresentation.

13.   BUYER'S RIGHT OF INSPECTION.

13.1   Buyer and its agents and representatives shall have a right of access to the Property at all reasonable times to make such inspections of the Property as Buyer may deem necessary. Without limiting the generality of the foregoing, Buyer and its agents shall have the right to inspect the condition of the Property, to take measurements and prepare plans, and to inspect the books, records, financial statements and tax returns of Seller in order to verify the truth and accuracy of the representations set forth in Section 14 hereof and in order to satisfy the conditions set forth in Section 20. Buyer shall indemnify and hold Seller harmless from and against any loss, claim or liability to Seller on account of physical damage to property or physical injury to persons which arises from the entry of Buyer or Buyer's agents onto the Property. Buyer's right to enter upon the Property and to inspect the Property is conditioned upon the following: that such entry shall be at Buyer's sole risk, cost and expense and shall be performed only by licensed and bonded engineers retained by Buyer, and that prior to any such entry (i) Buyer shall afford Seller not less than one (1) business day advance notice of such

- 10 -

inspection, unless Seller agrees to an earlier entry, and permit Seller to have a representative present at such inspection; (ii) Buyer shall furnish Seller with proof satisfactory to Seller that all of the inspections to be conducted upon the Property by Buyer's representatives shall be protected by liability insurance coverage pursuant to a liability insurance policy satisfactory to Seller naming Seller and any tenants at the Property as additional insureds thereunder and having a single limit of not less than $3,000,000.00 which policy shall be in form and issued by an insurance company reasonably satisfactory to Seller; (iii) Buyer shall furnish Seller with a copy of any report prepared by the Buyer's engineer or other inspectors related to any such inspections and (vi) after the inspections Buyer shall restore the Property to its original condition.

13.2   Buyer shall have the right to terminate this Agreement, in Buyer's sole and absolute discretion, by giving notice to Seller on or before December 26, 2007 if the results of any inspection, title review or other investigation concerning the Property are not acceptable to Buyer.  In the event that Buyer gives such termination notice, the Deposit (together with all interest thereon) shall be immediately returned to Buyer, and this Agreement shall then become null and void without further recourse to any of the parties hereto.

14.   REPRESENTATIONS OF SELLER.  Seller agrees and represents and warrants to Buyer that:

14.1   Since January 14, 2006 Seller has not received actual notice of any violation of laws, ordinances, codes, regulations or other requirements of any governmental agency relating to the use or construction of the Property;

- 11 -

14.2   This Agreement and its execution, delivery and performance by Seller have been duly authorized by all necessary action on behalf of Seller; this Agreement is a valid and binding obligation of Seller, enforceable in accordance with its terms; and the sale of the Property, and the consummation of the transactions contemplated hereby, will not result in any violation or breach of any indenture or agreement to which Seller is a party or by which Seller or the Property is affected or bound;

14.3   Since January 14, 2006 Seller has not received actual notice of any condemnation proceeding or declaration of taking or other similar instrument filed against the Property;

14.4   Since January 14, 2006 Seller has not received actual notice of any requirement of any insurance carrier requiring any modifications or work to be performed on the Land or Improvements as a condition to the maintenance or renewal of any policies of insurance in respect of the Property;

14.5   There are no contracts or agreements, written or oral, affecting the ownership or operation of the Property which are not cancelable by Seller or its assignee on 30 days or less prior notice without penalty except the Ground Lease;

14.6   Except for alleged defaults by the Ground Lessor regarding the amount of Rent payable under Section 4 of the Ground Lease, Seller has not received actual notice of alleged defaults under the Ground Lease and the Ground Lease is in full force and effect, enforceable by Seller in accordance with its terms;

14.7   Since January 14, 2006 Seller has not entered into any agreements granting any person, firm or entity, any rights to acquire, rent, lease or occupy the Land or Improvements or any part thereof;

