**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| TEXTRON FINANCIAL-NEW JERSEY INC., et al., | : | CIVIL ACTION NO. 06-2585 (MLC) |
| Plaintiffs | : | **MEMORANDUM OPINION** |
| v. | : | |
| HERRING LAND GROUP, LLC, | : | |
| Defendant. | : | |

**COOPER, District Judge**

This is a dispute regarding several lease agreements ("Leases") concerning real property (the "Subject Property"), including the underlying land ("Land") and the improvements built on top ("Improvements").  Plaintiffs, GF Princeton ("GFP") and Textron Financial-New Jersey Inc. ("Textron") (collectively, "Plaintiffs") seek declaratory relief and damages for breach of contract against Defendant, Herring Land Group, LLC ("Herring").  (Dkt. entry no. 17, Am. Compl.)  Herring filed a counterclaim seeking similar declaratory relief and specific performance.  (Dkt. entry no. 8, Ans. & Countercl.)  The Court bifurcated this matter (dkt. entry no. 156, 6-18-10 Order), which is now before the Court for a judgment declaring the required methodology for determining the fair market rental value of the Land.  The Court held a bench trial over several days, hearing testimony from three expert appraisers (the "Appraisers").  The parties also submitted pre- and post-trial briefs.  (See dkt. entry nos. 152-

154, 226, 228.)  In addition, Herring and GFP moved to strike the testimony of certain Appraisers.  (Dkt. entry no. 190, Mot. To Disqual. Korpacz; dkt. entry no. 218, GFP Opp'n & Cross-Mot. To Strike Hedden Rept.)  The Court has carefully considered the submissions and arguments of the parties on this matter.  This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law with respect to the declaratory judgment issues currently before us pursuant to Federal Rule of Civil Procedure ("Rule") 52(a), as well as the Court's ruling on the motions to disqualify, exclude, or strike certain Appraisers.

For the reasons given herein, the Court will deny the motions to disqualify and strike certain Appraisers.  In addition, the Court will enter declaratory judgment, in part, in favor of Plaintiffs, because the Court finds that the proper methodology for determining the fair market rental value of the Land as of January 14, 2006 requires the appraisers to value the Subject Property with the existing Improvements.  However, as further discussed herein, this is not necessarily the required methodology for future determination dates.

I.    **Factual Background and Procedural History**

A.    **Factual Background**

Over twenty-five years ago, New Jersey National Bank ("NJNB") maintained its corporate headquarters and operations center at the Subject Property, where it owned both the Land and

the Improvements, known as Tax Lot 3, Block S-371 on the Tax Map
of Ewing Township, Mercer County, New Jersey, and Tax Lot 21,
Block S-91 on the Tax Map of Hopewell Township, Mercer Country,
New Jersey.  (Dkt. entry no. 135, Pretrial Order, Stipulation of
Facts ("Stip. Facts") at ¶¶ B, I.)  On December 27, 1985, NJNB
entered into a tax-driven "sale-leaseback" transaction with
Textron, whereby it sold Textron the Improvements.  (See, e.g.,
Stip. Facts at ¶¶ D, G; dkt. entry no. 152, Textron Tr. Br. at
1.)  NJNB and Textron then entered into a lease (the
"Improvements Lease") for the Improvements, whereby NJNB rented
and continued to use them.  (Stip. Facts. at ¶ I.).  Included
among the Improvements were two buildings, defined in the Leases
as the "Old Office Building," constructed prior to 1981, and the
"New Office Building," built sometime after 1981 (collectively,
"Buildings").  (Id. at ¶ E; Textron Tr. Br. at 1.)  The Buildings
consist of approximately 179,000 square feet of office space.
(Stip. Facts. at ¶ F.)

    NJNB maintained ownership of the Land, however, and thus
further entered into a Ground Lease (the "Ground Lease") with
Textron, effective December 27, 1985, pursuant to which Textron
leased certain parcels of the Land.  (Stip. Facts at ¶ A.)

    The Ground Lease states the Ground Lessee:

    [M]ay, at its expense, make additions to and alterations of
    the Improvements located or constructed on each Site, and
    construct additional improvements and make substitutions and
    replacements for any of the Improvements, provided that if

any such addition or alteration is made after the
[Improvements] Lease terminates (i) the fair market value of
the Site shall not be materially lessened thereby, and (ii)
the general character and utility of the Site are not
materially altered thereby unless Ground Lessor's prior
consent shall have been obtained, which consent shall not be
unreasonably withheld or delayed. . . . (b) Ground Lessee
shall notify Ground Lessor of any construction with respect
to any Site or Improvements located thereon that Ground
Lessee commences after the [Improvements] Lease terminates
as to the Premises encompassing such Site and that has an
estimated cost [. . . .] Such notice shall include a brief
narrative description of the work that will be done and a
copy of the plans and specifications therefor.  The plans
and specifications for any such construction shall be
subject to the reasonable approval of Ground Lessor. . . .

(Stip. Facts at ¶ Z (citing Ground Lease at Section 9).)  The

Ground Lessee may also "sublet any Site or assign this Ground

Lease in connection with the transfer of the Improvements or any

interest therein pursuant to the [Improvements] Lease or after

the date on which the [Improvements] Lease terminates."  (Stip.

Facts at ¶ DD (citing Ground Lease at Section 13).)

The original size of the Land subject to the Ground Lease

was approximately 55 acres, but NJNB and Textron amended the

Ground Lease in 1986, reducing the Land to its current size of

approximately 16 acres.  (Id. at ¶ M (describing the 16-acre Land

as the "Principal Parcel" and the remainder as the "Released

Property").)[1]  The Land is largely surrounded by the Released

Property, and the only means of egress from the Land to a public

right-of-way is a paved road across the Released Property.  (Dkt.

---

[1] For simplicity, the Court will refer to the size of the
parcels as "16 acres" and "55 acres."

entry no. 95, Snyder Decl., Ex. K, Second Amendment to Ground
Lease at 3.)  Thus, in their amendments, NJNB and Textron also
provided for mutual access to, and maintenance of, the paved
road.  (Id. at 5.)[2]  The term of the Ground Lease extends through
December 31, 2060.  Thus, it is a seventy-five-year land lease.
(Stip. Facts at ¶ C.)  At termination, the Ground Lease specifies
that:

> Ground Lessee shall surrender such Site to Ground Lessor in
> the condition (or reasonable equivalent thereof) which such
> Site was upon commencement of the term of this Ground Lease,
> except as improved, repaired, rebuilt, restored, altered or
> added to prior to the expiration of the Lease or as
> permitted or required hereby or by any other Operative
> Document; provided, however, that any property remaining on
> such Site shall be in conformity with Legal Requirements.

(Ground Lease at Section 20.)

The initial term of the Improvements Lease was twenty years,
terminating on January 14, 2006, but it provided NJNB the option
to renew.  (Id. at ¶¶ H, I.)  The Improvements Lease also gave
NJNB the option to repurchase the Improvements, as well as
Textron's interest in the Ground Lease, at the end of the
Improvements Lease term.  (Id. at ¶ J.)  The Ground Lease

---

[2] The Ground Lease contemplated such an amendment,
addressing easements and the possibility of releasing some of the
Land to the Ground Lessor, as long as the Ground Lessee was
assured the value of the Improvements would be maintained and
their use or sale not impeded, and that the Ground Lessor would
not use this Land in a way disadvantageous to the Improvements,
including new construction.  (Ground Lease at Section 18.)

contemplated this eventuality.[3]  In fact, this is the outcome the parties expected.  (Id. at ¶ Y; Textron Tr. Br. at 1.)  However, by the expiration of the Improvements Lease in 2006, NJNB had been acquired by another bank, which decided not to repurchase the Improvements.  (Textron Tr. Br. at 1.)  Instead, on or about January 17, 2006, NJNB's successor sold its interests in the Subject Property and  Ground Lease to Herring.  (Stip. Facts at ¶ O; Textron Tr. Br. at 1.)  Herring had previously explored purchasing the Improvements from Textron, but never reached an agreement.  (See, e.g., Textron Tr. Br., Ex. C, Herring Dep. at 43-45, 60-64.)

The Ground Lease sets the initial rent for the Land ("Ground Rent") at $1, but states that upon termination of the Improvements Lease, the Ground Lessee will begin to pay Ground Rent to the Ground Lessor at the "fair market rental value" ("FMRV") rate.  (See Stip. Facts at ¶ K.)  The Improvements Lease terminated on January 14, 2006, which became the "Determination Date" for purposes of determining the Ground Rent.  (Id. at ¶ N.)  The Leases then provide a procedure for determining the Ground

_____

[3] "In the event that fee title to any Improvements is transferred to Ground Lessor . . . all of Ground Lessee's obligations and liabilities hereunder, including its obligation to make rental payments . . . shall be automatically assumed by Ground Lessor and Ground Lessee shall be automatically released therefrom."  (Ground Lease at Section 3(b).)

Rent every five years.  (Id. at ¶ K; Ground Lease; Improvements

Lease.)  The Ground Lease provides:

> 4. Rent. (a) . . . On each Payment Date after the
> Separation Date [the date upon which the Improvements Lease
> terminated] during the remainder of the Ground Lease Term,
> Ground Lessee shall pay Ground Lessor as rental payment for
> each Site the Appropriate Fraction for the annual fair
> market rental value of such Site determined (as provided in
> paragraphs (b) below) as of the Determination Date (as
> defined in paragraph (b) below) immediately preceding such
> Payment Date. . . .
>
> (b) The annual fair market rental value of each Site shall
> be determined as of each Determination Date.  The
> determination of annual fair market rental value required
> pursuant to the preceding sentence shall be determined by
> Ground Lessor and Ground Lessee within 60 days following
> each Determination Date or, if they fail to agree within
> such 60 date [sic] period, by the appraisal procedure set
> forth in Section 16 of the [Improvements] Lease.

(Stip. Facts at ¶ K (citing Ground Lease, Section 4).)  Section

16 of the Improvements Lease provides in turn:

> . . . Lessor and Lessee shall each appoint an appraiser
> within 10 days of their failure to agree, and the fair
> market value shall be determined by the two appraisers so
> appointed within 45 days of appointment.  If the two
> appraisers so appointed shall be unable to agree upon fair
> market value, fair market value shall be the average of the
> amounts determined by the appraisers if the greater of such
> amounts is no more than 105% of the lesser of such amounts.
> If the greater of such amounts shall exceed 105% of the
> lesser of such amounts, a determination shall be made by a
> third appraiser, who shall be selected within 10 days by the
> two appraisers appointed by the parties hereto.  Such
> determination shall be made by the third appraiser within 45
> days of his appointment.  In such event, fair market value
> shall be in the average of the two closest appraised
> amounts.  Each party agrees that it shall bear the cost of
> its own appraiser, and shall evenly divide the cost of any
> third appraiser. . . . All appraisers shall be members in
> good standing of the American Institute of Real Estate
> Appraisers or any organization succeeding thereto of
> similarly recognized national standing and shall be familiar

> with the real estate market in Mercer and Ocean Counties,
> New Jersey.  Each methodology or approach to valuation of
> the Premises used by an appraiser <u>shall treat the Premises
> as encumbered by this Lease</u>, shall assume that all renewal
> options pursuant to Section 4(a) hereof would be exercised
> and shall disregard the value of Lessee Owned Additions.

(<u>Id.</u> at ¶ L (citing Improvements Lease at Section 16 (emphasis

added).)  The Leases contain no definition of FMRV.  (<u>See id.</u> at

¶¶ T-X.)

Sixty days after the Determination Date, Textron and Herring

were unable to agree upon the FMRV.  (<u>Id.</u> at ¶ P.)  According to

the Ground Lease, when the parties cannot agree upon the FMRV of

the property, the FMRV should be determined according to the

appraisal procedure outlined in Section 16 of the Improvements

Lease.  (<u>See id.</u> at ¶ K; Am. Compl. at ¶¶ 13-14.)  Because "it

was assumed that [NJNB] would acquire the [Improvements] at the

end of the original lease term," the Ground Lease appears to have

been "at best, a peripheral item."  (Stip. Facts at ¶ Y (quoting

individual involved in the transaction).)  There appears to be no

institutional memory on how to define FMRV.  (<u>See</u> Stip. Facts at

¶¶ W-Y.)  However, "[w]hen the purpose of an appraisal is to

develop an opinion of market value, highest and best use analysis

identifies the most profitable, competitive use to which the

property can be put."  Appraisal Institute, <u>The Appraisal of Real

Estate</u>, 305 (12th ed. 2001).[4]  Highest and best use ("HBU") can

--------

[4] Unless noted otherwise, the Court cites the Twelfth
Edition.

in turn be defined as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." Id.