- 12 -

14.8   In 1995 a 15,000 gallon underground storage tank was emptied, cleaned and removed from the Property and a 5,000 gallon underground storage tank was emptied, cleaned and abandoned in place at the Property.  In 1996 a second 5,000 gallon underground storage tank was emptied, cleaned and abandoned in place at the Property.   A No Further Action Letter issued by the New Jersey Department of Environmental Protection, dated August 28, 1997, regarding these procedures is attached to this Agreement as Exhibit C.  Seller has no knowledge of any other activities conducted at the Property since January 14, 2006 involving the spilling, placing, holding, locating, disposing of, cleaning-up or handling of Hazardous Material, other than cleaning products which may have stored or used at the Property in *de minimus* quantities.  For purposes of this Section 14, the term "Hazardous Material" shall mean (y) oil, petroleum, hazardous waste, as that term is defined in the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, 42 U.S.C. 9601, or in any applicable state law or regulation or (z) friable asbestos or any other substance which presents a threat or danger to the environment;

14.9   Since January 14, 2006 Seller has not received actual notice of a claim for work which has been done on the Land or Improvements which could give rise to a construction lien or similar lien.  If any such work is performed prior to the Closing Date, Seller shall discharge, prior to the Closing Date, all obligations arising therefrom, and shall remain liable after the Closing Date for the discharge of all such obligations;

14.10 Except for the Litigation, since January 14, 2006 Seller has not received actual notice of threatened or pending litigation relating to the Property;

- 13 -

14.11 To the actual knowledge of Seller, the Warranties are the only such guaranties, warranties and agreements of which Seller has the benefit or under which Seller has rights against third-parties; and

14.12 All representations and warranties made by Seller above or elsewhere in this Agreement shall be deemed to be made on the date of this Agreement and on the Closing Date, and it shall be a condition of Buyer's obligation to close that all warranties and representations made hereunder are true as of the relevant dates to which they apply.

15.   REPRESENTATIONS OF BUYER.   Buyer represents and warrants to Seller that:

15.1   The execution, delivery and performance of this Agreement have been duly authorized by all necessary action on behalf of Buyer;

15.2   This Agreement is a valid and binding obligation of Buyer, enforceable in accordance with its terms;

15.3   The performance by Buyer of this Agreement will not result in any violation or breach of any indenture or agreement to which Buyer is a party or by which Buyer is bound; and

15.4   All representations and warranties made by Buyer above or elsewhere in this Agreement shall be deemed to be made on the date of this Agreement and on the Closing Date, and it shall be a condition of Seller's obligation to close that all representations made hereunder are true as of the relevant dates to which they apply.

16.   SURVIVAL OF WARRANTIES.   All warranties and representations made in Sections 14 and 15 shall be deemed to be made on the date of this Agreement and

- 14 -

again at the time of delivery of the Conveyance Documents and shall survive the delivery of the Conveyance Documents. Each of Seller and Buyer (an "indemnifying party") agrees to indemnify and hold harmless the other (an "indemnified party") from and against any and all suits, claims, actions, loss, cost or expense (including reasonable attorneys' fees) made, brought or threatened against or suffered or incurred by any indemnified party in the event that any representation or warranty is breached in any material respect or in the event that any material covenant or obligation of an indemnifying party has not been performed or observed. An indemnifying party shall have the right to participate in any such suit through counsel of its own choice, and no settlement of such suit or claim shall be made without approval of the indemnifying party, which approval shall not be unreasonably withheld or delayed.

17.     ACTIONS PRIOR TO CLOSING. From the date of this Agreement to the Closing Date, Seller shall:

17.1    Deliver true and correct copies of the Ground Lease concurrently herewith and promptly provide Buyer with concurrent copies of all correspondence, notices and communications to or from the Ground Lessor and Seller or any representative or agent of Seller or Ground Lessor;

17.2    Perform its obligations under the Ground Lease, except as asserted in the Litigation;

17.3    Promptly advise Buyer of, and comply with, all tax bills and assessments, notices received by Seller of violation by Seller of laws or municipal ordinances, regulations, orders or requirements of departments of housing, building, fire, labor, health or other state, city or municipal department or other governmental authority

- 15 -

having jurisdiction against or affecting the Land or Improvements or the use or operation thereof and promptly furnish all copies thereof to Buyer;

17.4   Promptly advise Buyer of any failure by the Ground Lessor to observe, perform and comply with the Ground Lease in any material respect, other than failures of the Ground Lessor asserted in the Litigation;

17.5   Discharge, at or prior to the Closing Date, any mortgages, liens, claims, charges, encumbrances, mechanics' liens or transfer, inheritance, estate, franchise, license or other similar taxes which are not included in the Permitted Encumbrances;