Although Textron and Herring agreed that the Ground Rent should be the FMRV determined according to the appraisal mechanism set forth in the Leases, they disagreed about the proper appraisal methodology.  Herring believed the HBU of the Land, and thus the Ground Rent, should be assessed as if the Land were vacant and unimproved, whereas Textron believed any HBU analysis and determination of Ground Rent must "take into account the remaining term of the Ground Lease and limitations on any potential additional development imposed by the existing buildings and improvements" owned by Textron.  (Stip. Facts at ¶ Q; Ans. & Countercl. at 8; dkt. entry no. 154, Herring Tr. Br. at 1-2, 10, 12, 23.)  On or about May 26, 2006, Textron provided an appraisal (the "Sockler Report"), which concluded the HBU of the Land was its continued use as a 179,000 square foot office facility.  (Stip. Facts at ¶ R; dkt. entry no. 153, GFP Tr. Br. at 3-4; Herring Tr. Br. at 10-11; P-3, Sockler Report at 65.)  Two weeks later, on June 8, 2006, Textron initiated the instant litigation against Herring, seeking a judgment declaring the method for appraising the FMRV under the Ground Lease.  (See

<u>generally</u>, Compl.)[5]  Herring filed a counterclaim for a judgment declaring  that its proposed definition of FMRV under the Ground Lease is correct and seeking specific performance, including requiring that the appraisal process go forward and back rent be paid.  (Ans. & Countercl. at 8-9.)  In the Amended Complaint, Textron asserted a claim for breach of contract, which is not considered here.  (<u>See</u> Am. Compl.)

**B.   Procedural History**

On December 21, 2007, as recorded in the Mercer County Clerk's Office, Textron deeded the Improvements and assigned its interest in the Leases to GFP.  (Stip. Facts at ¶¶ BB, CC.)  Textron also purported to assign GFP its rights and affirmative claims in the instant litigation.  (Dkt. entry no. 64, 10-22-08 Magistrate Judge Op. at 2.)  GFP subsequently embarked on a series of attempts to join the action and file a Second Amended Complaint that would have asserted additional counts and damage claims, which the Court recently described.  (<u>See</u> dkt. entry no. 250, 5-24-11 Op.)  The Court will not do so again here, as it is irrelevant to these declaratory judgment issues.  It suffices to note that GFP was permitted to join the action, standing in Textron's shoes as a plaintiff, but was not permitted to amend

---

[5] Herring did not submit an appraisal before Textron initiated this action, but has since provided an appraisal report (the "Hedden Report").  (D-3, Hedden Report.)

the pleadings, modify the scheduling order, amend its interrogatories, or reopen discovery.  (See id. at 8-9, 26-27.)

Along with the aforementioned motion practice, the parties and the Court have concurrently pursued resolution of the methodology issue in this bifurcated action.  The Court has tried Count One of the Amended Complaint and Count One of the Counterclaim.  Count One of the Amended Complaint asks the Court to declare:

> a. That the Ground Lease and Improvements Lease . . . require the appraisers to take into account the remaining term of the Ground Lease and limitations on any potential additional development imposed by the existing buildings and improvements owned by Textron Financial;
>
> b. That the Ground Lease and Improvements Lease . . . . : 1) require the appraisers to take into account, in their determination of the "highest and best use" of the property for purposes of determining the [FMRV] under the Ground Lease, the right of the existing buildings and improvements owned by Textron Financial to continue to remain in place; and 2) preclude the appraisers from determining the [FMRV] as if the underlying land were raw land without any buildings or leasehold interests; and
>
> c. for such other and further relief as the Court may deem just and appropriate.

(Am. Compl. at 5-6 (emphasis added).)  Count One of the Counterclaim asks for:

> A. Adjudging and declaring that the appraisers' determination of [FMRV] pursuant to the Ground Lease must be based upon their determination of the [HBU] of the Site which is the subject of the Ground Lease as though vacant.
>
> B. Specifically enforcing the terms of the Ground Lease and, in particular, requiring the appraisal process provided for to go forward in the manner, and within the time frames, provided for in the Ground Lease.

11

C. For costs of this action, including reasonable attorneys'
fees pursuant to the Ground Lease.

D. For such other relief as the Court deems just and proper.
(Ans. & Countercl. at 8 (emphasis added).)

To gain an understanding of the process involved in this
kind of Ground Rent determination, the Court ordered the parties
to provide a third appraiser to assess the Subject Property and
submit an appraisal report, which the parties agreed was modeled
on the process provided in the Leases.  (See, e.g., dkt. entry
no. 158, 6-17-10 Tr. at 45-52; dkt. entry no. 175, 6-30-10 Tr. at
95-97.)[6]  Testimony was taken from the three Appraisers during
the course of the trial, and their reports and rebuttal reports
were admitted into evidence.  (See dkt. entry nos. 161, 184-185,
191-193, 199-201, 204, 206-207, 209, 213, & 231-232, Minutes of
Trial Proceedings; Hedden Report; D-23, Hedden Rebuttal; Sockler
Report; P-46, Sockler Rebuttal; K-1, Korpacz Report.)  During
trial, facts emerged about relationships among the Appraisers
which prompted Herring to move to disqualify the Korpacz Report
and Korpacz's testimony, arguing that he was an insufficiently
neutral "arbitrator."  (Mot. To Disqual. Korpacz.)  GFP opposed
the motion, cross-moving to strike the Hedden Report on the

_____

[6] Despite the procedural similarities, the Court has not
ordered specific performance (see 6-30-10 Tr. at 96), and will
not determine the Ground Rent at this time.

grounds that it fails to meet the <u>Daubert</u> standard.  (GFP Opp'n & Cross-Mot. To Strike Hedden Rept.)

While the Court renders a declaratory judgment here, and denies the motions, as discussed below, the Court does not see the answer to the question of what is the required methodology for determining the Ground Rent as starkly as the parties.  (<u>See</u> Am. Compl. at 5-6; Ans. & Countercl. at 8.)

## II.  Discussion

### A.  Legal Framework

New Jersey substantive law governs the question of contract interpretation in this matter.  <u>See</u> <u>Mayfair Supermarkets, Inc. v. Acme Mkts., Inc.</u>, No. 87-3994, 1989 WL 32133, at *7 (D.N.J. Apr. 3, 1989) ("New Jersey law construes lease agreements under the same guidelines employed to interpret contracts.").  In New Jersey, "[t]he construction of the terms of a written lease is a matter of law for the courts."  <u>Barclays Bank P.C. v. 865 Centennial Ave. Assocs. Ltd. P'ship</u>, 26 F.Supp.2d 712, 718 (D.N.J. 1998).  It is well-settled law that "where the terms of the contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written."  <u>In re Cendant Corp. Sec. Litig.</u>, 569 F.Supp.2d 440, 443 (D.N.J. 2008).  Indeed, "[t]he law will not make a better contract for parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and

13

to the detriment of another.  The judicial function of a court of law is to enforce the contract as it is written." Gahney v. State Farm Ins. Co., 56 F.Supp.2d 491, 495 (D.N.J. 1999).  "In the interpretation of a contract, the intention of the parties is to be gathered from the language used in the instrument as a whole." N'Jie v. Mei Cheung, No. 09-919, 2011 WL 809990, at *3 (D.N.J. Mar. 1, 2011) (citing Wash. Const. Co., Inc., v. Spinella, 13 N.J. Super. 139, 142 (N.J. App. Div. 1951)).  "The situation of the parties, the attendant circumstances, and the objects they sought to attain are all necessarily to be considered by the trial court in its inquiry as to the intention of the parties." Schnakenberg v. Gibraltar Sav. & Loan Ass'n, 37 N.J. Super. 150, 155 (N.J. App. Div. 1961).

The contractual document in dispute here is a seventy-five-year land lease.  The term at issue is annual "fair market rental value."  As the New Jersey Appellate Division has explained:

> "[f]air market rental" is not a self defining term. Obviously, we have recognized that the [FMRV] of a property can be determined even if the lease fails to articulate any guidelines or standards, but such a determination can be problematic.  See, e.g., P.J.'s Pantry v. Puschak, 188 N.J. Super. 580, 584-85 (N.J. App. Div. 1983).  Fair market value has been defined as the price which a willing buyer would offer and a willing seller would accept.  City of Trenton v. Lenzner, 16 N.J. 465, 476 (1954).  Thus, all of the considerations that would influence a willing buyer and willing seller in making their decisions are relevant to a determination of fair market value.  Village of S. Orange v. Alden Corp., 71 N.J. 362, 368 (1976).

> When an option becomes exercisable, it is not unusual that the parties are not able to agree on a fair market rental or

> value.  As a consequence they must resort to consultants,
> appraisers or other experts.  If a consensus still cannot be
> achieved, the parties find themselves subject to the
> substantial expense, strain and attendant delay of
> litigation.

Oscar v. Simeonidis, 352 N.J. Super. 476, 487-88 (N.J. App. Div.

2002).[7]  "Although all reasonable uses of the property may have a

bearing on its fair market value, the most relevant consideration

is the property's [HBU]."  City of Camden v. Formosa, No. A-0644-

05T3, 2007 WL 3071016, at *3 (N.J. App. Div. Oct. 23, 2007)

(citing State v. Caoili, 135 N.J. 252, 260 (1994)).

The New Jersey Supreme Court has discussed the consideration

of HBU in the determination of fair market value ("FMV") in the

context of tax assessment:

> In Inmar Assocs, Inc. v. Twp. of Edison, 2 N.J. Tax 59, 64
> (1980), the Tax Court explained that "[a]ny parcel of land
> should be examined for all possible uses and that use which
> will yield the highest return should be selected."  That use
> is known as the "highest and best use," and has been defined
> as "the use that at the time of appraisal is the most
> profitable, likely use" or alternatively, "the available use
> and program of future utilization that produces the highest
> present land value." . . .
>
> Property valuation at [HBU] . . . requires the appraisal of
> each parcel "as though it were being put to its most
> profitable use, given probable legal, physical and financial
> constraints. . . . It simply implements a market value
> standard identifying [HBU] by reference to prices bid for
> the property in light of all of its possible legal uses."
> That view has been regarded as a reaction to taxpayer
> manipulation of "functional obsolescence," . . . a ready
> argument for reducing the assessment of almost any structure
> below its reproduction cost less physical depreciation.

---

[7] Though truer words may never have been spoken, the court
in Oscar found the fair market value provision in the lease
inapplicable.  Id.

15

Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 300-301 (1992)
(internal citations omitted).  The Court has also noted
throughout this action that its equitable jurisdiction will
likely come into play.[8]

The Court has reviewed the cases involving disputes over
ground leases and periodic rent determinations.  Each is fact-
specific, with summary judgment only available where the parties
agreed to a broad stipulation of facts.  While illustrative of
the factors the Court must consider in determining the proper
appraisal methodology for the Subject Property, none of the cases
precisely matches the facts here.

A collection of California cases is instructive.  In Wu v.
Interstate Consol. Indus., 226 Cal. App. 3d 1511, 1514-15 (Cal.
Ct. App. 1991), plaintiffs ran a movie theater business in a
building leased from defendants, and brought suit when defendants

---

[8] "It has become a general rule that equity may intervene,
in a case where, in order to avoid hardship or injustice, a
present need is shown to determine valuation of property held
under a partially executed long term-lease which provides for
rent adjustments at stated intervals, with the amount of rent for
a particular period to be governed by the result of a valuation
then made, where failure to make the valuation is not
attributable to a fault of the complaining party and appears to
have resulted after exhaustion of all reasonable efforts to
conform to the lease in that regard, and where the provisions
thereof indicate no contrary purpose and prescribe no other
course of action." City of Kenai v. Ferguson, 732 P.2d 184, 189
n.8 (Alaska 1987) (quoting Annot., Equity Jurisdiction to
Determine Valuation, Where Arbitration or Appraisal Has Failed,
Under Long-Term Lease Providing for Appraisal of Premises and
Fixing Rental Value at Stated Intervals, 26 A.L.R.2d 744, 745
(1952)).

attempted to set the rent based on the HBU of the premises as
retail shops.  The lease contained a similar appraisal procedure
to the one here: a renewal term every five years, and the
question before the court was whether the FMRV should be based on
the purpose for which it had been rented or the HBU.  Id.  The
Court affirmed award of summary judgment in favor of plaintiffs
where (1) the lease specifically provided it would be used for a
movie theater and nothing else without the landlord's consent,
and (2) the premises were not raw land or a generic commercial
building.  This case is further distinguishable because at issue
was not the setting of ground rent, and plaintiffs did not own
the buildings.  However, bearing some similarity to this case,
the Wu court observed that defendants' contention was that "to
remain in the premises [plaintiffs] must incur the substantial
expense of converting the theater into a retail shopping center,
an investment [plaintiffs] may never recoup because in another
five years [defendants] may conclude there is yet another [HBU]
of the property. . . . Such an option is in essence no option, is
unreasonable, and could not have been the intent of the parties
when they signed the lease."  Id. at 1515.