17.6   Cooperate with Buyer in commercially reasonable good faith in satisfying all conditions to Buyer's obligation to close;

17.7   Continue to operate and manage the Property in a normal, prudent and customary fashion and commit no waste with respect thereto;

17.8   Require all employees and agents of Seller to cooperate, in a commercially reasonable manner with Buyer in its review and inspection of the Property;

17.9   Keep Buyer advised of the status of negotiations for new leases and promptly advise Buyer (a) of the occurrence of any fire or other casualty on the Property and (b) of any notices of condemnation received by Seller;

17.10  Advise Buyer of any matters which may have, or may reasonably be expected to have, a material adverse affect on the Property or any part thereof;

17.11  Not enter into any leases, service or supply contracts or other agreements with respect to the Property without Buyer's written consent, which consent shall not be unreasonably withheld or delayed;

- 16 -

17.12 Not cancel, amend, modify or extend or otherwise vary the Ground Lease or waive any default, breach or failure of performance by the Ground Lessor thereunder;

17.13 Not make or permit any material or structural alteration to the Property except in the case of emergency, in which event prompt written notice thereof shall be given to Buyer; and

17.14 Seller shall not settle the Litigation without Buyer's consent.

18.   DOCUMENTS TO BE DELIVERED BY SELLER.   At or prior to the Closing, Seller shall deliver the following documents to Buyer:

18.1   The Conveyance Documents (with payment by Seller of required state and/or local documentary stamps, if any to be affixed thereto) in each case in form reasonably acceptable to Buyer's counsel;

18.2   A certified copy of a vote or resolution of the Board of Directors (and shareholders if necessary) of Seller authorizing the transactions contemplated by this Agreement;

18.3   A certificate from the Secretaries of States of Delaware and New Jersey dated not more than thirty (30) days prior to the Closing confirming that Seller is in good standing with such officials;

18.4   A bill of sale transferring Seller's entire interest in the Personal Property with warranties against liens, claims or encumbrances created by Seller and in form and substance acceptable to Seller and Buyer;

18.5   Executed originals of the Ground Lease, if available, or otherwise, a certified copy of the Ground Lease;

- 17 -

18.6   An affidavit substantially in the form customarily required by title insurance companies operating in the State of New Jersey concerning parties in possession and mechanic's liens for the purpose of permitting such title insurance company to issue an owner's title policy without the standard exceptions for parties in possession and mechanic's liens;

18.7   All plans, surveys, engineering reports, zoning reports, market studies. Permits and similar documents in Seller's possession relating to the Property and not previously delivered to Buyer; provided that the items listed in this Section may be delivered reasonably promptly following the closing;

18.8   An assignment in form and substance reasonably acceptable to Buyer of all Warranties and Permits in form and substance reasonably acceptable to Buyer and Seller;

18.9   Such affidavits and other documents as Buyer may request in order to confirm that Seller is not a "foreign person" for purposes of Section 1445 of the Internal Revenue Code of 1986, as amended;

18.10 A settlement statement (the "Settlement Statement") in form and substance acceptable to Buyer and Seller; and

18.11 Such other documents as may be required under the provisions of this Agreement to be delivered by Seller on the Closing Date.

19.   DOCUMENTS TO BE DELIVERED BY BUYER AT CLOSING.   At the Closing, Buyer shall deliver the following documents to Seller, as applicable:

19.1   The balance of the Purchase Price; and

- 18 -

19.2   A certified copy of a vote or resolution of the members of Buyer authorizing the transactions contemplated by the Agreement;

19.3   The Settlement Statement; and

19.4   All other instruments and documents to which Seller may be entitled under any provision of this Agreement.

20.     CONDITIONS TO CLOSING.  The obligation of Buyer to consummate the transactions contemplated herein is subject to the satisfaction or waiver in writing by Buyer of each of the following conditions at or prior to the Closing:

20.1   No lien, statute, ordinance, administration, regulation, encumbrance, right of any easement, exception, reservation or restriction enacted or arising after December 26, 2007 shall, in the reasonable judgment of Buyer or the Title Company, render title to the Property not clear and marketable or constitute material interference with the contemplated use of the Property by Buyer;