   The Wu court also discussed three other California cases
concerning the determination of ground rent, Bullock's, Inc. v.
Sec.-First Nat'l Bank., 160 Cal. App. 2d 277 (Cal. Ct. App.
1958), Eltinge & Graziadio Dev. Co. v. Childs, 49 Cal. App. 3d

294 (Cal. Ct. App. 1975), and Humphries Invs., Inc. v. Walsh, 202 Cal. App. 3d 766 (Cal. Ct. App. 1988).  In Bullock's, the parties attempted to set the ground rent for a 10-year term of a 50-year ground lease for land upon which sat a department store.  There, however, the lease specifically stated the appraisal was to be determined "exclusive of buildings and improvements thereon" and a 5% capitalization rate ("cap rate") was specifically stated. Id. at 279-81.  Although the court found it was reasonable for the appraiser to ignore the effect of the lease on the property's value, "the court was tasked with interpreting the meaning of the word 'value' in lease provisions that explicitly provided that rent would be a percentage of the value of the property."  Id. at 286; see also Cook Assocs., Inc. v. Utah Sch. & Inst. Tr. Lands, 243 P.3d 888, 898 n.9 (Utah App. 2010) (lease provided lessor with discretion to raise the ground rent, but court held no summary judgment because question of fact whether lessor acted in good faith); City of Kenai, 732 P.2d at 188 n.7 (although "lessor might lose money, when compared to the [HBU] valuation, the . . . purpose of [a] long term lease or renewal clause [is] to insulate the parties from a change in circumstances as to use, [particularly where] the lessor ha[s] notice of the intended use"); Moolenaar v. Co-Build Cos., 354 F.Supp. 980, 984 (D.V.I. 1973) (holding same with respect to land leased for the purpose of raising sheep and goats).

The question in <u>Eltinge</u> was whether the rent should be based on FMV or the site's value as a shopping center, and the parties stipulated the decision should be based almost exclusively upon the four corners of the lease.  49 Cal. App. 3d at 297.  The court there recognized that "a covenant in a lease to use property for a particular purpose does not necessarily mean that lessee may only use the leased property for that purpose," and there none of the lease terms "required the maintenance of a shopping center for any fixed portion" of the whole term.  <u>Id.</u> at 297-98.  As here, the case involved a long-term lease and five-year periods, but a specific capitalization rate and the purpose of the lease - the development of a shopping center - were stated outright.  <u>Id.</u> at 296-97.  While the <u>Eltinge</u> court held the rent should be based on FMV, unlike the Leases here it appears that lease stated explicitly that the appraisals should be made "exclusive of any improvements."  <u>Id.</u> at n.1.[9]

The issue in <u>Humphries</u> was whether the appraisal process should consider a change in local regulations that made a change in land use more difficult.  <u>See</u> 202 Cal. App. 3d at 770.  The

---

[9] The reverse situation occurred in <u>Sills Cummis & Gross, P.C. v. Matrix One Riverfront Plaza, L.L.C.</u>, No. A-3630-08T3, 2009 WL 4646922, at *2 (N.J. App. Div. Dec. 3, 2009), where the lease said to "consider the premises in its 'as is' condition, as if the premises were vacant and unencumbered by the Lease, as herein amended . . . ."  The court characterized this phrasing as having "subtracted another ingredient from the [FMRV] of the premises," implying that leaving the phrasing out would permit consideration of either vacant or improved.  <u>Id.</u> at *8.

long-term ground lease there specifically designated the land to be used as a mobile-home park for the first ten years, but permitted other uses after that.  Id. at 768.  However, before the first appraisal period, new regulations made it more difficult to convert the land to any other use.  Id.

The Humphries court looked to tax and eminent domain valuations, noting that "the factor of usability entails a consideration of all the uses to which a parcel is adapted, not merely the owner's current use . . . uses which are not reasonably probable should be excluded."  Id. at 772.  Moreover, "where it is not shown that a suggested use would be profitable, or where it appears that the operations cannot be carried on except at a loss, the prospect of use for such a purpose is not a proper element of value."  Id. at 772-73.  The court held legal impediments to a change in use should be considered.  Id.  The parties did not dispute whether the land should be valued as vacant or improved.  See id.

The converse situation arose in N.Y. Overnight Partners, L.P. v. Gordon, 217 A.D.2d 20 (N.Y. App. Div. 1st Dep't 1995), aff'd, 88 N.Y.2d 716 (N.Y. 1996), where the ground lessee owned a hotel that contributed to the site's value because it exceeded the zoning for new construction permitted on the site.  The lessors sought to ignore all zoning restrictions and include the benefit of the improvements in the appraisal of ground rent,

20

whereas the lessee argued it should be assessed as if vacant and subject to the current zoning regulations.  <u>Id.</u> at 23.  The court determined the contracting parties intended "land" to mean "raw land," and thus that the land should be valued as vacant and subject to current zoning regulations.  <u>Id.</u> at 27, 30.  The parties stipulated sufficient facts to expedite the matter to summary judgment, and the lease contained an appraisal formula that specified the rent should be "six and one-half percent of the appraised value of the land," whereas here the Ground Lease states the Ground Rent should be "the annual fair market rental value."  <u>Id.</u> at 24.  (Ground Lease at Section 4.)[10]

The long-term lease in <u>City of Kenai</u>, finally, specified no appraisal process and simply called for a renegotiation of ground rent every five years.  732 P.2d at 185.  At the ten-year mark, ground lessor city attempted to raise the rent pursuant to a new city ordinance requiring a certain cap rate, where the city knew the tenant used the property as a gas station.  The court rejected the contention that the lease necessarily called for a HBU standard, and held the actual use of the premises was to be considered in ascertaining the FMV.  <u>Id.</u> at 188-89.  The court reached this decision, in part, because the tenant could not

_____

[10] Other New York cases indicate statutory tenancies may be considered, depending on the wording of the lease.  <u>See, e.g.</u>, <u>Madison Murray Assocs. v. Perlbinder</u>, 215 A.D.2d 204 (N.Y. App. Div. 1st Dep't 1995); <u>853 Seventh Ave. Owners, LLC v. W & HM Realty Co., LLC</u>, 18 A.D.3d 241 (N.Y. App. Div. 1st Dep't 2005).

sublease or redevelop the land without the city's consent, and it was "apparent that the parties contemplated that the premises would be used for the purpose of operating a gas station." Id.

The parties here agree HBU is the proper analysis to arrive at the annual FMRV Ground Rent.  The Leases do not specify whether this HBU analysis should be performed as if the Subject Property is vacant or improved, or whether the Improvements must remain.  They also do not specify a particular cap rate. Although the Ground Lease requires the Ground Lessee to "notify Ground Lessor of any construction . . . that has an estimated cost . . . in excess of $1,500,000" and that "such construction shall be subject to the reasonable approval of Ground Lessor," there is no real bar to redevelopment in the Leases.  (See Stip. Facts at ¶ Z (citing Ground Lease at Section (9)).)  There is no particular use stated or required in the Ground Lease.  But it is clear from the history and tax-driven nature of the transaction that (1) both parties had notice of the Buildings' existence when they contracted the long-term Leases, (2) NJNB intended to occupy the Buildings for some time, and to perhaps eventually reacquire them, and (3) Textron had no real intent to use the Buildings and its interests in the Leases for anything but depreciation.

The Court considers this case law and the distinguishing factor here when making its determination of the required methodology, as discussed below.

22

**B.   Findings and Conclusions**

In addition to considering the parties' legal arguments, the Court heard trial testimony from the three Appraisers, Peter E. Sockler ("Sockler"), Michael P. Hedden ("Hedden"), and Peter F. Korpacz ("Korpacz").   Their reports were admitted into evidence and during their testimony they thoroughly explained the processes and methods they used to reach their conclusions on HBU and FMRV.   The parties were also permitted to rebut conflicting expert appraisal reports during their direct examination. Finally, the Appraisers also testified to the nature of their business and personal relationships.   The Court derives its findings and conclusions from all of the information supplied by the parties and their appraisers, as discussed below.

### 1. Expert Appraiser Reports and Testimony

#### (i) The Appraisal of Real Estate

The Appraisers all use and refer to The Appraisal of Real Estate, commonly referred to as the "Appraiser's Handbook" or the "Appraiser's Bible."   (See 1-18-11 Tr. at 41; dkt. entry no. 202, 2-7-11 Tr. at 167.)   N.Y. Overnight Partners, 217 A.D.2d at 30. The parties quote its guidelines on the proper determination of FMV through the identification of HBU, though HBU often turns on many different variables.[11]   For example, it explains "[t]he

_____

[11] During his testimony, Korpacz described HBU as:

the foundation for the valuation in that properties are

23

theoretical emphasis of [HBU] analysis is on the potential uses
of the land as though vacant.  In practice, though, the
contribution of value of the existing improvements and any
possible alteration of those improvements must be recognized, so
the [HBU] of the property as improved is equally important in
developing an opinion of market value of the property."  The
Appraisal of Real Estate at 305.  Thus, both are frequently
considered.  Id. at 306 ("In the development of an appraisal, the
appraiser must distinguish between [HBU] of the land as though
vacant and [HBU] of the property as improved.  The appraisal
report should clearly identify, explain, and justify the purpose
and conclusion for each type of use . . . .").

It appears that deciding which of the two is required can be
complex: "[i]n general, the conclusion of [HBU] of land as though
vacant is required except in circumstances where improved
properties have structures with significant remaining economic

----

> generally valued based on their [HBU].  So, that if the
> existing use is found not to be the [HBU], the appraiser
> seeks out some other use that he can then opine is the
> [HBU], and then values the property subject to that [HBU]
> conclusion.  So, all properties are valued based on the
> [HBU] unless . . . the terms of the assignment dictate
> otherwise.  Clients are not limited to what's in an
> appraisal textbook.

(Dkt. entry no. 187, 12-1-10 Tr. at 81 (opining that "this is a
case where . . . it needs to be appraised subject to the terms of
the lease")).)

lives and little or no indication of market demand for a change

in use." Id. at 309.  However,

> [t]he possibility of removing existing improvements
> underlies the concept of [HBU] of land as though vacant,
> even when improvements are present.  Any building can be
> demolished; the fact that most buildings in a given area are
> not does not negate the possibility.  Land values are not
> penalized so long as the existing buildings have economic
> value.  If the buildings no longer have value, demolition is
> appropriate. . . . The potential use, not the existing use,
> usually governs the price that will be paid for land if that
> use is economically feasible.

Id.  Complicating matters further, Herring cites the Thirteenth

Edition, which states in the "Land and Site Valuation" chapter,

> [s]ite value must always be considered in terms of [HBU].
> Even if the site has improvements, the site value is based
> on its [HBU] as though vacant and available for development
> to its most economic use.  Consideration of the site as
> though vacant is a commonly accepted procedure that
> facilitates the orderly analysis and solution of appraisal
> problems, which often require land to be valued separately.

The Appraisal of Real Estate (13th ed. 2008) at 361.[12]

> Appraising a property as improved does not, however,

necessarily mean keeping the currently existing buildings.

> [HBU] of a property as improved pertains to the use that
> should be made of an improved property in light of the
> existing improvements and the ideal improvement described at
> the conclusion of the analysis of [HBU] as though vacant.
> The [HBU] of a property as improved may be continuation of
> the existing use.  In such a case, the appraiser need not
> analyze expenditures or rates of return for alternative uses
> except to test or support the conclusion of [HBU].  However,
> the [HBU] of a property as improved may involve renovation

---

[12] However, considering this statement might amount to
comparing apples to oranges, as the Land and Site Valuation
chapter qualifies that "[t]he site value analysis in an appraisal
report can appear as a separate stand-alone section or as a
subsection of the cost approach." Id. at 362.

or rehabilitation, expansion, adaptation or conversion to another use, partial or total demolition, or some combination of these alternatives.