20.2   Seller shall have performed all covenants, promises, agreements and conditions to be performed by it; all the representations, warranties, covenants and agreements of Seller herein contained shall be true and correct at or as of the Closing with the same force and effect as if then made, and Seller shall have delivered to Buyer a certificate to such effect;

20.3   There shall have been no material adverse change in the condition of the Property from such condition as of the date hereof, or in any of the fixtures or mechanical equipment included in the Property;

20.4   Buyer shall have received, at Buyer's expense, an updated ALTA survey of the Land and all improvements included therein (the "Survey") showing the location

- 19 -

thereof and of all easements and similar matters, which Survey shall disclose no encroachments or violations of applicable set-back requirements and which shall otherwise be satisfactory to Buyer; provided, however, that in the event the Survey is not received on or prior to the Closing Date, Buyer agrees to waive this condition, and Seller agrees to cooperate with Buyer, but without cost to Seller, in removing any encroachment and correcting any violations; and

20.5   No eminent domain, condemnation, public or quasi-public taking or similar proceeding of or against the Property or any part thereof (a "Public Taking") shall have been commenced or threatened; provided, however, that if this condition is not satisfied and is waived by Buyer, all proceeds, awards and other payments paid to Seller in connection with a Public Taking and all rights of Seller to receive the same shall be transferred and assigned by Seller to Buyer at the Closing.

21.   BROKER.   Each of Buyer and Seller represents and warrants that it has dealt exclusively with C.B. Richard Ellis and Sab Russo, currently employed by Mercer Oak Realty, LLC (the "Broker") and with no other broker with respect to the transactions contemplated by this contract.   Seller hereby agrees to pay any brokerage commission payable to the Broker with respect to this Agreement or the sale of the Property.   Each of Buyer and Seller agrees to indemnify and hold harmless the other party, and its respective successors and assigns, against and from all claims, losses, liabilities and expenses including attorney's fees, arising out of any claim by other brokers, consultants, finders or like agents which are based upon alleged dealings with it.   The provisions of this Section shall survive the Closing.

22.   NOTICES.  All notices permitted or required to be given hereunder (other than notices indicating the time for access to the Property) shall be in writing and sent by registered mail, postage prepaid, return receipt requested, by prepaid nationally-recognized overnight courier service or hand delivered, addressed as follows:

If to Seller:

Textron Financial - New Jersey Inc.
c/o Textron Financial Corporation
40 Westminster Street
Providence, RI 02903
Attention:  Jane M. Lavoie, Vice President - Operations

If to Buyer:

GF Princeton LLC
c/o Greyfields Investors LLC
551 Fifth Avenue, 31st Floor
New York, NY 10176
Attention:  Robert P. Freeman

With copies by ordinary
First-class mail to:

Wolf, Block, Schorr and Solis-Cohen LLP
1650 Arch Street
Philadelphia, PA  19103
Attention:  Joseph C. Bright, Esq.

Cameron & Mittleman LLP
56 Exchange Terrace
Providence, RI 02903
Attention:  Joseph F. Whinery, Jr.

or to such other address or addresses as the parties may designate from time to time by notice given in accordance with this Section.  Any such notice shall be deemed given on the date of such mailing or hand delivery, as the case may be.

- 21 -

23.   LITIGATION COOPERATION.  From and after the Closing Date Buyer will assume all responsibility for pursuing the litigation commenced by Seller against the Ground Lessor (Docket No. 3:  06-cv-0285-MLC-TJB) and against Ewing Township Planning Board (Docket No. MER-L-1244-07) currently pending in the U.S. District Court for the District of New Jersey and the Superior Court of New Jersey, respectively, and all counterclaims, appeals and other litigation relating thereto (the "Litigation"). From and after the Closing Date Buyer assumes all obligations, risks and liabilities associated with the Litigation or any appraisal process undertaken pursuant to the Ground Lease, including but not limited to attorney's fees, costs of litigation, all expenses relating to claims asserted by the Ground Lessor in the Litigation and all judgments or awards granted to the Ground Lessor in the Litigation or in connection with the outcome of any appraisal process undertaken pursuant to the Ground Lease, except to the extent Seller elects to retain its own counsel to advise Seller in connection with the Litigation or any appraisal process undertaken pursuant to the Ground Lease, in which event Seller shall be solely responsible for any attorneys' fees or costs of such counsel.  For the avoidance of doubt, Buyer assumes all obligations, risks and liabilities arising from any judgments or awards granted in the Litigation or arising out of any appraisal process undertaken pursuant to the Ground Lease relating to periods prior to or after the Closing Date, except to the extent Seller elects to retain its own counsel to advise Seller in connection with the Litigation or any appraisal process undertaken pursuant to the Ground Lease, in which event Seller shall be solely responsible for any attorneys' fees or costs of such counsel.  From and after the Closing Date, Seller, at Buyer's sole cost and expense, shall, and shall cause its attorneys to, cooperate