The Appraisal of Real Estate at 315-16.  With these principles in mind, the Court next examines the testimony of the Appraisers.

### (ii) Sockler Report

Sockler completed his Report as part of the pre-litigation appraisal process on or about May 18, 2006.  (See Sockler Report.)  He also completed a rebuttal report of the Hedden Report on January 8, 2008.  (Sockler Rebuttal.)  During trial, he was admitted as an expert in real estate appraisal and valuation without objection.  (Dkt. entry no. 188, 12-2-10 Tr. at 137-38.) Sockler described his assignment as twofold, "(1) to opine as to the market value of the subject's 16.3 acre office site as of the effective date of the appraisal" and "(2) to opine as to the annual market rent of the 16.3 acre office site as of the effective date of the appraisal."  (Sockler Report at 2.)[13]

Sockler first provides an overview of market information for the Central New Jersey region, then specifically for Mercer County and the Ewing Township neighborhood surrounding the Subject Property.  (Id. at 6-27, 28-30, 31-41.)  He defined the "greater neighborhood" around the Subject Property as "the area

_____

[13] All parties recognize that the Determination Date (or Valuation Date) in this case is January 14, 2006.  (Stip. Facts at ¶¶ N, P; see also 12-1-10 Tr. at 43; 12-2-10 Tr. at 143.) Sockler testified that his appraisal's effective date was consistent with the Determination Date.  (12-2-10 Tr. at 111-12.)

26

along Scotch Road with its northern border formed by Route 546;
the eastern border by Route 31; the southern border by Parkway
Avenue and the western border by Rout[e] 579." (Id. at 34.)
While Sockler acknowledges the recent development in the greater
neighborhood, such as the Merrill Lynch facility, he notes:

> land use in the immediate neighborhood vicinity of the
> subject is a mix of Class B office, Sierra Office Park, and
> service facilities connected with the Mercer Airport and the
> State of New Jersey.  A property adjacent to the subject is
> used by the State of New Jersey Department of Transportation
> and for parking trucks which are visible from the entrance
> to the subject property.  The jug handle which provides
> entrance for southbound traffic from Scotch Road has
> industrial/service type facilities connected with the
> airport.

(Id. at 34-35.)  Sockler described this location as Class B,
noting the view from the Subject Property of the maintenance
facility and the Class C Sierra Office Park.  (12-2-10 Tr. at
149, 152 (noting the maintenance facility is for vehicles and
might "be in conjunction" with Mercer County).)

    The Sockler Report opined that because of its "easy access
to the area's major transportation arteries and the influence of
the Princeton Corridor, proximity to Bucks County and the Route 1
Corridor and I-95 has aided in development in recent decades,"
"[g]rowth is expected to continue, though at a moderate pace."
(Sockler Report at 39.)  In his testimony, Sockler described the
four stages of typical neighborhood development, (1) growth, (2)
stability, (3) possible further growth, and (4) decline.  (12-2-
10 Tr. at 159.)  He concluded that at the Determination Date, the

27

neighborhood surrounding the Subject Property was "in a state
between growth and stability," where "[a]reas south of the
subject reflected stability while areas to the north evidenced
growth."  (Id. at 158.)[14]

The Sockler Report next presents an analysis of the
"Princeton office market as it relates to the subject property."
(Sockler Report at 42.)  Sockler identified the Subject
Property's location in Ewing as a submarket of the same, but one
that is dependent on the health of the whole.  (12-2-10 Tr. at
161-62.)  He sampled vacancy rates from different surveys over
time, citing overall Princeton area vacancy rates of 17% to 19.5%
in December 2005.  (Sockler Report at 43.)  Another survey, which
broke down rates between Class A and Class B space, noted vacancy
rates of 8.8% for Class A and 27.7% for Class B.  (Id.)  The
Sockler Report states that "[t]he rental differential between
Class A and Class B space is an all time high" and that "[t]he
market remains viable for Class A space," meaning "[i]f a Class B
building can be redeveloped into Class A space, landlords have
the opportunity to create value by differentiating their product
from lower quality buildings."  (Id. at 45.)  Nonetheless, in
part because "the subject property has no exposure to the

---

[14] While not relevant here, Sockler stated his belief that
the neighborhood is now, as of his trial testimony date in
December 2010, "probably in a period of stability and economic
decline."  (Id. at 161.)

Interstate and the immediate area evidences adjoining properties usually not associated with Class A office space," including "Class B and lesser C or even industrial space," the Sockler Report concluded that "[t]he subject buildings are Class B space with a Class B location."  (Id. at 47.)

When asked by the Court "as of the date of this report, the market was not healthy, is that fair?", Sockler answered "[t]hat's very true.  There were certainly economic indicators, such as high vacancy being one of them, that were showing that things weren't that healthy."  (12-2-10 Tr. at 168.)  When further asked about upgrading Class B space to Class A, Sockler responded that it can be done, but "[i]t's usually very costly. And the financial feasibility of that has to be addressed. There's a lot of vacant available land available for development, and development in areas that are considered more premiere Class A space."  (Id. at 173.)

The next section of the Sockler Report does a "Site Analysis" of the Subject Property, and Sockler testified to inspecting the Subject Property and the Buildings personally. (Sockler Report at 50-59; dkt. entry no. 194, 12-16-10 Tr. at 34.)[15]  "The subject site is improved with a two-story single-tenant corporate office building built in 1985 and a two-story

_____

[15] Sockler testified to his belief that Hedden had not inspected the Buildings and, over objection, that this was necessary to do an adequate appraisal.  Id.

29

single-tenant operations center built in 1981. . . . The combined
gross square footage of these two buildings is 179,940 square
feet including the basement space." (Sockler Report at 53.)
Sockler considered a variety of factors and noted, inter alia,
the "property has been maintained and is in average condition,"
compliance with the Americans with Disabilities Act, most of the
paved areas were in "fair condition," and "detrimental
influences" such as the "subject site has inferior access because
there is no road frontage and no exposure to the roadways in the
immediate vicinity. Access to the site is circuitous." (Id. at
51, 57.) Sockler finally noted that the common areas, including
lobbies, and atrium, dining areas, and hallways "increase[] the
appeal of the building," and might "be viewed as a competitive
advantage," but they also limit the useable area. (Id. at 58.)

The Sockler Report concluded that "no functional
obsolescence [was] noted," except "[t]he property is suited
ideally for one or possible two tenant and is not immediately
suitable for multi-tenancy," because "the building interiors
would require reconfiguring." (Id. at 58, 47-48; see also 12-16-
10 Tr. at 6.) "The overall size can be an issue as leasing
blocks of space of this size is not as commonplace in the current
market. However, proximity to Princeton remains a strong
inducement and the subject should be competitive with the Class B
space offerings." (Sockler Report at 48.)

The Sockler Report also provides a zoning analysis, which Sockler testified was necessary in determining the HBU.  (12-16-10 Tr. at 40.)  Based on an engineering report provided by a Victor Sestokas, PE, PP, Sockler concluded that the Subject Property had no excess land, did not conform to zoning regulations on the required number of parking spaces, and already exceeded the "Maximum Impervious Surface Coverage."  (Sockler Report at 61; 12-16-10 Tr. at 40-42.)  The Sockler Report also scrutinized the Subject Property's tax assessment because, according to Sockler, "in theory, the assessment should be representative of market value."  (Sockler Report at 62; 12-16-10 Tr. at 43.)  For purposes of his appraisal, since the tenant must pay them, Sockler estimated real estate taxes would be $2.95 per square foot after the tenant obtained a certificate of occupancy, above the assessed amount of $1.49 per square foot.  (See Sockler Report at 62; 12-16-10 Tr. at 54; see generally, id. at 42-58.)

The Sockler Report next performs the HBU analysis.  (See generally, Sockler Report at 63-65.)  It explains that:

> [a] property's [HBU] must be legally permissible, physically possible, financially feasible, and maximally productive. These four criteria are considered sequentially and conditionally.  Although a use may be financially feasible, it would be irrelevant if the use were legally prohibited or physically impossible.  Therefore, tests of legal permissibility and physical possibility must be applied before the remaining tests of financially [sic] feasibility and maximal productivity.

(Id. at 63.)  It further describes that HBU analysis:

31

> generally involves consideration of the subject property
> under two scenarios: as vacant land and as presently
> improved.  The as vacant scenario assumes that the subject
> site is vacant or can be made vacant and available for
> development.  The purpose of determining the [HBU] of land
> as though vacant is to identify the [HBU] of land as though
> vacant is to identify the site's potential use, which
> governs its value.

(Id.)  The Sockler Report then proceeded to consider the HBU of

the land both as vacant and as improved.

In determining the HBU of the Subject Property as vacant,

the Sockler Report analyzed the Subject Property under the four

components of HBU.  Under the legal permissibility prong it noted

the zoning classification, a utility easement, and that a

variance might be required.  (Id. at 64.)  Under the physical

possibility prong, the Sockler Report noted the mixed use nature

of the surrounding neighborhood - office, industrial, airport,

and residential.  (Id.)  It also noted possible concerns

surrounding the Ewing Creek wetland buffers and issues of storm

water management.  (Id.; 12-16-10 Tr. at 67.)  It did not

consider any particular proposed construction plan.

The Sockler Report explained that under the financial

feasibility prong, one considers which uses identified so far are

likely to produce a positive return.  (Sockler Report at 64.)  It

concluded that the site should be "developed with an office or

industrial facility."  (Id.)  Combining this with the maximum

profitability prong, which considers which use among all will

produce the highest net return, the Sockler Report further

concluded the HBU of the Subject Property would be for "secondary or 'back office' space" because the lack of access and exposure, and the adjacent land use "precludes the development of Class A office space." (Id. at 65.)  During testimony, Sockler noted that the Subject Property "is not a Class A office, and couldn't command rent in a $30 per square foot plus electric range necessary for this space." (12-16-10 Tr. at 68.)  Consequently, the Sockler Report concluded the HBU of the land as vacant would be to use it for a Class B office site, "flex space," or a combination of office and light industrial space.  (Id.)[16]

Sockler next examined the HBU of the Subject Property as improved, in which "it is recognized that existing improvements should continue to be used until it is financially advantageous to alter physical elements of the structure or demolish it to build a new one." (Id.)  Sockler opined that the Buildings were, as of the Determination Date, "Class B quality," "in average condition," but they "have a significant remaining economic life and contribute materially to the overall property value." (Id.)  He concluded the continued use of the Buildings was the HBU of the site, as "[n]o other alternative use would provide a greater return to the ownership." (Id.)

---

[16]  "Flex space" is "typically one story space that can either accommodate an industrial warehouse type or manufacturing use, as well as office.  A lesser quality than Class B, C office." (12-16-10 Tr. at 69.)

33

Sockler, finally, performed an appraisal of the Subject
Property to determine the Ground Rent.  (See generally, id. at
66-103.)  He explained the six methods of land valuation, and
when they are performed.  (See id. at 66-68.)  Here, Sockler
first performed the Sales Comparison Approach, where he compared
the Subject Property to similar (all actually vacant) properties
recently sold.  (Id.)  As a cross-check, he also performed the
Land Valuation by Extraction Approach, which also uses an Income
Capitalization Approach.  (Sockler Report at 87, 95.)

In the Sales Comparison Approach, Sockler examined six
nearby vacant land sales that took place between August 2001 and
November 2005, and that were considered comparable to the Subject
Property.  (Id. at 68-81.)  They ranged in size from 8.57 to
135.13 acres, with development approvals of 72,000 to 1,520,000
square feet.  (Id.)  The sale prices, sizes of the properties,
and square footage of approved development are combined to yield
a "sale price per each square foot of [approved but unbuilt]
office space," referred to in appraisal terminology as the price
per square foot of Floor Area Ratio ("FAR").  (Id.; 12-16-10 Tr.
at 75 (defining FAR as "per square feet of approved office
building area"); see also Korpacz Report at 32 (stating "FAR
represents the development potential of a particular site in
relation to zoning and approvals and is considered the most
applicable unit of comparison for development sites").)

34

The six comparables in the Sockler Report had initial FARs of $19 to $28.  (Sockler Report at 83.)  To account for various differences between the Subject Property and the comparables, Sockler made various downward or upward percentage "adjustments" to arrive at the FAR for the Subject Property.  (Id. at 83-86.)  These characteristics include location, size, improvements, utilities, easements, and approvals.  (Id.)  Sockler made the largest adjustment in location, as he found the Subject Property's location inferior to those of the comparable sales.  (See id. at 86.)  After adjustment, the FAR range was $19 to $23.  He found Sales One and Six most comparable, and thus formed the opinion that the Subject Property has a FAR of $21.  (Id. at 85.)  Multiplying this by the 179,940 square feet of approved and actually built Improvements yields a Land value of $3,800,000 (rounded).  (Id.)