- 22 -

promptly and in a commercially reasonable manner with Buyer in connection with the Litigation.   From and after the Closing Date Seller will not assert its attorney client privilege to prevent Seller's attorney from cooperating with Buyer in formulating strategy for the Litigation.   Promptly following the Closing, Buyer (or its nominee or assignee) shall be substituted as a party to the Litigation, and Seller shall, and shall cause its attorneys to, provide Buyer and its attorneys with copies of all documents relating to the Litigation at Buyer's expense.   From and after the Closing Date Buyer agrees to defend, indemnify and hold harmless Seller from and against any and all suits, claims, actions, loss, cost or expense (including reasonable attorneys' fees) arising in, out of or in any way relating to the Litigation prior to or after the Closing Date or any appraisal process undertaken pursuant to the Ground Lease, except to the extent Seller elects to retain its own counsel to advise Seller in connection with the Litigation or any appraisal process undertaken pursuant to the Ground Lease, in which event Seller shall be solely responsible for any attorneys' fees or costs of such counsel.   Seller agrees not to take any affirmative action with respect to the Litigation without consulting Buyer.

24.   MISCELLANEOUS.

24.1   This Agreement may be executed in counterparts, each of which shall be deemed an original.   The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

24.2   This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New Jersey.

24.3   This Agreement (including all exhibits attached hereto) contains the entire agreement between the parties with respect to the subject matter hereof and

- 23 -

supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, and no obligation hereunder may be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto except any nominee of Buyer acquiring title to the Property at the Closing. The provisions of this Section shall survive the Closing.

24.4 No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligation or act shall be deemed an extension of the time for performance of any other obligation or act. Time is of the essence in the performance of this Agreement.

24.5 This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

24.6 All pronouns or any variation thereof shall be deemed to refer to the masculine, feminine or neuter nouns, and to have singular or plural nouns, as the identity or nature of the person or persons referred to may require.

24.7 <u>Further Assurances</u>. Whenever reasonably requested to do so by the other party, Seller and Buyer shall execute, acknowledge, and deliver any and all such further conveyances, assignments, confirmations, satisfactions, releases, instruments of further assurance, approvals, consents and any and all such further instruments and documents as may be reasonably necessary in order to complete any and all conveyances, transfers sales and assignments herein provided, and to do any and all

other acts and to execute, acknowledge and deliver any and all documents as so requested in order to carry out the intent and purpose of this Agreement. The foregoing is not intended to reinstate any rights which are waived or terminated by either party prior to the Closing Date.

24.8   Non-Solicitation.  As long as this Agreement remains in effect, Seller shall not, directly or indirectly, solicit, entertain or consider proposals from, provide information to, or approve a transaction with, any other person with respect to the purchase of the Property or any part thereof and shall refrain from seeking, soliciting or responding to any such offers.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

(Corporate Seal)

Attest:

_Jene M. Cwore_

WITNESS:

SELLER:

TEXTRON FINANCIAL – NEW JERSEY INC.

By:_____
  Its: President

BUYER:

GF PRINCETON LLC

By:_____
Its:

_____

By:_____
Its:

The undersigned hereby acknowledges receipt of the Deposit as described in Section 11 of the foregoing Agreement (the "Agreement") and agrees to hold the same, together with all other amounts paid to the Escrow Agent, in escrow, in accordance with Section 11 of the Agreement.

VISTA ABSTRACT, INC.
d/b/a Vista Land Services

By:_____

December _____, 2007

G:\Leq\Greyfields\Ewing\Purchase and Sale Agt(12-20-07)v2.DOC

- 26 -

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

(Corporate Seal)

Attest:

SELLER:

TEXTRON FINANCIAL - NEW JERSEY INC.