The Land Valuation by Extraction proceeds by valuing the entire Subject Property, determining and then subtracting the depreciated value of the Improvements, with the remainder representing the value of the Land.  (Id. at 87.)  To do this, Sockler first estimated the market rent for the Subject Property at $14.50 per square foot by examining comparable office rentals.  (Id. at 88.)  Next, he estimated expenses, including a vacancy allowance, and calculated an estimated net operating income of $16,170,788.  (Id. at 89-90.)  Then he estimated an overall cap

rate for the Subject Property of 7%, noting national averages and local comparables. (Id. at 91-95.)[17] Applying this cap rate to the operating income, Sockler concluded, yields a market value for the Subject Property of $16,200,000 (rounded). (Id. at 95.) Sockler next used the Cost Approach to determine the current value of the Improvements. He began with the cost to replace them today, then applied depreciation and other factors to arrive at a Building Value of $12,700,000 (rounded). (Id. at 100.) Deducting this from the value of the Subject Property, Sockler arrived at a Land value of $3,500,000. (Id. at 101.)

Observing that the Land values from the Sales Comparison and Extraction Approaches were similar, Sockler took the larger value of $3.8 million for the Land. (Id. at 101-02.) He then applied a land cap rate of 6.5%, what he determined to be appropriate for what he characterized as a lower-risk investment (land only), for an annual rental rate of $247,000. (Id. at 102-07.)[18]

On cross-examination, Sockler conceded that there is no provision in the Leases that bars the Ground Lessee from using the Subject Property for any lawful purpose or from redeveloping it, or that precludes HBU analysis as if vacant and unimproved.

_____

[17] Korpacz defined the cap rate as "the relationship of income to value. . . . often expressed with the formula I over R equals V," where I is the income generated by the asset, R is the overall cap rate, and V is the value. (12-1-10 Tr. at 28-29.)

[18] Sockler further discussed the procedure for arriving at the land cap rate during testimony. (12-16-10 Tr. at 84-89.)

(Id. at 87-90, 100.)   In addition, counsel for Herring pointed
out that one version of Sockler's engagement letter with Textron
included the crossed-out phrase "as if vacant and available for
development to its highest and best use."   (Id. at 103-04.)
Sockler responded that the phrase was probably stricken because
"[i]t's redundant. . . . Implied within market value is that you
go through a complete [HBU] analysis.   That includes the analysis
of the subject property as to its [HBU] as vacant, and the [HBU]
as improved."   (Id. at 104-05.)   Sockler also admitted he did not
calculate how much Class A space could be built, citing economic
feasibility concerns.   (Dkt. entry no. 196, 1-11-11 Tr. at 147-
52.)[19]

Sockler criticized the Hedden Report, noting that it failed
to discuss the Ground Lease as an encumbrance on the Subject
Property.   (12-16-10 Tr. at 130-32.)   He noted that the Uniform
Standards of Professional Appraisal Practice ("USPAP") Rule
1-4(d) requires an appraiser to "analyze the effect on value, if
any, of the terms and conditions of the lease."   (Id. at 134.)
Thus, Sockler concluded "the land lease has to be considered, it
has to be explained.   It's a legal encumbrance on the subject
property."   (Id.)   According to Sockler, Hedden's decision to
value the land only as vacant, and to completely ignore the

---

[19] On redirect, he opined if the Land were actually vacant,
it would probably be held for "land banking" in anticipation of
future development.   (Dkt. entry no. 197, 1-14-11 Tr. at 49, 75.)

Improvements and their value, is both incorrect and in contravention of USPAP standards.  (Id. at 140-41.)  Moreover, Sockler noted the Hedden Report cites the cost of demolishing the Buildings, but that it fails to cite the cost of acquiring the Buildings so as to demolish them.  (See id. at 149-51.)

Sockler also expressed the belief that the Hedden Report is advocacy, in violation of USPAP Rule 23, because it uses "a conceptual hypothetical 600,000 square feet office development on the 16.3 acres" and assumes "it's a foregone conclusion that this is the [HBU] without going through all of the tests of [HBU]," whereas in his analysis, he "go[es] through financially feasible, maximally productive."  (Id. at 138-39.)  Instead, Sockler testified to his belief that the hypothetical development would require structured parking, and that the Subject Property could not command the rent required to support such an investment.  (Id. at 145-45, 147 ("no one would build this at this point in time at that location.").)  Moreover, he noted that there are no other developments of this density in this area - "[i]t's just not seen in this market" - and expressed his belief that the Subject Property is not zoned for such development.  (12-17-10 Tr. at 11-12, 18-19.)

When the Court asked "[i]n view of the fact that the rents are reevaluated every five years, would it be economically feasible to redevelop its property [with 600,000 square feet] in

38

the context of the Hedden report?", Sockler answered "[n]o, it's absolutely not feasible. . . . because, number one, the very basic rules of supply and demand.  There's certainly not the demand for a Class A office space here, and there's not even demand for that much Class B office space here in the entire market."  (12-16-10 Tr. at 158.)

Sockler also noted that when Hedden values the property at $17 million, he fails to mention or explain that this is 5.71 times the value of the sale of the parcel to Herring in 2006. (Id. at 171.)  "[T]hat would mean that Herring underpaid the owner of the entire parcel . . . by over $42 million, which is ridiculous.  Again, this sale was never analyzed in the [Hedden Report].  It was mentioned, but it was never analyzed.  There must be an explanation for this disparity.  [Hedden] is required by USPAP, and common sense, to explain this."  (Dkt. entry no. 195, 12-17-10 Tr. at 8-9.)[20]  In addition, he criticized the Hedden Report's 8% cap rate, arguing it improperly includes the risk the Ground Lessee takes in financing improvements, which is not borne by the Ground Lessor.  (See id. at 27-40.)

During examination about his business and personal relationships with Korpacz and Hedden, Sockler testified that the real state appraisal community is very small, one participates in trade meetings, conferences, continuing education, and it is

---

[20] The Sockler Report briefly notes that its Land valuation is 32% higher than what Herring paid.  (Sockler Report at 85.)

important to maintain one's network of contacts to share information and expertise.  (12-16-10 Tr. at 128-29.)  He testified all three are unbiased and their job is to render an "unbiased third party opinion."  (12-17-10 Tr. at 49-50.) Sockler testified he has worked with Hedden before, that he has subcontracted for him, and that in fact when Herring tried to hire Sockler after he had been engaged by Textron, he referred Herring to Hedden.  (12-16-10 Tr. at 120-21, 123; 1-11-11 Tr. at 34.)  He also testified he has no financial relationship with Korpacz.  (12-17-10 Tr. at 50-51.)

### (iii) Hedden Report

The Hedden Report was completed in the course of this litigation on or about September 26, 2007.  (<u>See</u> Hedden Report.) Hedden also completed a rebuttal letter of the Sockler Report on or about January 10, 2008.  (Hedden Rebuttal.)  During trial, he was admitted as an expert in real estate appraisal and valuation without objection.  (Dkt. entry no. 198, 1-18-11 Tr. at 35.)

The Hedden Report states as its purpose "to determine the annual [FMRV] of a fee simple interest for the subject property under its [HBU] as of January 1, 2006 . . . " and that "[t]he fee simple interest in the property is being appraised."  (Hedden Report at 1, 3.)[21]  It decided that "[b]ased on our appraisal

_____

[21] Hedden testified, like Sockler, that his appraisal was consistent with the Determination Date.  (1-18-11 Tr. at 138.) He further testified that "Herring's acquisition was not relevant

40

experience, an appraiser would interpret the language in the lease agreement to mean the annual [FMRV] of the land without improvements under its [HBU]." (Id.)  Hedden testified that this is standard appraisal practice, "under the premise of [FMV], [HBU] as vacant," and that there was nothing in the Ground Lease that precluded the same.  (1-18-11 Tr. at 35.)  He also testified that in order to value the Land and Improvements individually, first "property is valued in its totality, all the components combined.  Then by subtracting from the total value the estimated value of the land valued under its premise of [HBU] as vacant, you arrive at the contribution of the improvements of the building and land improvements, and thereby the technique is known as a building residual."  (Id. at 38-39.)

The Hedden Report begins with an "Area Analysis," setting the Subject Property in a regional context, similar to the Sockler Report.  (See Hedden Report at 4-8.)  Then it presents an "Office Market Analysis," again similar to the Sockler Report, noting both the Subject Property's presence in, and dependence

---

because in Herring's acquisition, he buys land that is encumbered by a ground lease.  He's buying a leased fee position, not the fee simple position.  And as a result, he doesn't have the same rights as the tenant in this case.  The tenant enjoys the right to redevelop the site to its maximum potential, and gain those economic benefits."  (2-7-11 Tr. at 137.)  He further elaborated: "Herring's acquisition of the site encumbered by a ground lease without all the rights of fee simple ownership, therefore, do not make his purchase relevant to the matter at hand because in the matter at hand, I am valuing the fee simple as vacant to its [HBU], which were those bundle of rights that are transferred to the lessee in this case."  (Id. at 138.)

on, the Great Princeton Market Area, and the increased vacancy
rates at the end of 2005 and beginning of 2006.  (Id. at 9-11.)
It also identified a 16.46% vacancy rate for Class A space.  (Id.
at 12.)  However, Hedden projected "stronger demand in office
properties," and he further testified that he would classify the
location of the Subject Property as Class A because of

> the amount of investment that is occurring at this
> intersection.  The location being in south Princeton market,
> and in a growth trend area.  "Growth trend" meaning that the
> relocation of or the desirability of this location versus
> the Route 1 corridor is evidenced by the corporate moves and
> the desirability of Bloomb[e]rg when they originally had
> acquired that tract that we referred to as Opus. . . . the
> identification of this submarket by both a Merrill Lynch and
> a Bloomberg, with their approvals for . . . one million
> square feet of space, indicate that there is significant
> impetus to develop along this [Interstate] 95 corridor.

(Id. at 14; 1-18-11 Tr. at 47-48.)  He also cited other amenities
like the airport, the development that occurred subsequent to the
Determination Date, including two hotels and the Capital Health
Hospital, and the fact that the nearby Opus property was able to
command Class A rent, to support his Class A designation.  (1-18-
11 Tr. at 49.)  He also concluded the Buildings are Class B or
lower, although he did not inspect the interior.  (Id. at 50-53.)

The Hedden Report next presents the HBU analysis, using the
definition from the Fourth Edition of The Appraisal of Real
Estate.  (Hedden Report at 17.)  It notes that while the current
zoning permits office development such as the Buildings, the Van
Cleef Engineering Associates Conceptual Plan ("Van Cleef Plan")

supports the conclusion that 600,000 square feet of office space is the HBU. (Id. at 18; id., Ex. C, Van Cleef Plan.) Hedden testified that he determined the Van Cleef Plan was legally permissible and physically possible under current zoning, including rules on maximum building coverage. (1-18-11 Tr. at 60, 64-65.) The Van Cleef Plan does not address the other two factors. (See id.; Van Cleef Plan.)

Hedden later testified to his belief that the Van Cleef Plan was financially feasible, based on an "inferred analysis" of the comparable vacant land sale transactions, which were "reflective of similar improvements that would be developed on the subject property. By similar caliber of tenants and similar improvements. Some with structured parking." (1-18-11 Tr. at 138-40.)[22] He also testified the Van Cleef Plan was the maximally productive use of the Subject Property. (Id. at 142-43.) Hedden claimed this was thus the HBU because the value of the Land as vacant and available for this project (see below) was more valuable than Sockler's valuation of the Subject Property as a whole. (Id. at 67.) By valuing the Land as "encumbered" by the Improvements, Hedden argued, Sockler failed to value its HBU. (Id. at 147.) When asked "the current [Buildings] as of the valuation date have no value under this analysis, right?", Hedden

_____

[22] Plaintiffs objected to this characterization, arguing that in some cases the properties were actually used for purposes other than those for which they were originally approved. (Id.)

answered "Correct," and when further asked "what relevance, if any, does the cost of the [Buildings] have with respect to the [HBU] analysis as to the land?", he said "None."  (Id. at 58.)