By: _____
                    Its: _____

WITNESS:

BUYER:

GF PRINCETON LLC

By: _____
Its: _Director OF Finance And Accounting_

The undersigned hereby acknowledges receipt of the Deposit as described in Section 11 of the foregoing Agreement (the "Agreement") and agrees to hold the same, together with all other amounts paid to the Escrow Agent, in escrow, in accordance with Section 11 of the Agreement.

VISTA ABSTRACT, INC.
d/b/a Vista Land Services

By: _____

December _____, 2007

G:\...\Greyfield\Ewing\Purchase and Sale Agt\12-20-07 V2.DOC

- 26 -

EXHIBIT A

LEGAL DESCRIPTION

ALL that certain plot piece or parcel of land, situate, lying and being in the Township of Ewing, County of Mercer and State of New Jersey across Tax Lot 3, Block 371, (all tax lot information was taken from the Ewing Township Tax Atlas data), and being more particularly bounded and described as follows:

BEGINNING at a point, said point being a southeasterly corner of Tax Lot 13, Block 371, lands now or formally of Sierra Office Park, said point being distant North 85 degrees 23 minutes 54 seconds East, 1,300.00 feet as measured along a southerly line of said Lot 13, from the easterly line of Scotch Road, and form said point of Beginning running, thence:

(1)   North 40 degrees 08 minutes 06 seconds East, 251.21 feet across Tax Lot 3 to an angle point; thence

(2)   North 89 degrees 58 minutes 44 seconds East, 607.36 feet across same to an angle point; thence

(3)   South 45 degrees 01 minutes 16 seconds East, 490.70 feet across same to an angle point; thence

(4)   South 00 degrees 36 minutes 40 seconds West, 333.18 feet across same to a point in a southerly line of Tax Lot 3, said point also being in a northerly line of Tax Lot 2, Block 371, land now or formerly of County of Mercer; thence

(5)   North 89 degrees 23 minutes 20 seconds West, 1,194.35 feet along the northerly line of Lot 2 to a point; thence

(6)   North 00 degrees 36 minutes 40 seconds East, 383.27 feet across Tax Lot 3 to an angle point; thence

(7)   North 40 degrees 08 minutes 06 seconds East, 120.00 feet across same to a point, being the first mentioned point or place of BEGINNING.

Being also know as (reported for informational purposes only):

370 SCOTCH ROAD, EWING, NJ. and designated on the Official Tax Map of the Township of Ewing as BLOCK 371 PART OF LOT 3.02.

This description is attached at the request of the Assignee and the Assignor makes no representations concerning the accuracy of this description.

| | |
|---|---|
| *Issued By:* *Chicago Title Insurance Company* | Schedule A — Description of Premises |

## COMMITMENT FOR TITLE INSURANCE

Your Reference: GREYFIELDS INVESTORS TO TEXTRON FINANCIAL     Commitment No.: 707-1070346

*(Description Amended 12/20/2007)*

ALL that certain plot piece or parcel of land, situate, lying and being in the Township of Ewing, County of Mercer and State of New Jersey across Tax Lot 3.02, Block 371, (all tax lot information was taken from the Ewing Township Tax Atlas data), and being more particularly bounded and described as follows:

BEGINNING at a point, said point being a southeasterly corner of Tax Lot 13, Block 371, lands now or formally of Sierra Office Park, said point being distant North 85 degrees 23 minutes 54 seconds East, 1,300.00 feet as measured along a southerly line of said Lot 13, from the easterly line of Scotch Road, and form said point of Beginning running, thence:

(1)   North 40 degrees 08 minutes 06 seconds East, 251.21 feet across Tax Lot 3.02 to an angle point; thence

(2)   North 89 degrees 58 minutes 44 seconds East, 607.36 feet across same to an angle point; thence

(3)   South 45 degrees 01 minutes 16 seconds East, 490.70 feet across same to an angle point; thence

(4)   South 00 degrees 36 minutes 40 seconds West, 333.18 feet across same to a point in a southerly line of Tax Lot 3.02, said point also being in a northerly line of Tax Lot 2, Block 371, land now or formerly of County of Mercer; thence