The Hedden Report next performs its Sales Comparison Approach, similar to the Sockler Report and using some of the same comparables, but with some slightly differing information. (See Hedden Report at 19-32.)  During testimony, Hedden thoroughly explained his methodology.  (See 1-18-11 Tr. at 77-96, 104-127.)  His initial FAR range was from $21.75 to $35.73.  (See Hedden Report at 30.)  He also adjusted for various features, including off-site improvements, location, approvals, and size, but did so very differently than Sockler, including a very small location adjustment and a greater one for size.  (See id.)  His adjusted FAR range was $23.98 to $35.76, and he settled on $30.00 for the Subject Property.  (See id. at 30-32.)  Multiplying this number by his HBU of 600,000 square feet of office space yielded a gross property value of $18,000,000.  (Id. at 32.)  He deducted the estimated demolition costs of $900,000, for a total vacant land value of $17,100,000.  (Id.)  Hedden testified that Sockler's methodology used the existing Improvements, which values the Land "in use" and "suppressed the land value."  (1-18-11 Tr. at 131.)

Hedden next determined a land cap rate through consultation of various surveys examining national, suburban, and Philadelphia office markets.  (Hedden Report at 33-38; 1-18-11 Tr. at 132-36.)

44

He used a higher cap rate here because "participants [indicated] capitalization rates for ground leases are slightly higher than overall capitalization rates for leased buildings," though he admitted to being a little surprised by this finding.  (Hedden Report at 38; see 1-18-11 Tr. at 135.)  Multiplying his 8% cap rate by the $17,100,000 Land value yielded a FMRV of $1,368,000 per year.  (Hedden Report at 39.)

Hedden finally testified on direct regarding his relationships with Sockler and Korpacz, noting that while he was aware the two knew each other, he did not know they had been guests in each others' homes, and that if he had known, he would not have recommended Korpacz for the assignment.  (See, e.g., 1-18-11 Tr. at 168-73.)  Hedden stated during cross-examination that he retained Sockler for other assignments during the pendency of this assignment, and that he revealed this to Herring.  (2-7-11 Tr. at 87, 92.)

On cross-examination, Hedden admitted to having read the Sockler Report before he completed his own.  (Id. at 10.)  When asked "you were given [the Van Cleef Plan] for what purpose, Mr. Hedden?" he answered "[a]s a basis for the use in my [HBU] conclusion relative to the physical and legal factors that we've discussed as part of the [HBU] analysis."  (Id. at 21-22.)  Hedden qualified that he was not told to use it, but he did not hire his own engineer either.  (Id.)  Counsel for GFP asked if he was then advocating the Van Cleef Plan, but Hedden disagreed with

this characterization.  (Id. at 23-24.)  Hedden also testified to
his belief that he disclosed the hypothetical nature of the Van
Cleef Plan in conformity with USPAP, without using the exact word
"hypothetical."  (See id. at 74-77.)  Hedden further stated that
"any rent that might be attributable" during construction of the
Van Cleef Plan "is not considered" in his calculations.  (2-7-11
Tr. at 131.)  He conceded that he knew of no other facility in
the area as dense as the Van Cleef Plan.  (Id. at 132-33.)

GFP also inquired into the potential development costs to
build the structures in the Van Cleef Plan.  (See id. at 149.)
Hedden testified he had not done the calculations, but that they
were not required for determining financial feasibility because
that information was "baked in" to the comparables in the Sales
Comparison Approach.  (Id. at 150, 155-59; see also id. at 162-
63.)  GFP continued:

> GFP: "And you didn't really consider the financial
> feasibility in terms of any hard costs, soft cost analysis
> of what it would actually cost to create structures in
> accordance with the Van Cleef [ ] plan, isn't that true?"
>
> Hedden: "I did not do any cost analysis, that's true."

(Id. at 184.)  Finally, Hedden acknowledged that the development
plans for many of his comparable properties were altered or never
developed at all.  (Id. at 186-87.)

During redirect on the next trial day, Hedden said he had
calculated the costs of building the Van Cleef Plan since his
previous testimony.  (Dkt. entry no. 205, 2-23-11 Tr. at 37.)

46

Over GFP objection, the Court admitted into evidence Hedden's opinion that it would cost $168 million to demolish the current buildings and build 600,000 square feet including structured parking; that with an 8% cap rate you would need it to produce operating income of $13,440,000 per year for construction, plus $4.2 million per year in expenses; for a total necessary income of $18,568,421, requiring a FAR of $31 per square foot of rent needed, which Hedden asserted even Sockler said was achievable for Class A space in this market.  (Id. at 39-48; see id. at 72 (the Court admitting testimony and permitting GFP to recall Sockler for further rebuttal testimony).)  Hedden also claimed the proposed 85% density was not a factor, because as vertical density, plenty of open space would remain.  (Id. at 54-57.)

During re-cross, Hedden admitted he had not considered various costs associated with constructing the buildings in the Van Cleef Plan, but contended this was not necessary for HBU. (Id. at 80-85.)  He did not know how long it would take to construct the project, but it was his opinion that the Ground Lessee would be required to pay rent in the interim.  (Id. at 87-88.)  Hedden also contended that the inferred financial feasibility analysis was inherent in the Hedden Report, and did not need to be explicitly stated.  (Id. at 90-95.)  Hedden further testified that while demand for Class A office space was declining by September 2007, he did not need to include this in his report.  (Id. at 98-99.)

47

Sockler was recalled to the stand to rebut Hedden's newer testimony. (Dkt. entry no. 208, 2-24-11 Tr.) He testified that rather than an 8% cap rate for ground rent, 5% to 6% was a more appropriate number. (Id. at 8, 10-12 (noting in part because if Ground Lessee defaults, Ground Lessor can seize the Buildings).) He also explained why he thought the operating expenses for the Van Cleef Plan would be much greater than Hedden's $7 per square foot, probably $12 to $14. (Id. at 12-18.) Sockler estimated the cost to build the structured parking at $51 million and the buildings at $222 million, for a total cost estimate of $273 million, with an additional $10 million for offsite improvements. (Id. at 19-21, 25.) Using what he characterized as the same methodology as Hedden, as well as the same 8% cap rate, Sockler estimated one would have to charge rents of $48 per square foot to build this project, a sum he described as "unattainable." (Id. at 26-27.)

Sockler also disagreed with Hedden on trends and density. He asserted Hedden should have considered trends from 2006 and 2007. (Id. at 41-42.) He also said "[t]here is nothing that I have seen, short of maybe something on Nassau Street in Princeton, that would have the development density of that proposed by" the Van Cleef Plan. (Id. at 46; see also id. at 121-22.) He further noted that four of Hedden's comparables were planned as developments for specific users, whereas here, the Van Cleef Plan would have to be built "on spec." (Id. at 47-50.)

48

Finally, Sockler claimed Hedden's inferred analysis was improper
because "inferred analysis is something that's done when you're
generally speaking about a class of real estate, generally. . . .
When you're dealing with a specific property, what you have to do
is a fundamental analysis." (Id. at 53-54.)  Sockler stated the
Hedden Report "was a hypothetical valuation based on a
hypothetical concept, assuming it were built and in place and
fully leased as of the date of valuation."  (Id. at 55.)

### (iv) Korpacz Report

In selecting the third appraiser ordered by the Court,
Sockler testified he and Hedden started with a list of five to
ten appraisers, narrowed it to three finalists, and finally chose
Korpacz.  (12-16-10 Tr. at 125.)  He testified they "mutually
agreed" on Korpacz as the best candidate, and with respect to
some of the data used in this kind of appraisal, Korpacz was
"perhaps the best known authority in the world." (Id. at 126;
see also 1-11-11 Tr. at 19.)  At least in part because of this
national reputation, Sockler and Hedden recommended the parties
waive the requirement that Korpacz be "familiar with the real
estate market in Mercer and Ocean Counties," and the parties
agreed.  (See, e.g., Mot to Disqual. Korpacz at 12-13.)

Korpacz was admitted as an expert in commercial real estate
appraisal, including FMRV, without objection. (12-1-10 Tr. at
26-27.)  He testified that he "was asked to estimate the [FMRV]

49

of the 16.3 acre parcel situated at 370 Scotch Road in Ewing Township," and confirmed that he did so as of the January 14, 2006 Determination Date.  (Id. at 28, 133.)  Though he was the independent third appraiser, he testified first as a matter of scheduling, and so explained many terms commonly used in the appraisal field.  (See, e.g., id. at 28-30)  He explained that to

> find the rental value for land, you first have to establish its value. . . . one of the ways we do it, and the way we did it here is we look at comparable land sales, compare them to the subject property, and develop an opinion of what the subject land value is, usually on some unit basis like value per square foot of land, or value per square foot of building that could be built on that land, which is what we did here.

(Id. at 30-31.)  For determining the land cap rate, he explained "the theory is that . . . the ownership of land has less risk than ownership of land [and] building wherein you have lots of risk with finding tenants, with maintaining the property, and so forth, that the rate appropriate for land should be less than the rates that are being achieved on improved office building properties."  (Id. at 32.)

Korpacz next explained how he prepared his report, noting that this assignment was "a little different than a normal land valuation.  This particular assignment is controlled, to a large degree, by the ground lease, and what it specifies in terms of how the appraiser should approach the valuation problem.  It also involves the existence of two other appraisals . . . ."  (Id. at 33.)  The Korpacz Report begins by identifying the problem and

50

defining important terms, including Market Rent (which he
characterized as "synonymous with Fair Market Rental Value") as
"[t]he most probable rent that a property should bring in a
competitive and open market reflecting all conditions and
restrictions of the lease agreement, including permitted uses,
use restrictions, expense obligations, term, conditions, renewal
and purchase options, and tenant improvements." (Korpacz Report
at 3.)  He noted that the right valued in the Land is "the fee
simple estate, subject to the applicable provisions of the ground
lease." (<u>Id.</u> at 4.)  He also detailed how he familiarized
himself with the local market. (<u>Id.</u> at 5.)

The Korpacz Report proceeds, much like the Sockler Report
and the Hedden Report, with overviews of the national economy and
the more regional and local market trends. (<u>Id.</u> at 8-21.)  It
notes that in 2005, in the submarket where the Subject Property
is located, the vacancy rate was 20.90% and the rent range was
$18 to $27 per square foot. (<u>Id.</u> at 20.)  It speculates that
"[a]lthough rents were reported to be stable in 2005, the high
vacancy may eventually push rent levels lower." (<u>Id.</u> at 21.)
Korpacz also testified that the vacancy rate was increasing.
(12-1-10 Tr. at 47.)

Korpacz described the Subject Property as being basically
level, with some easements and surface parking. (<u>Id.</u> at 36.)  He
noted the two Buildings were probably originally Class A but are

51

now Class B, and remarked, "[t]hey're not part of the appraised
value, but they are in existence." (Id. at 36-39; see also
Korpacz Report at 23.)  The Korpacz Report observes that "the
subject site does not have any direct road frontage which
severely limits its signage potential and visibility from the
Interstate." (Korpacz Report at 23.)  It concluded that "[g]iven
the lack of new office construction in the area and the existence
of numerous non-office uses, the subject's office location would
be considered Class B for office use in its market." (Id.; see
also 12-1-10 Tr. at 56-57 (discussing surrounding uses in
neighborhood and reiterating Class B location opinion).)  It also
noted Herring's recent $9 million purchase of the larger 55-acre
parcel, but that "the transaction could not be used to value the
subject parcel" because "there was no formal allocation of the
purchase price between the improved ground lease parcel . . . and
the remaining land." (Korpacz Report at 22.)

     The Korpacz Report next discusses the zoning of the Subject
Property, with reference to the Bohler Engineering Report
("Bohler Report") that Korpacz commissioned. (Id. at 26-27; id.,
Ex. C, Bohler Report.)[23]  It also includes tax assessment

_____

     [23] The Bohler Report noted that "[p]arking requirements will
limit the amount of building expansion unless structured parking
is sought.  However, based on the economic conditions starting
back in 2006 to present and drop in rent prices, structured
parking would not be recommended due to the high costs to
construct . . . and the limited demand for office space."
(Bohler Report at 4.)  It concludes:

information, "to see what the local assessor thinks." (Korpacz Report at 28; 12-1-10 Tr. at 63.)