(5)   North 89 degrees 23 minutes 20 seconds West, 1,194.35 feet along the northerly line of Lot 2 to a point; thence

(6)   North 00 degrees 36 minutes 40 seconds East, 383.27 feet across Tax Lot 3.02 to an angle point; thence

- continued on next page -

*Issued By:*
*Chicago Title Insurance Company*

Schedule A – Description of Premises

## COMMITMENT FOR TITLE INSURANCE

Your Reference: GREYFIELDS INVESTORS TO TEXTRON FINANCIAL         Commitment No.: 707-1070346

(7)   North 40 degrees 08 minutes 06 seconds East, 120.00 feet across same to a point, being the first mentioned point or place of BEGINNING.

The above is intended to describe all that parcel of land shown as "Proposed Lease Area" Across Tax Lot 3.02 (f/k/a Tax Lot 3) (Ewing Township Tax Atlas Data), on a plan entitled "Plan of Survey of Tax Lot 3, Block 371 in Ewing Township and Tax Lot 21, Block 91 in Hopewell Township, Situate in Mercer County, New Jersey", prepared by Thomas Tyler Moore Associates, dated December 19, 1985 and revised to February 28, 1986, and marked as File No. 42-266.

Said premises being further described in accordance with survey prepared by Harry J. Sypniewski, N.J. Professional Land Surveyor, dated December 17, 2007as follows:

BEGINNING at a point on the northerly lands now or formerly of the County of Mercer, Lot 2, Block 371, said point bearing along said line South 87 degrees 43 minutes 49 seconds East, 661.07 feet from the southwesterly corner of Lot 3.02, Block 371 and from said point of Beginning running thence over and through Lot 3.02, Block 371 the following five courses:

(1)   North 02 degrees 16 minutes 11 seconds East, 383.27 feet to a point; thence

(2)   North 41 degrees 47 minutes 37 seconds East, 371.21 feet to a point; thence

(3)   South 88 degrees 21 minutes 45 seconds East, 607.36 feet (607.32 feet survey) to a point; thence

(4)   South 43 degrees 21 minutes 45 seconds East, 490.70 feet to a point; thence

(5)   South 02 degrees 16 minutes 11 seconds West, 333.18 feet to a point in the aforesaid northerly line of lands now or formerly of Mercer Lot 2, Block 371; and thence

- continued on next page -

Issued By:
**Chicago Title Insurance Company**

Schedule A – Description of Premises

# COMMITMENT FOR TITLE INSURANCE

Your Reference: GREYFIELDS INVESTORS TO TEXTRON FINANCIAL      Commitment No.: 707-1070346

(6)      Along the last mentioned lands North 87 degrees 43 minutes 49 seconds West, 1,194.35 feet to the point or place of BEGINNING.

Being also know as (reported for informational purposes only):

370 SCOTCH ROAD, EWING, NJ. and designated on the Official Tax Map of the Township of Ewing as BLOCK 371 PART OF LOT 3.02.