The "Valuation" section of the Korpacz Report begins with a discussion of HBU, defining it as "[t]he reasonabl[e], probable, and legal use of vacant land or an improved property, that is physically possible, appropriately supported, financially feasible, and that results in the highest value." (Korpacz Report at 31.) It next defines the problem:

> Often, ground leases indicate whether the valuation should be based on the land being considered as (1) vacant and unimproved or (2) as improved. It is unusual for a ground lease to refer to another lease for the appraisal procedures to be followed in determining a ground lease rent, but that is what happened in this situation. In the ground lease itself, there is no description of the appraisal process or in any reference to whether or not the existing buildings and site improvements should be taken into account in the valuation process. And yet, that is the crux of this appraisal assignment. For valuation purposes, should the subject's 16.30-acre land parcel be considered as vacant and unimproved, or should it be subject to the continued use of the existing building and site improvements?

(Id. at 31.) Then, the Korpacz Report discusses its solution:

> The division of the real estate, into separate entities (land and improvements) by two separate leases (the Ground

---

> [ba]sed on a preliminary review of the lease area and existing conditions . . . no further expansion of the existing buildings . . . would be permitted as the existing development is under parked by 11 spaces based on the building square footage and the development is nearly built-out within the lease area. Considering a new build-out . . . where the existing site is demolished, it appears the site could contain approximately 268,750 SF of building floor area. . . an increase of 89,819 SF.

(Id. at 4-5.)

Lease and the Improvements Lease), was accomplished with the same parties and within a few days of one another.  We interpret this to mean that there was tacit, if not written, agreement that the ground rent renewals were to consider the improvements on the site at each ground rent renewal date.

Absent clear and unambiguous language in the Ground Lease or the appraisal procedures section of the Improvements Lease that the land was to be valued as if vacant and unimproved, th land valuation process should reflect the continued use of the existing improvements. . . .

Based on this conclusion, a traditional [HBU] is not useful or required.  The valuation analysis will, therefore, be based on the square feet of the building area of the existing improvements plus any additional building area allowed by zoning.  The [Bohler Report] concludes that "no further expansion of the existing buildings would be permitted."  Hence, we conclude that the land should be valued on the basis of the floor area of the existing two buildings or 179,000 square feet.

(Id.)  Korpacz further explained his reasoning, testifying that

he was "left with this very vague language" which

. . . led me to think about how I might solve the problem. And I thought about my experience where I've looked at other ground lease renewals, where typically the land was leased before there were any buildings on it.  Maybe the parties anticipated a certain type of building on there.  Maybe the building was approved by planning, and they were going to do it, and the parties got together, they knew what the economic units were, they could figure out a fair rent for the land.  And . . . in most of those cases, they will say that for each . . . rental renewal, that the land should be valued based upon vacant and unimproved.  That's the typical ground lease renewal I've had experience with.

(12-1-10 Tr. at 72-74.)  However, in this case, he reasoned that

the buildings were already there.  And the parties decided to split the property interest into a land ownership and a building ownership, and in the process has to create a way to charge ground rent.  But they didn't specify in the lease how the appraiser is to look upon that land, which has a building on it on the date of value. . . .

54

And as I thought about it, I came to the conclusion that
when the ground lease was drawn, and the improvement lease
was drawn, both parties knew what was on the site.  They
knew what the current tenants were paying in rent.  They had
a sense of what fair rent was for that improved property.
And, in my mind, they must have thought that going forward,
that the existence of those buildings should be taken in
consideration in any future ground rent renewals and
resetting of the rent.

And my conclusion in the last paragraph with the [HBU]
before the final conclusion was absent clear and unambiguous
language in the ground lease, or the appraiser's procedure
section of the improvement lease, that the land was to be
valued as vacant and unimproved[; t]he land valuation
process should reflect the continued use of the improvement.

So, my conclusion is that the appraiser should consider the
fact that those improvements are there.  And they are an
encumbrance.  They might help the property if a lot more can
be built, they might hinder the property for future
development, [if] the reverse is true.

But in any event, given the circumstances of how this . . .
joint ownership of the land and buildings was split up, that
it was my view that it would have been in the minds of the
parties that the existing buildings should be reflected in
any resetting of the ground lease.

(Id. at 75-76 (the Court overruling Herring's motion to strike).)

Like Sockler and Hedden, Korpacz used the Sales Comparison

Approach.  (Korpacz Report at 32-37; see Sockler Report; Hedden

Report.)  However, where Sockler and Hedden used a grid to make

percentage adjustments to the FAR based on various features,

Korpacz compared the comparables to the Subject Property in

narrative form.  (Korpacz Report at 32-37; 12-1-10 Tr. at 83-86;

see Sockler Report; Hedden Report.)[24]  Korpacz identified two FAR

---

[24] Korpacz was thoroughly cross-examined on this subject,
and repeatedly noted same.  (See 12-1-10 Tr.; 12-2-10 Tr.)  He

values - FAR as per zoning and FAR as actually developed or proposed for a given site - and used the latter in his calculations, as he considers it "the most accurate, realistic, and reliable measure of investor motivations and expectations for a development site."  (Korpacz Report at 32.)

Korpacz examined eight comparable transactions, with a FAR range of $7.02 to $35.61 per square foot.  (Id. at 35.)  He concluded that Sales 3, 6, and 7 were most similar to the Subject Property, with Sale 7 being located close to the Subject Property and Sale 6 being considered superior, and thus concluded the FAR value of the Subject Property was $22 per square foot.  (Id. at 36; 12-1-10 Tr. at 92.)  Multiplying this by the square footage indicated in the Bohler Report yielded a Land value of $3,938,000.  (Korpacz Report at 36.)  Next, and again similar to Sockler and Hedden, he determined Land cap rate, reaching an ultimate figure of 7%.  (Id. at 37.)  Applying this rate to the Land value yields an Annual Fair Ground Rent of $275,660.  (Id.)

Korpacz was asked on cross-examination if he interpreted the Leases in the course of making his appraisal; he answered that he "was faced with no instructions or guidance in the lease, and had to make a judgment as to what made the most sense relative to

---

reasoned that "people in the real world, in the investing world do not do adjustment grids, do not make plus or minus adjustments.  They consider all of the characteristics of the various sale prices and the various sales that they are aware of in trying to come to a reasoned conclusion as to what they should pay for specific properties."  (12-2-10 Tr. at 23.)

solving this valuation problem." (12-1-10 Tr. at 109.)  He did,
however, concede that, absent specific instructions, he would do
HBU as if vacant and unimproved.  (Id.)  He agreed there was
"nothing specific in the lease to that effect" that HBU was
precluded.  (Id. at 109.)  The next day, he elaborated that "the
valuation of the appraisal process contained in the lease
required an analysis different from the standard [HBU] analysis."
(12-2-10 Tr. at 29.)  He concluded there was "tacit" agreement
that the Land should be valued based on the continued use of the
Improvements.  (12-1-10 Tr. at 113-17.)  When the Court asked him
about the difference between "standard" or "traditional" HBU and
what he did for this assignment, Korpacz explained:

> [T]his is a[n HBU] use appraisal.  But the [HBU] is driven
> by the appraisal methodology language in the ground lease
> which, as I have pointed out, leaves a very important
> unanswered question.  And that is whether the land should be
> valued as if vacant and unimproved, without regard to any
> improvements.  Or whether it should be valued, given
> consideration to the fact that there are existing
> improvements as an encumbrance, and they take up some of the
> permitted FAR.
>
> And then I had to reach -- make a judgment as to -- since
> the lease was silent, which of those two assumptions I
> should use.  And I concluded that it should be subject to
> the encumbrance of existing improvements insofar as they
> take up some of that permitted FAR.

(12-2-10 Tr. at 124.)

When questioned about his relationship with Sockler, Korpacz
said they made plans to vacation together before he was selected
for this assignment.  (12-1-10 Tr. at 146.)  But he asserted it
was the only time they had traveled together socially, and the

"social part is just incidental" to the business relationship.

(Id. at 143, 147.)  He later testified that "[w]e're all

professional about those things, and we put friendships aside

when we get into disputes."  (12-2-10 Tr. at 33.)

In comparing the construction density in his appraisal to

that of the Hedden Report, Korpacz noted that:

> if you look at the site plan in his report . . . all of the
> improvements, both parking garage and the office buildings,
> just totally overpower the site.  And, in fact, the parking
> garages, in terms of the space on the site that they take,
> they actually [dwarf] the office buildings.  So, he's
> proposing a very high density that is outside the range of
> what's been done in this market by a multiple.

(12-1-10 Tr. at 97.)[25]  He further opined that "I've never seen

this kind of density in a suburban office environment,

particularly one where you have to get pretty healthy rents to

afford to put in the structured parking."  (Id. at 101.)  Korpacz

also observed that Hedden's HBU was "a very perfunctory analysis

-- I wouldn't call it an analysis.  But basically statements

about . . . how [HBU] is defined, a listing of the criteria that

he used to determine the [HBU] of a property.  It's just a

listing of what they are . . .  There is no analysis of them,

particularly on financially feasible."  (12-2-10 Tr. at 62.)

Korpacz argued that rather than relying on the Van Cleef Plan,

---

[25]  Korpacz initially appeared to assert that the Hedden
Report calls for a FAR of $85 per square foot, but during cross-
examination clarified that he was talking about an 85% buildings-
to-land density level.  (See id. at 103-04.)

Hedden's HBU analysis should have had "at a minimum . . . a
discussion of how this dense use is going to be perceived in the
marketplace." (Id. at 63.)  Korpacz characterized the Hedden
Report HBU section as "a flawed analysis that has no market
support," explaining:

> there was no analysis of the marketability of this space in
> terms of its density.  There was no analysis of the impact
> of structured parking and the cost of structured parking on
> financial feasibility.  Without those analyses, there is
> really very little meat around the bones in the [HBU]
> section.  It really boils down to accepting the engineer's
> report that a building of this size could be constructed on
> the site, including the parking structure.
>
> But there's no support that the marketplace would actually
> accept it, rent it, and that it would be feasible for the
> developer to do.

(Id. at 64-65.)

### 2. Motions to Strike

The Court will not exclude or strike the testimony or
reports of any of the Appraisers.  All three are well-qualified,
drew upon a wealth of professional experience, and demonstrated a
thorough knowledge of academic appraisal principles.  Their
differences, while very real, lie primarily in their disparate
initial assumptions, not in impermissible biases or conflicts.

The Court is not persuaded by Herring's attempt to analogize
case law pertaining to arbitrators and Korpacz's role here.
(Mot. To Disqual. Korpacz at 18-23; dkt. entry no. 225, Herring
Reply To GFP Opp'n at 4-5.)  For one, Korpacz does not have any
authority over the determination of the Ground Rent.  While full

59

disclosure may have been preferable, Herring cites no relevant legal principles or standards of professional conduct for appraisers that would require it.  (See Mot. To Disqual. Korpacz; dkt. entry no. 245, 3-29-11 Tr. at 138-143 (where Herring argued for same).)  Moreover, the testimony of the Appraisers regarding the informal nature of the business relationships and professional conferences typical in their profession convinces the Court that the relationships among the three Appraisers did not adversely implicate their ability to remain unbiased here. (See, e.g., 12-2-10 Tr. at 33 (Korpacz testimony); 12-16-10 Tr. at 128-29 (Sockler testimony).)  Finally, even Hedden and Sockler have worked with each other on other projects during the pendency of this action.  (See 2-7-11 Tr. at 87 (Hedden testimony).)  The Court also denies GFP's motion to strike the Hedden Report, but the Court has heavily discounted it, as discussed below.

### 3. Methodology for Determining Ground Rent as of the January 14, 2006 Determination Date

The Court has carefully considered the legal arguments of the parties and the factual testimony of their expert appraisers. Despite the assertions of the parties that the appraisal methodology stated in the Ground Lease should be followed as if the Land is either vacant or improved with the Buildings for the duration of the Ground Lease, the Court concludes that the answer is neither static nor easily phrased in such black or white terms.  Rather, the proper methodology for a given Determination

60

Date, including whether to consider the presence of the Buildings, depends on a combination of factors, most importantly the components of HBU analysis.

This case presents a unique situation, one "a little different than a normal land valuation." (12-1-10 Tr. at 33 (Korpacz testimony).) As Korpacz noted "[i]n the ground lease itself, there is no description of the appraisal process or in any reference to whether or not the existing buildings and site improvements should be taken into account in this valuation process. And yet, that is the crux of this appraisal assignment." (Korpacz Report at 31.) The Court heard testimony from the Appraisers on how they, performing their expert functions, approached the situation. The Court also considered the law surrounding the determination of FMV. (See discussion supra section II(A).) While case law demonstrates that disputes over ground rent are not uncommon, they are fact-specific.