## DESCRIPTION

EXHIBIT B

370 Scotch Road
Inventory of Plans, Maintenance Records, Etc.
12/7/2007

| | Date given to buyer | Date Returned | Copies Given To/Date |
|---|---|---|---|
| **Prints/Plans/Surveys** | | | |
| 1 Operations Center Full Set | | | |
| Electrical | | | |
| 5 plans    Set A | | | |
| 10 plans   Set B | | | |
| 35 plans   Misc | | | |
| Plumbing | | | |
| 10 plans | | | |
| Foundation Plan | | | |
| 1 Plan    Part A | | | |
| 1 Plan    Part B | | | |
| 1 Plan    Foundation Section Detail | | | |
| 2 Plans   Furniture layout | | | |
| HVAC Schedules | | | |
| 11 Plans | | | |
| 5 Plans   Various schedules | | | |
| 8 Plans   Various | | | |
| Framing Plans | | | |
| 4 Plans   Upper and lower levels | | | |
| 1 Plan    Column and Schedules | | | |
| Sprinklers | | | |
| 2 Plans   Upper and lower levels | | | |
| | | | |
| 2 Corporate Center | | | |
| Full set (wrapped in brown paper) | | | |
| Furniture | | | |
| 5 plans   Basement, upper, lower | | | |
| | | | |
| 3 Site Plans | | | |
| Site Plans (3 small copies) | | | |
| | | | |
| Other Prints: | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Maintenance Records** | | | |
| | | | |
| HVAC Contract/ Repair Tickets | | | |
| Boiler Cleaning/ Testing | | | |
| Elevator Inspections and Maintenance | | | |
| Sprinkler/ Riser Inspection Records | | | |
| Fire Pump Inspections | | | |
| Wet/Dry System | | | |
| Extinguisher/ Hoses | | | |
| Fire Alarm Inspections/ Repair Tickets | | | |
| Generator Maintenance/ Tests | | | |
| **Other** | | | |
| UST Closure File | | | |
| UST Follow Up Letters (3) | | | |
| | | | |
| 2007 Carlisle Roof Warranty | | | |
| | | | |
| **Service Contracts** | | | |
| Landscaping - DeVries, Inc. | | | |
| Elevator Maintenance - Thyssen Krupp | | | |
| HVAC Maintenance - AA Duckett | | | |
| HVAC Water Treatment - Manatee Environmental | | | |
| Trash Removal - Waste Management | | | |
| Generator Maintenance - GenServe | | | |
| Alarm Monitoring - ADT | | | |
| Fire Alarm Maintenance - Siemens | | | |
| CBRE Management Contract | | | |

EXHIBIT C



## State of New Jersey
### Department of Environmental Protection

Christine Todd Whitman
*Governor*

Robert C. Shinn, Jr.
*Commissioner*

Bureau of Field Operations
Underground Storage Tanks Unit
PO Box 435
401 East State Street
Trenton, NJ 08625-0435

AUG 28 1997

Richard Cuccagna,
Corestates Bank N.A.
370 Scotch Road
West Trenton, NJ 08628

Re:   Corestates Bank N.A.
      370 Scotch Road, West Trenton, Mercer County
      Closure #s C93-6534, C93-6535
      UST # 0093431

Dear Mr. Cuccagna:

Pursuant to the authority vested in the Commissioner of the New Jersey Department of Environmental Protection (Department) and duly delegated to the Section Chief of the Bureau of Field Operations pursuant to the Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-21 et seq. and implementing regulations, N.J.A.C. 7:14B et seq., the referenced No Further Action (NFA) proposal for the below referenced area of concern (AOC) is hereby approved. This closure consisted of the removal of one 15,000 gallon #2 fuel oil underground storage tank (UST) and all associated piping and the abandonment-in-place of one 5,000 gallon diesel UST, one 5,000 gallon gasoline UST, and all associated piping. The results of the soil analysis indicated contaminant levels were below the cleanup criteria developed for this site. The results of the groundwater investigation indicated contaminant levels were below the Ground Water Quality Standards (N.J.A.C. 7:9-6).

This approval is based on the information provided to the Department concerning the satisfactory completion of the Site Investigation Report received on March 12, 1997 in accordance with the Technical Requirements for Site Remediation (N.J.A.C. 7:26E).

This approval shall be limited only to the above referenced AOC, the condition of such areas as of the date of this letter, and shall not be construed to address any other areas of the site. This NFA Approval Letter shall not restrict or prohibit the Department or any other agency from taking regulatory action under any other statute, rule or regulation. By issuing this NFA Approval Letter, the Department reserves its right to pursue any penalties allowable under the law for violations pursuant to the Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-21 et seq. and implementing regulations, N.J.A.C. 7:14B et seq., or any other statute, rule or regulation.

In addition, Corestates Bank N.A. is required to properly seal all abandoned wells. Therefore, all monitoring wells installed as part of the Remedial Investigation and/or remedial action at Corestates Bank's facility that will no longer

be used for ground water monitoring shall be sealed properly in accordance with the requirements of N.J.A.C. 7:9-9.1 et seq. by a licensed well driller certified to seal wells. The well abandonment forms shall be completed and submitted to the Bureau of Water Allocation. Please call (609) 984-6831 for forms and information.

Sincerely,

Vincent S. Krisak, Section Chief
Bureau of Field Operations

c:   Robert P. Posey, Case Manager
     Teal S. Jefferis, The Krydon Group, Inc.
     Robert Oberthaler, Bureau of Water Allocation