The Court has been called upon to declare how the parties are to determine the annual FMRV for the Land, more specifically whether the HBU of the Subject Property should be assessed as though vacant or as improved, with the Improvements. The Court has "slosh[ed]" its way through the "factbound morass," Davis v. United States, No. 09-11328, 2011 WL 2369583, at *16 (U.S. June 16, 2011), and finds that, for all of the reasons discussed, the Land must be appraised according to its HBU as improved, but

considering, as that method requires, whether the HBU consists of redevelopment or the continued use of the existing Improvements. In addition, the Court finds that for the January 14, 2006 Determination Date <u>only</u>, the Ground Rent must be set assuming the existing Improvements remain on the Subject Property.

Because the FMV is "the price which a willing buyer would offer and a willing seller would accept," and "all of the considerations that would influence a willing buyer and willing seller in making their decisions are relevant," the Court considers the problem from the standpoint of a hypothetical Investor.  <u>See, e.g.</u>, <u>Oscar</u>, 352 N.J.Super. at 487-88.  This Investor would consider the four prongs of HBU: physical possibility, legal permissibility, financial feasibility, and maximal productivity.  On January 14, 2006, the Investor contemplating the 16-acre Subject Property would know of the long-term encumbrance of the Ground Lease, the approximately thirty-year-old Buildings, and the easements and challenges to access.  The Investor would also have knowledge of the marketplace, including the general commercial knowledge of land investors and commercial office tenants.  What would that Investor be willing to pay for the Land, to rent it out for a reasonable return?

For the purposes of this Determination Date, the Court assumes <u>arguendo</u>, but does not decide, that the Van Cleef Plan is

physically possible and legally permissible.  However, financial feasibility is the key here.  The Court largely credits the Sockler Report and Korpacz Report in their conclusions that, at the January 14, 2006 Determination Date, (1) the Land must be valued as encumbered by the Ground Lease, (2) the location of the Subject Property could not support Class A office space, (3) there was little demand for new office space, and (4) because it was not financially feasible to build newer and larger office space, the HBU of the Subject Property was the continued use of the Buildings.

### (i) Land encumbered by the ambiguous Ground Lease

The appraisal methodology for setting the Ground Rent must take into account the existence of the Ground Lease.  The Subject Property is not held in fee simple; it is encumbered by the Ground Lease until 2060.  The hypothetical Investor would have, as Herring had, actual notice of the Ground Lease during acquisition.  When the original parties agreed to the Ground Lease, they also had knowledge of, and indeed transacted, the Improvements.  In addition, Section 16 of the Improvements Lease states that "[e]ach methodology or approach to valuation of the Premises used by an appraiser shall treat the Premises as encumbered by this Lease . . . ."  (Stip. Facts. at ¶ L.)[26]

---

[26] Though the meaning of this statement is admittedly unclear, as this section was originally intended for determining FMV of the Improvements; moreover, Appendix A is equally challenging where it states: "'Premises' shall mean (a) the

Contrary to Hedden's assertion during trial, the Ground Lease, and the rights it gives the Ground Lessee, would reduce the value of the Land to the Investor. It is not reasonable for this or any other Ground Lessor owning the Land to expect to collect the FMRV of fee simple property when the property is actually encumbered by a seventy-five-year Ground Lease. Nor is the FMRV supposed to be an artificial figure. The question in FMV, is what is the Land worth to a willing buyer? Any willing buyer of the Land has notice of the Ground Lease when purchasing. Indeed, Herring had notice of the Ground Lease encumbrance when it bought the Land. Yet it seeks to collect rent on the Land as if the Ground Lease does not exist.

### (ii) Class B location

As of the Determination Date, the location of the Subject Property was a Class B location. It is not on the prime Route 1 corridor. The surrounding neighborhood includes an airport, a highway maintenance depot, Class C office space, and few amenities. The site configuration of the Subject Property itself is also less than ideal. It is surrounded by the remainder of the original 55 acres, the hole inside of a donut, with poor access to and visibility from the road. Moreover, the tenant of

---

Improvements and (b) the leasehold interest of the Lessor in the Sites (or, <u>as the context may require</u>, the Lessor's right, title and interest in, to and under the Ground Lease)." (Improvements Lease, Appx. A (emphasis added).)

this landlocked parcel has little control over development of the
surrounding land, much less the capability to erect signage.
Hedden's Class A location conclusion, in reliance on neighboring
single-occupant sites and planned developments that never came to
fruition, is misplaced.  The Court credits the opinions of
Sockler and Korpacz that, as of the Determination Date, the
location of the Subject Property could not support Class A
development.  (See 12-2-10 Tr. at 149, 152 (Sockler testimony);
12-1-10 Tr. at 56-57 (Korpacz testimony).)[27]

### (iii) Financial feasibility, considering vacancy rates and density

The Court also credits the opinions of Sockler and Korpacz
with respect to the lack of a market for redevelopment or other
potential uses.  All of the Appraisers identified high vacancy
rates in the area at the end of 2005 and going into 2006.  (12-2-
10 Tr. at 168 (Sockler testimony); Hedden Report at 9-11; Korpacz
Report at 21.)  They also noted that then-recent construction had
contributed to an excess supply of office space in the market.
(See Hedden Report at 10-11; Korpacz Report at 20; Sockler Report
at 44.)  Many of the comparables cited by the Appraisers
subsequently scaled back their planned development square footage

---

[27] "[J]ust because you could build Rockefeller Center in the
middle of Iowa doesn't mean you would . . . ."  (2-7-11 Tr. at
181.)

because of softening demand.[28]  Herring pointed to Sockler's data
demonstrating a relatively low vacancy rate for Class A office
space.  (1-11-11 Tr. at 117-18.)  However, because the Court
finds that the Subject Property, as of the Determination Date,
was not a Class A location and could not support Class A
buildings, this vacancy rate is irrelevant.

The Hedden Report was based upon a 600,000 square foot plan,
but failed to properly consider the financial feasibility of this
kind of development.  For example, Hedden claimed that all of the
redevelopment costs were "baked in" to his inferred analysis, but
he maintained the value of the Buildings was irrelevant and not
considered.  (2-7-11 Tr. at 150, 155-59.)  If the hypothetical
Investor were interested in acquiring the fee simple interest in
the Subject Property to redevelop it, the Investor would have to
factor in the cost of purchasing and demolishing the Buildings,
as they have value that cannot be ignored.[29]  Sockler and Korpacz

_____

[28] In considering this factor, the Court is mindful of the
applicable Determination Date and the need to avoid hindsight.

[29] "Appraisal theory holds that as long as the value of a
property as improved is greater than the value of the land as
though vacant, the [HBU] is the use of the property as improved.
In practice, however, a property owner who is redeveloping a
parcel of land may remove an improvement even when the value of
the property as improved exceeds the value of the vacant land.
Investors are not likely to pay large sums for the underlying
land simply to hold onto the property until the value of the
remaining improvement has decreased to zero.  The cost of
demolition and any remaining improvement value are worked into
the test of financial feasibility for redevelopment of the land."
The Appraisal of Real Estate at 306-07 (emphasis added).

also opined the density of this development would both exceed
demand and be out of character with the surrounding suburban
office market.  Their Reports more realistically contemplated
development in the range of 179,000 to 268,000 square feet,
leading to the Improvements remaining the HBU at the
Determination Date.  Appraisers must consider the demand for new
office space, in both size and character, in determining the
financial feasibility of redevelopment.

    The Court does not reject the possibility that the Buildings
may reach obsolescence before the end of the Ground Lease term in
2060.  The Buildings, as fully depreciated commercial real
estate, are a deteriorating asset.  The owner of the Buildings is
not likely to recoup their purchase price in a later sale.  But
as of January 14, 2006, the Buildings were capable of generating
rent and were not obsolete.

    Because of the fluid ambiguity in the useful life of the
Buildings over time, the proper methodology for each
Determination Date from now to 2060 is not clearly "as if vacant"
or "as improved with the Improvements."  Rather, the appraiser
must take into account the four components of HBU, combined with
the other surrounding factors discussed above, to determine which
use is appropriate at a given Determination Date.  Here, the
financial feasibility factor clearly weighed in favor of finding
the Buildings non-obsolete, and against demolition and

redevelopment.  Thus, the methodology for determining the FMRV of the Land as of January 14, 2006, must take into account the continued existence of the Buildings.  The methodology for determining the FMRV of the Land at future Determination Dates must <u>consider</u> the continued use of the Buildings and <u>compare</u> them to other possible and <u>financially feasible</u> uses to arrive at the HBU of the Subject Property.

### 4. Completing the Appraisal Process

The required methodology declared by the Court here is best reflected in the Sockler Report, which recognized that HBU "generally involves consideration of the subject property under two scenarios: as vacant land and as presently improved," and in the latter, consideration of whether alteration or demolition is the HBU.  (Sockler Report at 63, 65.)  Thus, we find that the Sockler Report is adequate for the purposes of the appraisal process dictated by the Ground Lease.

The Hedden Report, however, cannot stand.  To the extent Hedden claims an appraiser need not consider the Ground Lease or the Improvements, or that he contends financial feasibility was sufficiently considered in his HBU analysis, his Report is inadequate.  The Court finds the Hedden Report improperly neglects practical realities in favor of resorting to selectively interpreted appraisal theory.

The Korpacz Report is largely adequate and supports the Sockler Report, but the Court has some concerns.  For one, while Korpacz's "narrative form" may be acceptable in other forums, the Court finds the "grids" preferable for clarity and ease of comparison.  In addition, to the extent that Korpacz concluded the Land must always be valued with the existing Improvements for the remainder of the Ground Lease, this is incorrect.[30]  As discussed above, there may likely reach a point in time where the HBU of the Subject Property is to demolish the Buildings and redevelop the Land.  Furthermore, although the Bohler Report concluded that around 268,000 square feet of office space would be legally permissible and physically possible, it appears that Korpacz did not consider this potential use because he concluded the existing Buildings had to remain (alternatively, he may have considered this a use "as vacant," see 12-1-10 Tr. at 106).  Where the HBU of the Subject Property is an open question, this would constitute error.  But because here the Court finds the HBU is the existing Buildings, as of the January 14, 2006 Determination Date, this error is harmless.

_____

[30] This appears to be Korpacz's stance.  (See Korpacz Report at 31 ("We interpret this to mean that there was tacit, if not written, agreement that the ground rent renewals were to consider the improvements on the site at each ground rent renewal date."); 12-1-10 Tr. at 75-76 ("And, in my mind, they must have thought that going forward, that the existence of those buildings should be taken in consideration in any future ground rent renewals and resetting of the rent. . . . it was my view that it would have been in the minds of the parties that the existing buildings should be reflected in any resetting of the ground lease.").)

### III. Conclusion

For the reasons discussed above, the Court will (1) deny the motions to strike the expert appraiser reports and testimonies; (2) grant declaratory judgment in Plaintiffs' favor, to the extent they seek a declaration that the Land must be appraised taking into account the Ground Lease encumbrance, and, as of the January 14, 2006 Determination Date, the continued presence of the Improvements; (3) deny declaratory judgment in Plaintiffs' favor, to the extent they seek a declaration requiring appraisers assessing the HBU on future Determination Dates to recognize "the right" of the Improvements to "continue to remain in place";[31] (4) deny declaratory judgment in Herring's favor, to the extent it seeks a declaration that the Land must be appraised as though vacant for both the January 14, 2006 Determination Date and future Determination Dates; and (5) deny declaratory judgment to both parties, to the extent they seek a judgment declaring whether the methodology for future Determination Dates requires the Improvements to remain, as this must be determined at each Determination Date through consideration of factors as discussed above. The Court further determines that:

---

[31] Of course, the Improvements can remain, but this would not preclude Plaintiffs from being required to pay a higher Ground Rent if the appraisal process on a future Determination Date indicates the HBU as improved requires redevelopment.

(1) The parties my now complete the appraisal process for determining FMRV as of the Determination Date of January 14, 2006.  They may seek supervision of that process by the Court if necessary.

(2) Any future appraisal performing the Sales Comparison Approach must use comparison "grids" over a "narrative form."

(3) The Sockler Report may be used in future proceedings, but the Hedden Report may not, as it does not conform to the Court's declared methodology.  In addition, if needed, a new third appraiser must be selected.

(4) The Court will ultimately decide, after the Phase II trial, what amount, if any, of back rent and/or interest will be awarded to Herring, and what amount, if any, of damages or offset for alleged breach of contract or under equitable principles will be awarded to Plaintiffs.

The Court issues declaratory judgment and related orders herewith.


                              s/ Mary L. Cooper
                              **MARY L. COOPER**
                              United States District Judge


**Dated:**    June 29, 2011



71