**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TEXTRON FINANCIAL-NEW JERSEY INC., et al., | CIVIL ACTION NO. 06-2585 (MLC) |
| Plaintiffs, | **MEMORANDUM OPINION** |
| v. | |
| HERRING LAND GROUP, LLC, | |
| Defendant. | |

**COOPER, District Judge**

This matter, as more fully explained both below and in the Court's June 29, 2011 Memorandum Opinion, concerns the parties' disputes over lease agreements ("Leases") governing interests in real property ("Subject Property") consisting of a parcel of land and the improvements built upon it ("Improvements"). (See dkt. entry no. 264, 6-29-11 Mem. Op.)  The Leases include the lease governing the parties' interests in the land ("Ground Lease") and the lease governing the parties' interests in the Improvements ("Improvements Lease").

The Court earlier bifurcated the issues presented for trial. (Dkt. entry no. 156, 6-18-10 Order.)  Following Phase I of the trial in this matter, the Court ruled upon the parties' separate requests for declaratory judgment, thus declaring the proper method for appraising the fair market rental value of the land pursuant to the Ground Lease during the time period at issue, which is January 14, 2006 through January 13, 2011.  (See dkt.

entry no. 266, 6-29-11 Order; see also 6-29-11 Mem. Op.)   The
Ground Lease will expire in 2060, having been entered into as a
seventy-five-year land lease.  (See dkt. entry no. 135, Final
Pretrial Order, Stip. Facts at ¶ C.)

The plaintiff, GF Princeton ("GFP"), now seeks judgment in
its favor and against the defendant, Herring Land Group, LLC
("Herring"), for damages resulting from Herring's alleged breach
of contract, i.e., Herring's alleged failure to abide by the
appraisal process set forth in the Leases.  (See dkt. entry no.
17, Am. Compl. at ¶¶ 21-25.)[1]  Herring denies liability for
breach of contract and has counterclaimed for equitable relief,
i.e., "enforcement of the provisions of the Ground Lease for the
determination of" back rent owed.  (See dkt. entry no. 24, Answer
to Am. Compl. at 3-4.)[2]

The Court held a four-day bench trial on the breach of
contract claim and counterclaim seeking equitable relief.  The
parties thereafter submitted briefs and appeared on September 23,
2011 for post-trial argument.  (See dkt. entry no. 294, Herring
Post-trial Br.; dkt. entry no. 298, GFP Post-trial Br.)

---

[1] Textron Financial-New Jersey Inc. was the original
plaintiff in this action but was terminated after transferring
its interests in the Improvements, the Ground Lease, and this
litigation to GFP.  (See dkt. entry no. 1, Compl.; dkt. entry no.
270, 7-15-11 Order.)

[2] Herring incorporated the Counterclaim by reference in the
Answer to the Amended Complaint.  (Answer to Am. Compl. at 4;
dkt. entry no. 8, Answer & Counterclaim at 8-9.)

The Court has thoroughly reviewed the record and carefully considered the parties' submissions and arguments.  We now issue this Memorandum Opinion pursuant to Federal Rule of Civil Procedure ("Rule") 52(a), and set forth our findings of fact and conclusions of law as they pertain to the remaining issues.  This Memorandum Opinion also resolves outstanding motions and objections.  (See, e.g., dkt. entry nos. 258, 269, and 274.)  For the reasons set forth below, the Court has determined that: (1) Herring did not breach the appraisal process set forth in the Leases; (2) Herring's request for relief contravenes the equities and should thus be denied; and (3) in light of these determinations, the outstanding motions and objections are moot.

## I.   Background

### A.   The Original Sale-Leaseback Transaction

Over twenty-five years ago, New Jersey National Bank ("NJNB") owned the Subject Property.  (Stip. Facts at ¶¶ A, B, I.)[3]  The Improvements on the Subject Property were principally comprised of NJNB's corporate headquarters (the "HQ") and operations center (the "Ops. Center", and, together, the "Buildings").  (See id. at ¶ E.)  The land underlying the Improvements is, for purposes of this Memorandum Opinion, the "Land".

---

[3] The Subject Property encompasses approximately fifty-five acres of land, consisting of Tax Lot 3, Block S-371 on the Tax Map of Ewing Township, Mercer County, New Jersey and Tax Lot 21, Block S-91 on the Tax Map of Hopewell Township, Mercer County, New Jersey.  (Stip. Facts at ¶ B.)

NJNB entered into a sale-leaseback transaction with an entity named Textron Financial-New Jersey Inc. ("Textron") on December 27, 1985, whereby NJNB: (1) separated title to the Improvements from title to the Land; (2) sold Textron the title to the Improvements; (3) agreed to lease the Improvements back from Textron for a nominal sum; and (4) retained title to the Land.  (See, e.g., id. at ¶¶ D, G, I.)[4]  NJNB and Textron, as part of that transaction, also entered into the Ground Lease, pursuant to which Textron leased the Land from NJNB.  (See id. at ¶¶ A, M; see also dkt. entry no. 183-5, Ground Lease.)  NJNB benefitted from these transactions because it "put the entire purchase price for the Improvements on its balance sheet, with

---

[4] A sale-leaseback transaction "consists of a sale by the owner of the property, followed by the execution of a lease from the purchaser, as landlord, back to the seller, as tenant." 2 RICHARD R. POWELL ET AL., POWELL ON REAL PROPERTY § 17A, at 17A-2 to 17A-3 (Michael Allan Wolf, ed., 2000).  Such a transaction generally provides for a lengthy term, under which the tenant assumes responsibility for all taxes, insurance, maintenance, and other costs, and enjoys an option to repurchase the property. Id.  "Thus, the tenant's position as to use and occupancy and responsibility for operating expenses does not basically differ, from a practical standpoint, from the position that the tenant occupied as owner prior to sale."  Id. at 17A-3.  Such a transaction serves two functions:

> It is an alternative to raising capital through a mortgage or some other route . . ., an alternative that is effective because a sale will usually produce more working capital than mortgaging the subject property. It is also a means of securing tax advantages to both parties by giving the former owner (now tenant) a rental deduction, and giving the purchaser (now owner and landlord) deductions for depreciation and interest.

Id.

only the [Improvements] Lease payments as a liability." (Id. at ¶ I.)  Textron, for its part, added the Improvements to its portfolio of leveraged leases.  (See dkt. entry no. 290, 8-24-11 Transcript at 70-76.)  Although the Ground Lease originally controlled the entire fifty-five acre Subject Property, the parties amended it in 1986 such that it now covers only the sixteen acre parcel that underlies the Improvements.  (Stip. Facts at ¶ M.)

The Improvements Lease, as written, expired after approximately twenty years, on January 14, 2006.  (Stip. Facts at ¶ H.)  On that date, pursuant to the terms of the Improvements Lease, NJNB held an option, inter alia, to repurchase both the Improvements and Textron's interest in the Ground Lease.  (Id. at ¶ J.)  Although NJNB was not obligated or compelled by any of the above-mentioned agreements to repurchase the Improvements and Textron's interest in the Ground Lease, both NJNB and Textron anticipated this outcome.  (Id. at ¶ Y.)  NJNB and Textron thus failed to meaningfully prepare for other possibilities, and now lack institutional memory of the negotiations or drafting of the Improvements Lease and Ground Lease.  (See id. at ¶¶ W-Y.)[5]

---

[5] In fact, as demonstrated in the Court's 6-29-11 Memorandum Opinion, the failure to account for other possibilities in 1986 prompted Textron to file this lawsuit in 2006.

**B.    The Ground Lease**

The Ground Lease provided terms by which the Ground Lessee, Textron, would pay the Ground Lessor, NJNB, rent under the Ground Lease ("Ground Rent").  In exchange for the initial twenty-year leasehold interest in the Land, which expired upon termination of the Improvements Lease -- _i.e._, on January 14, 2006 -- the Ground Lease provided that the Ground Lessee would pay the Ground Lessor the nominal sum of one dollar.  (Stip. Facts at ¶ K (citation omitted).)  The Ground Lease also provides a procedure for determining Ground Rent for subsequent five-year intervals, the first beginning on January 14, 2006.  (<u>See</u> Stip. Facts at ¶¶ K, N.)  It states:

> (a) . . . On each Payment Date after the Separation Date [<u>i.e.</u>, January 14, 2006, the date upon which the Improvements Lease terminated] during the remainder of the Ground Lease Term, Ground Lessee shall pay Ground Lessor as rental payment for each Site the Appropriate Fraction for the annual fair market rental value ["FMRV"] of such Site determined (as provided in paragraph (b) below) as of the Determination Date (as defined in paragraph (b) below) immediately preceding such Payment Date. . . .

> (b) The annual fair market rental value of each Site shall be determined as of each Determination Date. The determination of annual fair market rental value required pursuant to the preceding sentence shall be determined by Ground Lessor and Ground Lessee within 60 days following each Determination Date or, if they fail to agree within such 60 day period, by the appraisal procedure set forth in Section 16 of the Improvement[s] Lease.

(Stip. Facts at ¶ K (citing Ground Lease at ¶¶ 4(a)-(b))

6

(brackets appearing in original omitted).)   Thus, if the Ground
Lessor and Ground Lessee could not agree upon FMRV for the Land,
they were to turn to Section 16 of the Improvements Lease.
Section 16 of the Improvements Lease provides that:

> . . . <u>Lessor and Lessee shall each appoint an appraiser
> within 10 days of their failure to agree</u>, and the fair
> market value shall be determined by the two appraisers
> so appointed within 45 days of appointment.  If the two
> appraisers so appointed shall be unable to agree upon
> fair market value, fair market value shall be the
> average of the amounts determined by the appraisers if
> the greater of such amounts is no more than 105% of the
> lesser of such amounts.  If the greater of such amounts
> shall exceed 105% of the lesser of such amounts, a
> determination shall be made by a third appraiser, who
> shall be selected within 10 days by the two appraisers
> appointed by the parties hereto.  Such determination
> shall be made by the third appraiser within 45 days of
> his appointment.  In such event, fair market value
> shall be in the average of the two closest appraised
> amounts. . . .

(<u>Id.</u> at ¶ L (citing Improvements Lease at § 16) (emphasis
added).)

The Ground Lease either expires on midnight on December 31,
2060, or terminates upon earlier events constituting default by
the Ground Lessee.  (Ground Lease at ¶¶ 3, 20.)  Upon expiration
or termination of the Ground Lease, the Improvements become the
property of the Ground Lessor.  (<u>Id.</u> at ¶ 20.)[6]

---

[6] The Ground Lease provides in pertinent part:

[U]pon the expiration of the Ground Lease Term or the
earlier termination of this Ground Lease . . ., Ground

Despite the importance now attached to it, the Ground Lease was, at the time of its inception, "at best, a peripheral item" to the tax-driven sale-leaseback transaction between NJNB and Textron; those parties "assumed that [NJNB] would acquire the [Improvements] at the end of the original lease term, and that the Ground Lease would be extinguished at that time." (See Stip. Facts at ¶ Y.) Thus, although both Leases refer to an appraisal process for determining FMRV after the initial twenty-year Ground Lease term, the Leases fail to explicitly or otherwise define FMRV or the methodology that the parties would use to appraise the Land. (See Stip. Facts at ¶¶ T-Y; see also dkt. entry no. 187, 12-1-10 Tr. at 73-74.)[7]

---

Lessee shall surrender such Site to Ground Lessor in the condition (or reasonable equivalent thereof) which such Site was upon commencement of the term of this Ground Lease, except as improved, repaired, rebuilt, restored, altered or added to prior to the expiration of the Lease or as permitted or required hereby or by any other Operative Document; provided, however, that any property remaining on such Site shall be in conformity with Legal Requirements.

(Ground Lease at ¶ 20 (emphasis in original).)

[7] Larry Loeb, an attorney who formerly worked for the law firm of Kramer Levin Naftalis & Frankel LLP ("Kramer Levin"), and who has invested and currently invests in Herring, testified that "the documents were prepared rather poorly," and "[t]here was a bit of dismay on the part of [Textron's lawyer] and myself that the documents lacked greater clarity." (Dkt. entry no. 292, 8-25-11 Tr. at 164-65, 209, 241.)

**C.   NJNB's Interests in the Leases Were Acquired by Wachovia**

Before the Improvements Lease expired in January of 2006, NJNB and its assets, including its interests in the Ground Lease and Improvements Lease, passed through a series of acquisitions and were ultimately acquired by Wachovia.  (Dkt. entry no. 288, 8-23-11 Tr. at 8, 39; 8-24-11 Tr. at 9-10.)   Wachovia thus acquired NJNB's option to repurchase the Improvements but decided sometime in 2005 against exercising that right.  (See 8-24-11 Tr. at 9-10.)

**D.   Towerhouse, an Entity Related to Herring, Attempted to Purchase Both the Land and the Improvements**

Textron, upon learning in the summer of 2005 that Wachovia would not repurchase the Improvements, began soliciting and entertaining other purchase offers.  (8-23-11 Tr. at 8-10.)   One such offer came from Towerhouse Properties, LLC ("Towerhouse"). Towerhouse, like Herring, is a limited liability company that was created and is managed by James P. Herring ("JH"), and purchases investment properties.  (8-25-11 Tr. 21-22.)[8]   JH has experience, including but not limited to experience as the "managing member" of both Towerhouse and Herring, in acquiring, developing, and leasing commercial real estate.  (See 8-25-11 Tr. at 8-23.)

_____

[8] Although the Court generally uses an individual's last name as a shorthand reference, the Court will refer to James P. Herring as "JH" to avoid confusion between James P. Herring and Herring Land Group, LLC.

JH hoped to purchase the Land from Wachovia and the Improvements from Textron, thereby reuniting the fee interests in the Land and the Improvements.  (8-25-11 Tr. at 108-09.)[9]  He also hoped that, by purchasing both the Land and the Improvements, he could collect rent from Wachovia.  (Id. at 97, 108.)  JH, through Towerhouse, thus contracted with Textron to purchase both the Improvements and Textron's interest in the Ground Lease for $13.5 million.  (Id. at 96-97.)

JH thereafter learned, however, that Wachovia did not intend to continue its tenancy in the Buildings.  (Id.)  Because Wachovia would not remain as a tenant, Towerhouse terminated its contract with Textron.  (8-24-11 Tr. at 11-12; 8-25-11 Tr. at 21-22, 27-28, 96-98.)[10]  It thereafter offered Textron $9.5 million for the Improvements, which reflected its "best estimate[]of the" value of the Improvements less "the additional costs without Wachovia as a primary tenant[,] including downtime,

---

[9] The Ground Lease contemplates the eventuality that someone, e.g., NJNB, would reunite the fee interests in the Land and the Improvements.  "In the event that fee title to any Improvements is transferred to Ground Lessor . . . all of Ground Lessee's obligations and liabilities hereunder, including its obligation to make rental payments . . . shall be automatically assumed by Ground Lessor and Ground Lessee shall be automatically released therefrom."  (Ground Lease at Section 3(b).)

[10] JH testified that the contract contained a ninety day due diligence period and a related "out clause" that, taken together, allowed him terminate the contract before it went "hard".  (See 8-25-11 Tr. at 22, 97.)  GFP did not contest this fact or present evidence to the contrary at trial.

tenant improvement allowances, brokerage commissions[,] and additional capital improvements to successfully re-tenant the [Buildings]." (Ex. P-25, 7-26-05 Offer Letter.)  Towerhouse's offer, however, was at best half-hearted. (See 8-25-11 Tr. at 104-07.)  JH testified that Towerhouse primarily made this offer to curry preferential treatment with Wachovia in its ongoing attempts to buy the Land, though this offer was also partly a "hedge" in case Wachovia changed course and decided to continue its tenancy in the Buildings.  (Id. at 104-109.)

Textron, believing that it could lease the Buildings to new tenants and thus sell the Improvements at a higher price, rejected Towerhouse's offer to purchase the Improvements for $9.5 million.  (8-24-11 Tr. at 19.)[11]  Around this time, Textron also hired Sab Russo of commercial real estate brokerage firm CB Richard Ellis ("CBRE") to market both the Buildings (for rent) and the Improvements (for sale, subject to the Ground Lease).  Textron charged Russo with finding either tenants for the Buildings or a buyer for the Improvements, or both.  (8-23-11 Tr.

---

[11] Jane Lavoie, the Vice President of Operations for Textron's structured finance group, testified that Textron rejected Towerhouse's offer.  (8-24-11 Tr. at 19-20.)  JH, however, testified that Textron did not respond to that offer. (8-25-11 Tr. at 105.)  The Court notes the discrepancy but finds that it has no bearing on the resolution of this matter.

at 9; 8-24-11 Tr. at 23-27.)[12]  Because Textron believed that it
would receive a higher sale price for the Improvements if the
Buildings were occupied, it stressed the importance of finding
tenants for the Buildings before selling the Improvements.  (Id.
at 26-27.)  Textron did not foreclose the possibility of selling
the Improvements if the Buildings remained vacant, but neither
Towerhouse nor Textron further attempted to consummate a sale of
the Improvements to Towerhouse.  (Id. at 19-20, 26-27.)

### E.   Herring Purchased the Land

JH successfully developed his relationship with Wachovia, as
strengthened by Towerhouse's offers to purchase the Improvements
from Textron, and, on January 17, 2006, his new entity, named
Herring Land Group, purchased all of the land contained in the
original Subject Property -- i.e., all fifty-five acres,
including the sixteen or so acres comprising the Land still
subject to the Ground Lease -- for $9 million.  (Stip. Facts at
¶ O; Ex. J-28, 1-13-06 Deed.)  Through the same purchase, Herring
also acquired Wachovia's rights under and interests in the Ground
Lease.  (1-13-06 Deed; see also Ex. P-7, 1-25-06 Lavoie Letter.)

Following Herring's purchase of the Land, Textron (as Ground
Lessee) and Herring (as Ground Lessor) sent letters to each

---

[12] It does not appear that Textron consulted or otherwise
involved Russo in its negotiations with Towerhouse.  The record
is unclear, however, whether Textron engaged Russo before or
after Towerhouse terminated the $13.5 million contract.

other, each declaring its interest in determining the rent due under the Ground Lease for the five-year term that began on January 14, 2006 ("Ground Rent").  (Ex. P-18, 1-24-06 Herring Letter; 1-25-06 Lavoie Letter.)  Textron and Herring thereafter arranged a meeting to resolve the issue, scheduled for February 16, 2006 in the New York City office of Kramer Levin.  (8-24-11 Tr. at 29; 8-25-11 Tr. at 29-30.)

### F.    Preparation for Ground Rent Negotiations

#### 1.   Textron's Preparations

The parties prepared for the February 2006 meeting by reviewing the Leases, particularly inasmuch as the Leases detailed the methods for appraising FMRV and setting Ground Rent after NJNB's initial 20-year term.  (Ex. P-6, 2-9-06 Russo Memo; 1-25-06 Lavoie Letter; 1-24-06 Herring Letter; 8-25-11 Tr. at 30-36.)  The lease provisions that are pertinent to this phase of trial are set forth in Section I.B., above.

Russo, the realtor, prepared a memorandum for his client, Textron, in anticipation of the February 2006 meeting.  (2-9-06 Russo Memo.)  Through that memorandum, Russo set forth three variables that he identified as important to the calculation of the Ground Rent: (1) "Condition of Site"; (2) "Sale Comparables"; and (3) "Cap[italization] Rate" ("cap rate").  (Id.)[13]

---

[13] A cap rate measures the factor of potential return or profit.  (8-25-11 Tr. at 32.)  During the first phase of trial, we noted that it may be defined as "'the relationship of income

With respect to the first variable, Russo noted that Textron owned the Improvements.  (Id.)  He therefore indicated that although the Land was "improved", i.e., a site containing "site work, including utilities, grading, storm water management, [and/or] curb cuts", it was best compared to properties that were merely "approved", i.e., sites having "all governmental entitlements required to begin construction".  (Id.)

Russo, as demonstrated by attachments to the memorandum, then compiled a list of and compared other "approved" sites that were subject to ground leases.  (Id.)  Ground leases are virtually nonexistent in the region surrounding the Subject Property.  (See dkt. entry no. 188, 12-2-10 Tr. at 48-49.) Russo's list of comparable sites thus included sites from a region that stretched from Maryland south to Alabama, and then West to Ohio and Texas.  (2-9-06 Russo Memo.)  These comparable sites, on the average, demonstrated that FMRV "$20 per buildable [square feet] for Approved sites is supported."  (Id.)

By comparing the cap rates applicable to the comparable "approved" sites, Russo noted that cap rates on such sites ranged from 5.25-6.75%.  He thus concluded that Textron's position should account for a 6.00% cap rate.  (Id.)  Based upon the square footage of the Buildings, and based on a $20 per square

---

to value . . . often expressed with the formula I over R equals V,' where I is the income generated by the asset, R is the overall cap rate, and V is the value."  (6-29-11 Op. at 36 n.17.)

foot FMRV, adjusted by a 6.00% cap rate, Russo recommended "a position on the ground lease rent negotiation at $314,717 per year". (Id.)[14]  Russo communicated this to Textron by memoranda, where he also stated his beliefs that Herring would: (1) "attempt to include improvements in the value (thereby increasing the Price per Buildable SF) and increase the Cap Rate," and (2) counteroffer closer to $375,755 per year. (Id.; see also 8-23-11 Tr. at 112.)

### 2.  Herring's Preparations

It appears that Herring did not create any notes or memoranda in preparation for the meeting. (8-25-11 Tr. at 95-96, 189-90.)  But JH testified that he reviewed the Ground Lease when he acquired the Land and, based on his experience, expected that Ground Rent would be based on fair market value, where such fair market value represented the highest and best use ("HBU") of the land, examined as though the land were vacant and unimproved. (8-25-11 Tr. at 25.)

JH, in preparation for the meeting, hired a land planner and an engineer to determine the physical and legal limitations of buildings that hypothetically could be erected on the Land.  JH testified that he also considered the financial feasibility of buildings that could be erected on the Land and that he was very

---

[14] The Buildings consist of approximately 179,000 square feet. (Stip. Facts at ¶ F.)  Russo's calculations accounted for 178,931 square feet. (2-9-06 Russo Memo.)

familiar with the local commercial real estate market.  (Id. at
30-45.)  He also testified that he examined comparable sites and
reviewed related cap rates to determine the appropriate price per
floor area ratio ("FAR").[15]  (Id.)

As a result of his efforts, JH concluded that the HBU of the
Land was to demolish the 179,000 square foot Buildings and in
their place build a new "Class A" office complex, which would
include 480,000 square feet of office space.  (Id. at 42-44.)  He
also determined that comparable sites supported FAR between $29
and $35 per square foot, with a cap rate between 6.00-7.50%.
(Id.)  Based on this information, he calculated a proposed Ground
Rent premised upon a $30 FAR and a proposed Ground Rent between
$1 and $1.2 million per year.  (Id.)[16]

### G.   Ground Rent Negotiations (January 2006-May 2006)

#### 1.   February 2006 Meeting

The February 16, 2006 meeting took place as scheduled at
Kramer Levin's New York City office.  (8-24-11 Tr. at 28-29;
8-25-11 Tr. at 29-30.)  Lavoie and Russo attended on behalf of

---

[15] The Court earlier defined FAR as the "sale price per each
square foot of [approved but unbuilt] office space" or "the price
per square foot of Floor Area Ratio." (6-29-11 Op. at 34.)

[16] The Court notes that JH's figures are flawed.  Based on
480,000 square feet and a $30 FAR, cap rates between 6.00-7.50%
would yield annual ground rent between $900,000 and $1,080,000.
To reach JH's proposed Ground Rent, i.e., a figure between
$1,000,000 and $1,200,000, one would need to assume 480,000
square feet, a FAR roughly equivalent to $33.33, and cap rates
between 6.25-7.50%.

Textron, and JH and a Herring investor, Lester Weindling,
attended on behalf of Herring.  (8-24-11 Tr. at 29-30; 8-25-11
Tr. at 44.)  It was a short meeting.  (8-24-11 Tr. at 33.)

The parties explained their respective approaches to
determining Ground Rent for the leasehold term at issue.  Textron
stated its position on Ground Rent, explaining that it based that
position on the Buildings in their then-current state.  (8-24-11
Tr. at 32-33.)  JH, in turn, explained that he sought between
$1.2 and $1.3 million in annual Ground Rent.  (See Ex. P-5, 2-16-
06 Russo Memo.)[17]  JH indicated that Herring premised its
position upon what could hypothetically be built on the Land
rather than the existing Buildings, and that he had hired land
planners to explore denser development on the Land.  (Id.; 8-25-
11 Tr. at 45-47.)  He asserted that a redesigned structure could
increase the overall square footage while complying with the
zoning requirements.  (8-25-11 Tr. at 46-47.)  Russo opined that
one could not add any square footage to the Subject Property,
because the Buildings already contributed the maximum impervious
coverage permitted by law, but conceded Textron had not yet
consulted its own land planner.  (Id. at 45-46.)

---

[17] JH explained that these figures were based on 480,000
square feet, but also on a $35 FAR and a 7.00-8.00% cap rate.
(2-16-06 Russo Memo.)

Russo summarized his impressions of the meeting in a
contemporaneous memorandum to his client, Textron, in which he
recorded his belief that Herring was "not . . . what I would
consider to be a reasonable party" and "that it was clear to me
. . . that there was an agenda here; that it wasn't about coming
to any kind of conclusion on the ground rent, at all.  It was
about something entirely different."  (2-16-06 Russo Memo.;
8-23-11 Tr. at 92.)  Russo's post-meeting memorandum began by
recounting the Ground Rent calculation JH presented to Russo and
Lavoie at the meeting.  (2-16-06 Russo Memo.)[18]  Russo then
stated five reasons why he objected to Herring's valuation:
(1) "Ewing zoning ordinances limit building coverage or FAR to
35% (248,999 sf max) in the IP-1 zone"; (2) "The existing
building configuration and placement on the 16.3 acres makes
further buildout on the underlying land limited at best";
(3) "Valuation should be based on existing conditions and use --
not what could or couldn't be built on the site"; (4) "The
buildings exist and belong to [Textron] [until] 2060" and "[t]o
value the land based on the premise that the buildings don't
exist is not possible"; and (5) "Ground rent should be based on

_____

[18] Russo also reported that JH presented an "income
approach" to calculating Ground Rent; JH did not remember
presenting this approach.  (2-16-06 Russo Memo.; 8-25-11 Tr. at
50-51.)  Whether JH actually presented an income approach to
calculating Ground Rent is, however, irrelevant because neither
party has further pursued it.

the approved value of the land for the improvements that exist. Basing the value on what could exist as per the zoning ordinances or other concept plans as opposed to what is actually approved, requires a much lower buildable square foot value (i.e. $10-$15/sf for unapproved land) to be used in the calculation." (Id.; see also 8-23-11 Tr. at 93-95, 109-12 (explaining valuation differences between "approved" and "improved" lands).)

Russo opined that "[JH]'s position is completely baseless and without merit, and is part of a strategy to put [Textron] through a protracted arbitration process thereby blocking a sale of the [B]uildings to a third party so he can buy them later at a distressed price." (2-16-06 Russo Memo.)[19] He also expressed concern regarding: (1) "Herring's posturing", inasmuch as it might delay a closing on any sale of the Improvements; and (2) the need to "prepar[e] appropriate language that can be inserted into our counter proposals [to prospective Building tenants,] neutralizing the unresolved ground lease payments as an issue." (Id.)

---

[19] JH, at trial, disputed Russo's characterization of his motives, testifying over objection that Russo "poison[ed] the water with some conspiracy theory". (8-25-11 Tr. at 56.)  JH agreed, however, that Russo's memorandum otherwise fairly accurately recounted Textron's and Herring's respective positions and presentations.  (Id. at 51-53.)
    Lavoie took no notes at the meeting but agreed with the summary contained in Russo's memorandum.  (8-24-11 Tr. at 83-84.) She testified at trial that she and Russo were both shocked by the disparity in the parties' valuations.  (Id. at 32.)

Russo reiterated at trial that, in his view, JH's position was "clearly posturing and . . . it was just basically looking to establish his position, as unreasonable as it was, and come and get me type of thing. . . . [H]e was not there to be constructive.  He was there to basically set up the battle lines."  (8-23-11 Tr. at 113-14.)  Russo also stated that JH's "assertion that you could build 480,000 feet on a 16.3 acre property . . . was absurd, quite absurd to me.  And then to also secondarily go on to say, and I want to value that 480,000 feet at $35 a buildable foot was . . . equally as absurd. . . . so that was my cue that this is not going to be a reasonable negotiation."  (Id. at 96.)  Because Russo knew of JH's previous attempts to unify title to both the Land and the Improvements by purchasing both, Russo believed that JH's strategy was to "confound the process" long enough to frustrate Textron into giving away its interest in the Ground Lease and the Improvements.  (8-23-11 Tr. at 97-98.)

Despite the disparity in the parties' proposed valuations of Ground Rent, Textron and Herring failed to begin the appraisal process set forth in the Leases during or immediately after the February 2006 meeting.  (8-24-11 Tr. at 32; 8-25-11 Tr. at 57; see also 2-16-96 Russo (recounting meeting and failing to mention invocation of appraisal process).)  Textron, however, nonetheless requested an appraisal from Peter E. Sockler.  (See Ex. D-2, 2-27-06 Sockler Proposal.)

20

2.   March 2006 Conference Calls

Textron and Herring followed the February 2006 meeting with two telephone conference calls, held on March 3, 2006 and March 23, 2006.  Textron's attorney, Philip Notopolous, and Lavoie participated in the calls on behalf of Textron, and JH and Loeb participated on behalf of Herring.  (8-24-11 Tr. at 91-92; 8-25-11 Tr. at 57-58.)[20]  Lavoie's handwritten notes from the calls were read into the record at trial and admitted into evidence.  (Ex. D-48, 3-2-06 Lavoie Notes; Ex. D-49, 3-23-06 Lavoie Notes; 8-24-11 Tr. at 105-07, 113-17.)

During the first call, the parties essentially repeated the positions assumed at the February meeting: Herring asserted the same price per buildable foot and that more square footage could be built, whereas Textron argued that the existing Buildings represented the maximum buildout, had to be taken into account, and could not be ignored.  (3-2-06 Lavoie Notes; 8-24-11 Tr. at

---

[20] Lavoie, JH, and Loeb testified differently with respect to which other parties, if any, participated in these conference calls.  Lavoie's notes, for example, indicate that Textron's Division President, Shanuah Beamon, and in-house counsel, Donnie Braunstein, participated in the March 23, 2006 call; Loeb agreed. (8-24-11 Tr. at 113; 8-25-11 Tr. at 168-69.)  JH testified, however, that Lavoie's supervisor might have been on the first call and that the participants of the second call were the same as the first.  (See 8-25-11 Tr. at 57-59.)  The Court notes but does not find this disparity relevant.

Lavoie also testified that she participated in "several conference calls with attorneys".  (See 8-24-11 Tr. at 91.) Neither Lavoie nor the other witnesses called during the Phase II trial, however, provided any additional testimony or evidence regarding the content of those other conference calls.

58, 104-07, 167-68.)   Textron's representatives asked JH for the reports from Herring's land planner and engineer, and JH said he would consider their request.   (3-2-06 Lavoie Notes; 8-25-11 Tr. at 58.)

By the second conference call, Herring had formal reports from its land planner and engineer, who had "uncovered" that because of a purported zoning change one could actually erect office space including up to 600,000 square feet on the Land. (8-25-11 Tr. at 59-60.)   From Lavoie's perspective, Herring's number "kept going up."   (8-24-11 Tr. at 119; see also 3-23-06 Lavoie Notes (noting that Herring's plan was a "pipe dream").) Loeb recalled the second conference call being "more specific" than the first, with discussion: (1) of Herring's purchase price for the Land; (2) "about how one accounted for the ownership of the buildings on the property"; and (3) to the effect that Textron had retained land use counsel in New Jersey, Dan Haggerty, to investigate JH's claims about potential redevelopment.   (8-25-11 Tr. at 169-71.)[21]

According to Loeb, the parties conducted themselves on both calls without adopting a combative tone, although Textron's

_____

[21] It is unclear whether Loeb participated in these calls as one of Herring's investors or as its legal counsel.   JH testified that Loeb's role, as it pertained to these calls, was not defined and that he was uncertain whether Loeb was paid to negotiate on Herring's behalf.   (8-25-11 Tr. at 129-31.)   Loeb, however, believed he was acting as an attorney for Herring from February to June of 2006, until April 2007.   (8-25-11 Tr. at 193.)

representatives seemed surprised that JH, during the second call, suggested building more on the property.  (8-25-11 Tr. at 241.) Loeb testified that the parties were "making an effort to sort out what the ground rent would be."  (8-25-11 Tr. at 171.)  Loeb felt, however, that Textron, which originally entered into transactions concerning the Subject Property to obtain certain tax benefits, needed to "re-familiarize" or "re-acquaint" itself with the physical aspects of the Subject Property and the documents that would determine the Ground Rent.  (See 8-25-11 Tr. at 167-68, 171, 240-41.)[22]

      3.   May 2006 Letters

It appears that the parties did not communicate directly with one another between March 23, 2006 and May 20, 2006, although their attorneys continued to negotiate in pursuit of an agreement.  (See 8-24-11 Tr. at 121; 8-25-11 Tr. at 62, 173-75; Ex. P-1, 5-10-06 Letter (noting ongoing telephone discussions between attorneys).)

---

[22] Loeb also recalled a general discussion about how to determine the Ground Rent, including a discussion of New York cases and the fact that neither he nor Notopolous knew how New Jersey law governed the matter.  (Id. at 242.)  In fact, Loeb's position and his opinion that appraisers would not have been helpful was informed by New York law, which according to him provides that which appraisal methodology to use is a judicial determination.  (Id. at 246-47.)  The Court only notes this to illustrate Loeb's position, as the Ground Lease states that it "shall be governed by and interpreted under the laws of the State of New Jersey."  (Ex. P-8, Ground Lease.)  Loeb is not admitted to the New Jersey bar.  (8-25-11 Tr. at 224.)

In a letter dated May 10, 2006, Textron's New York counsel, Notopolous, informed Loeb that Textron: (1) had retained an appraiser, Peter Sockler; (2) expected to receive Sockler's appraisal report (the "Sockler Report") by the end of the week; and (3) would then share the Sockler Report with Herring "for settlement discussion purposes only." (5-10-06 Letter.)  The letter reiterated that "[a]s we have discussed in all of our telephone calls, this letter, the appraisal and our conversations constitute settlement discussions."  (Id.)  After describing how Sockler's appraisal supported Textron's position, the letter broached the subject of the appraisal process:

> As you know, both parties have previously agreed to defer the start of the formal appraisal process under the lease to enable the settlement discussions to continue.  That said, we must inform you that in view of the extreme differences in our positions, we are willing to continue settlement discussions only for an additional two (2) weeks from the date we send you the appraisal.  If the parties have not reached a settlement by that date, then this letter will serve as an appointment by [Textron] of Sockler as its appraiser under the applicable lease provisions.

(Id.)[23]

Lavoie testified this language put Herring on notice that Textron "would be commencing" the appraisal process because the settlement discussions were not getting anywhere.  (8-24-11 Tr.

---

[23] Although there must have been previous discussion of the "formal appraisal process," this letter appears to be the first "formal" mention of commencing that process.

at 34-36.)  Loeb, however, did not view this letter as invoking
the appraisal process and did not respond because of the "ongoing
effort to sort out what the ground rent would be."  (8-25-11 Tr.
at 176.)  He assumed that Textron forwarded the Sockler Report in
further efforts to settle the matter.  (See id. ("This letter
suggested that Textron had made a judgment that it needed to get
an appraisal. It was being done informally as part of a
settlement effort, and I was awaiting that appraisal.").)

Textron received the Sockler Report on or about May 18,
2006.  That report concluded that the HBU of the Land was its
continued use with the existing Buildings, comprised of 179,000
square feet of office space.  (Stip. Facts at ¶ R; dkt. entry no.
153, GFP Trial Br. at 3-4; dkt. entry no. 154, Herring Trial Br.
at 10-11; Ex. P-3, Sockler Report at 65.)  Textron's local New
Jersey counsel, Daniel L. Haggerty, attempted to e-mail Loeb the
Sockler Report on May 19, 2006, but the e-mail was apparently too
large and failed to go through.  Haggerty re-sent the email on
Monday, May 22, 2006, noting his earlier attempt and specifying
that "[t]his transmittal is being made to you as a follow up to
[the 5-10-06 Letter] to you, subject to and under the terms and
conditions set forth therein.  [Lavoie] has asked me to confirm
the ground lessee's willingness to meet at a mutually convenient
time and place to discuss this matter."  (Ex. D-51, 5-22-06
Haggerty E-mail.)  JH learned of the Sockler Report on the same
day, May 22, 2006.  (8-25-11 Tr. at 65.)

On May 26, 2006, Textron's counsel sent Herring a letter stating that Textron "hereby designates Sockler . . . as its appraiser for purposes of determining the fair rental value pursuant to the" Leases.  (P-2, 5-26-06 Letter.)  Neither Herring nor Loeb responded to the letter in writing, though Loeb responded to Textron's counsel by phone.  (8-25-11 Tr. 90, 124.)

Lavoie understood the May 10, 2006 letter to name Sockler as Textron's appraiser in accordance with the provisions in the Leases, and similarly understood Textron's May 26, 2006 letter to confirm that Textron had commenced the appraisal process.  (8-24-11 Tr. at 156-57.)  Loeb, in contrast, characterized Textron's letters as "saber-rattling" based on his perception that Textron was frustrated with the pace of negotiations.  (See 8-25-11 Tr. at 200-01, 211.)  He thus did not understand the May 26, 2010 letter to invoke the appraisal process set forth in the Leases.  (Id. at 202-03.)  He instead expected that further negotiation would resolve the issue.  (Id. at 179-81, 232.)

JH only understood from the May 10, 2006 letter that Textron intended to "push the process forward" while still giving "time to continue our discussions".  (Id. at 89.)  He acknowledged, however, that the May 10, 2006 letter "accelerat[ed] . . . and put[] a two-week time frame on" the process because Textron "wanted to put an end date on" the ongoing settlement negotiations.  (Id. at 65, 89.)

JH nonetheless understood, upon receipt of the Sockler Report, that Textron wanted to proceed with the appraisal process.  (Id. at 89-90.)  At trial, he was uncertain whether he reviewed the leases upon receipt of Textron's May 26, 2006 letter; in any case, he testified that he did not know that Herring was obligated to appoint an appraiser within ten days. (Id. at 124.)  He continued to hope that Textron and Herring would reach an agreement.  (See id. at 122.)

### 4.   June of 2006

JH and Loeb, following receipt of the Sockler Report, still believed that the parties' negotiations were ongoing.  (See id. at 66, 70, 209-10.)[24]  Herring nonetheless retained an appraiser, Michael Hedden, on June 7, 2006.  (Id. at 67-68, 182.)  Loeb testified that Herring retained Hedden for "all eventualities", including: (1) securing an appraiser in case one of the parties invoked the appraisal process; and (2) allowing Hedden sufficient time to familiarize himself with and become comfortable with Herring's position.  (Id. at 209-10.)  "[P]rophylactically[,] it was prudent to have an appraiser on board as part of [Herring's]

---

[24] The record demonstrates that Herring had good reason to believe that negotiations were ongoing.  Haggerty, for example, stated to Loeb on June 7, 2006 that "[r]ather than continuing our game of telephone tag, I thought I would just go ahead and send this e-mail along to you.  I have a conference call tomorrow morning with the [Textron] folks.  I will try to reach you either by telephone or e-mail tomorrow afternoon.  I have a closing after the conference call, but I should be back to the office by early afternoon."  (Ex. D-52, 6-7-06 Haggerty E-mail.)

team." (<u>Id.</u> at 210.)  Herring did not notify either Lavoie or other Textron representatives that it had retained or otherwise consulted an appraiser.  (8-24-11 Tr. at 158-60; 8-25-11 Tr. at 69, 211.)

     **H.**   **Textron Brings Suit Against Herring**

         1.  <u>Textron's Pleadings</u>

Textron commenced this action on June 8, 2006.  Through the Complaint, Textron sought only declaratory relief, <u>i.e.</u>, a judgment declaring the "proper" method for appraising the FMRV of the Land under the Ground Lease.  (<u>See generally</u> Compl.)  It specifically sought declaration that the Leases required the parties' appraisers to: (1) "take into account the remaining term of the Ground Lease and limitations on any potential development imposed by the existing buildings and improvements owned by [Textron]"; and (2) conduct an HBU analysis by analyzing the Land with the Improvements rather than as vacant, <u>i.e.</u>, "raw land without any buildings or lease hold interests".  (<u>Id.</u> at 5-6.)

Textron filed the Amended Complaint on November 3, 2006.  (Am. Compl.)  Through the Amended Complaint, Textron preserved its claim for declaratory relief and raised a new claim against Herring for breach of contract, for allegedly failing to abide by the appraisal process set forth in the Leases.  (<u>Id.</u>)

28

2.   <u>Herring's Pleadings</u>

Herring filed an Answer to the Amended Complaint, denying that it breached the pertinent provisions of the parties' Leases. (Answer to Amended Complaint 3.)  Herring also filed the Counterclaim, seeking two forms of relief.  It first sought declaratory judgment, seeking declaration "that the appraisers' determination of [FMRV] pursuant to the Ground Lease must be based upon their determination of the [HBU] of the [Land] as though Vacant."  (<u>Id.</u> (incorporating the Answer & Counterclaim at 8-9).)  Herring also sought equitable relief, asking the Court to "specifically enforc[e] the provisions of the Ground Lease for the determination of basic rent" and to "retain[] jurisdiction for the purpose of entering Judgment in favor of [Herring], and against [Textron], for the full amount of [Ground Rent] found to be due", with interest.  (<u>Id.</u>)

3.   <u>Textron's Filing Halted the Appraisal Process</u>

Both JH and Loeb were surprised by the lawsuit.  (8-25-11 Tr. at 68, 185, 213-14.)  Until they received notice of the lawsuit, JH and Loeb believed that Herring and Textron would continue to negotiate the proper method of valuation under the Leases.  (<u>Id.</u> at 68-70, 213-14.)  Indeed, JH and Loeb had attempted to schedule a meeting with Lavoie, at her request, as late as June 6, 2006.  (<u>Id.</u> at 70; <u>see also</u> 6-7-06 Haggerty E-mail.)  JH thus testified at trial that, given the tenor of the

conversations between Textron and Herring, he did not believe that it was necessary to "rush the process". (8-25-11 Tr. at 115.)  Loeb similarly testified that the lawsuit was "not in keeping with the tone of the relationship between Textron and Herring" and that he thought that Textron secured the Sockler appraisal simply to advance the parties' ongoing negotiations. (Id. at 175-76, 180, 185 213-14.)

Lavoie testified that Textron filed suit because Herring declined to participate in the appraisal process. (See 8-24-11 Tr. at 56.)  She noted that the parties could not effectively set the Ground Rent without first agreeing upon the appraisal process methodology. (Id. at 153-54.)  And she stated that Textron "supplied. . . the appraiser name, and we were told that [Herring] would not engage in the appraisal process, until we agreed on the methodology and that if the courts had to decide it, that was fine." (Id. at 54-55.)  She also stated that "the contract spelled out what to do, if there was a dispute, which there clearly was . . . .  We felt that we were doing our part of it and we expected him to honor his part." (Id. at 56.)

JH testified that he did not produce an appraisal because "it did not make sense." (8-25-11 Tr. at 71.)  He recognized that the parties held widely divergent views concerning the appraisal methodology and thus believed that they had to resolve such differences before engaging in the appraisal process. (Id.

30

at 71-72.)  Moreover, once Textron commenced this action, JH saw
no merit in producing an appraisal before the Court determined
the appropriate appraisal methodology.  (8-25-11 Tr. at 127, 144,
147, 150 (producing such report would be a "worthless exercise"
that "became futile" while awaiting the Court's resolution).)
Herring, however, ultimately produced its appraiser's report (the
"Hedden Report") in 2007 and introduced it as an expert report in
this action.  (See 8-22-11 Tr. at 133.)

> 4.   GFP Purchased both the Improvements and Textron's
>       Interests in the Ground Lease

The current plaintiff, GFP, entered the picture some time
after Textron commenced this action.  In mid-2007 and amidst this
litigation, Robert Freeman, as a representative of Greyfields
Capital, LLC ("Greyfields"), which is in turn the managing member
of GFP, approached Textron about purchasing both the Improvements
and Textron's interest in the Ground Lease.  (Dkt. entry no. 286,
8-22-11 Tr. at 13; 8-24-11 Tr. at 60-62.)  Freeman, like Herring,
has substantial experience in investing in commercial real
estate.  (See 8-22-11 Tr. at 6-14.)  In fact, the name of his
company, "Greyfields", denotes his company's investment approach:
"Greyfields" is a reference to properties that are outdated or
otherwise subject to "legal entitlements or other types of issues
that trap value."  (Id. at 15, 99.)  Greyfields purchases
distressed properties to "unlock significant value."  (Id. at 15,
98, 101.)

Freeman identified the Improvements as distressed properties based upon "the litigation and the fact that [they were] on a ground lease that was not being observed." (Id. at 130.)[25]   He thus sought to acquire the Improvements at a low price and "unlock" the property's "significant value". (See id. at 15, 98, 101.)   As part of the due diligence preceding any such transaction, Freeman hired consultants to examine aspects of the proposed transaction, including the litigation history of this action. (Id. at 16, 108-09.)

Freeman, acting through GFP, ultimately purchased both the Improvements and Textron's interest in the Ground Lease for $5 million in December of 2007. (Id.; P-14, Improvements Deed from Textron to GFP; P-15, Assignment of Ground Lease from Textron to GFP.)   In so doing, Freeman speculated on both the value of the Land and the value, if any, that he might derive from the ongoing litigation. (See 8-22-11 Tr. at 133.)   At trial, Freeman testified that the Hedden Report "was preposterous and would not stand" and he was "willing to bet good money on that conclusion." (Id.)   In so doing, he acted purposefully and with full knowledge of the scope and nature of the pending federal action. (Id. at 107-17.)

--------

[25] Freeman knew both of this action and various state court proceedings concerning the Subject Property. (8-22-11 Tr. at 107.)

5.   <u>Meeting Between GFP and Herring</u>

After GFP acquired Textron's interests, Freeman and JH met to discuss the existing dispute concerning the Ground Rent. Their discussion, like the earlier discussions between Textron's representatives and Herring's representatives, did not resolve the issue.[26]

6.   <u>GFP Joins the Lawsuit</u>

GFP became a party to the lawsuit, pursuant to Rule 25(c), in October 2008 and thereafter moved for leave to file a second amended complaint pursuant to Rule 15(a).  (<u>See</u> dkt. entry no. 64, 10-22-08 Magistrate Judge Order; dkt. entry no. 66, Second Mot. to Amend/Correct Pleadings.)[27]  Through the proposed Second Amended Complaint, GFP sought to, <u>inter alia</u>: (1) expand the existing claim for breach of contract; and (2) add claims for tortious interference with prospective economic advantage, breach of duty of good faith and fair dealing, breach of the covenant of quiet enjoyment, and constructive eviction.  (Dkt. entry no 66-2, Second Am. Compl.)

---

[26] The Court excluded testimony regarding the exact content of their meeting as inadmissible settlement discussions under Federal Rule of Evidence ("FRE") 408.  (8-22-11 Tr. at 24-25; 8-25-11 Tr. at 73-74.)  The parties were, however, permitted to proffer evidence of those meetings for the record.  (<u>See</u> 8-22-11 Tr. at 20-29; 8-25-11 Tr. at 74-77, 186-89.)

[27] Textron earlier filed the Amended Complaint, thereby adding the claim for breach of contract claim currently at issue. (Am. Compl.)  The Court eventually granted Textron's motion for summary judgment and terminated this action insofar as it was raised against Textron.  (Dkt. entry no. 270, 7-15-11 Order.)

The Magistrate Judge noted that GFP purchased Textron's interests in the Buildings, Land, and this lawsuit in December 2007, approximately four months after the close of discovery. (10-22-08 Magistrate Judge Order at 4; see also dkt. entry no. 30, Scheduling Order (setting discovery deadlines).)  The Magistrate Judge thus denied GFP's motion to amend or correct the pleadings because GFP's proposed amendments went "well beyond" the Amended Complaint, would necessitate reopening discovery, and would prejudice Herring.  (See generally dkt. entry no. 73, 3-11-09 Magistrate Judge Mem. Op.)  The Magistrate Judge further found that such amendments were unnecessary because Textron could have made such amendments but chose not to, stating:

> When [GFP] acquired Textron['s interests] it knew or should have known the steps Textron had taken to pursue this litigation.  As a party joined under Rule 25(c), [GFP] stands in the shoes of Textron and the Court considers [GFP's] proposed amendments according to Textron's ability to pursue same. . . .  [I]t appears that Textron could have sought to bring the claims that [GFP] now seeks to add at least as early as August 2007, and likely sooner.  [GFP] sets forth no argument to the contrary.  Rather, it appears that Textron simply chose not to pursue the amendments that [GFP] now seeks leave to make.  The fact that [GFP] has a different point of view . . . is not persuasive. Textron's decision not to amend earlier, whether deliberate or not, is imputed to [GFP.]

(Id. at 10-11.)

GFP appealed from the Magistrate Judge's Order, and this Court affirmed.  (Dkt. entry no. 91, 6-23-09 Order; see also 5-24-11 Mem. Op. at 5-19.)

34

7.   Phase I Methodology Opinion

As noted above, the Court bifurcated the issues for trial, thereby separating: (1) the parties' separately filed requests for declaratory relief relating to the proper appraisal method for HBU of the Land ("Phase I") from (2) GFP's claim for breach of contract and Herring's counterclaim for equitable relief ("Phase II").   Following a nine-day bench trial, the Court determined in Phase I that the proper appraisal method for the Land during the rental period at issue requires appraisers to value the Land as modified by the Improvements.   (6-29-11 Op.; 6-29-11 Order.)   Because the Court was only presented with the five-year rental period that began in January of 2006, it did not issue any decision or make any determination relating to future five-year rental periods.   (See 6-29-11 Op.)

**I.   The Phase II Trial**

The parties appeared for a four-day bench trial regarding Phase II of this matter in August of 2011.   (See generally 8-22-11 Tr.; 8-23-11 Tr.; 8-24-11 Tr.; 8-25-11 Tr.)   To the extent that the parties provided relevant testimony and evidence concerning the Leases' terms, the parties' discussions and negotiations in 2006, and their failure to agree on Ground Rent, the Court has set forth those facts and appropriate citations to the record, above.   The following sections summarize the additional evidence presented at the Phase II trial.

35

1.   <u>The Plaintiffs' Attempts to Let the Buildings</u>

Russo, acting on behalf of Textron, began marketing the Buildings for rent in 2005.  (8-23-11 Tr. at 10.)[28]  To this end, he created brochures, canvassed the local area, and contacted larger prospective tenants.  (<u>Id.</u> at 20.)  Because Russo identified only a small number of large prospective tenants, he also researched the possibility of subdividing the Buildings to accommodate several smaller tenants.  (<u>Id.</u> at 37-38, 46.)  In sum, Russo presented proposals to over fifty prospective tenants, some of whom inquired more seriously about renting the Buildings than others.  (<u>Id.</u> at 86.)

Beginning in 2006, Textron sought rents of $24 per square foot for the HQ and $19 per square foot for the Ops. Center. (8-24-11 Tr. at 178-79.)  In 2007, it reduced the rent sought by $1 per square foot in both the HQ and the Ops. Center.  It nevertheless failed to secure a tenant in either 2006 or 2007. (<u>See</u> 8-23-11 Tr. at 31-39.)

After GFP bought Textron's interests, it further reduced the rent sought for the Buildings; GFP sought only $20 per square foot for the HQ and, eventually, only $16 per square foot for the Ops. Center.  (8-24-11 Tr. at 182-83; 8-24-11 Tr. at 184.)  GFP

_____

[28] After GFP purchased the Buildings from Textron, it contracted with Russo, who had by then left CBRE to found Mercer Oak Realty, to continue marketing the Buildings.  (8-22-11 Tr. at 20; 8-23-11 Tr. at 42; 8-24-11 Tr. at 188.)

also attempted to employ a variety of aggressive marketing
efforts.  (8-22-11 Tr. at 21.)  It failed, however -- like
Textron failed before it, in 2006 and 2007 -- to secure a tenant
in 2008.  (See 8-22-11 Tr. at 21; 8-23-11 Tr. at 50-54.)  Freeman
testified that GFP would have accepted rents lower than those
sought if GFP could have rented both the HQ and the Ops. Center.
(8-24-11 Tr. at 195-96.)

    Russo testified that this litigation created a barrier to
securing leases in either the HQ or the Ops. Center; he testified
that tenants generally like stability and that, in the commercial
real estate market, it was well-known that the parties had not
resolved the Ground Rent issue.  (8-23-11 Tr. at 24-27; 8-24-11
Tr. at 242.)  He further noted the difficulty of negotiating an
appropriate lease for either of the Buildings when the Ground
Rent was unknown.  (Id. at 55-57.)  Prospective tenants expressed
concern, for example, regarding GFP's ability and willingness to
improve the property, given the uncertainty created by the
parties' ongoing dispute.  (8-22-11 Tr. at 53-54.)  Freeman thus
also testified that this litigation prevented GFP from renting
the Buildings to at least one prospective tenant.  (Id. at 53.)

    GFP nonetheless found a tenant willing to lease the HQ as of
February of 2009: Vantage Communications ("Vantage").  (Ex. P-86,
Vantage Lease.)  The Vantage Lease, at $19.50 per square foot,
was "one of those lucky deals, where you had a tenant that just

loved the building just the way it was." (8-23-11 Tr. at 66;
8-24-11 Tr. at 183.) But this litigation again acted as a
barrier to a lease; to secure the Vantage Lease, GFP had to make
several large concessions, including, inter alia: (1) granting
Vantage a right of first refusal on the Ops. Center; (2) giving
Vantage "free rent" in certain portions of the HQ for at least
one year; (3) basing the Vantage Lease on only eighty percent of
the square footage actually occupied; (4) further discounting the
rent to $19.50 per square foot; (5) taking a relatively small
security deposit; (6) further improving the Buildings by adding
electrical wiring and a new air conditioning "chiller"; and (7)
providing Vantage two termination options. (8-22-11 Tr. at 14,
38-42, 144; 8-23-11 Tr. at 67-71.)[29] These improvements cost GFP
approximately $175,000, and GFP paid approximately $110,000 in
additional commissions. (8-22-11 Tr. at 40.)

During the leasehold period at issue, however, neither Russo
nor GFP was able to find a tenant for the Ops. Center. (Id. at
49-50, 57-58; 8-23-11 Tr. at 86; 8-24-11 Tr. at 184.) Although
Russo testified that this litigation affected his ability to let
the Ops. Center, he acknowledged that the vacancy rate for office
structures like the Ops. Center increased between 2006 and 2010,

---

[29] GFP proffered that Vantage intended to terminate the
Vantage Lease in late 2011. (See 8-23-11 Tr. at 71-72.) We note
that proffer here but note also that such testimony was excluded
under FRE 403. (Id.)

reached a plateau in 2010, and was just starting to come down in August of 2011.  (8-24-11 Tr. at 187.)  He also noted that, conservatively, it could take eighteen to twenty-four months to reach "full occupancy" in the Ops. Center.  (See id. at 238-40.)[30]

### 2.   The Plaintiffs' Carrying Costs

GFP offered several exhibits purportedly demonstrating GFP's carrying costs during the leasehold term at issue.  Herring has moved to preclude GFP from both pursuing certain damage claims and introducing certain exhibits that support its claims (the "Herring Motions").  (Dkt. entry no. 258, Mot. to Preclude Claims; dkt. entry no. 274, Mot. to Preclude Evidence.)  GFP opposes the Herring Motions and the Court has reserved its decision upon them.  (See 8-25-11 Tr. at 245-48.)

GFP also introduced a document titled "Revised 370 Scotch Road Estimated 2006 Expenses," which Russo prepared in 2005 to extrapolate what a prospective Building lessee or purchaser might pay to "carry" the Buildings when fully occupied.  (8-23-11 Tr. at 116-18; 8-24-11 Tr. at 195, 212-13; Ex. P-95, Rev. Estimated Expenses.)  In that document, Exhibit P-95 in evidence, which is not the subject of the Herring Motions, Russo estimated that the

_____

[30] On direct examination, Russo testified that vacancy rates for "Class B" commercial properties varied between 2006 and 2010, between fourteen and eighteen percent.  (8-24-11 Tr. at 187.)

"Total Annual Carrying Costs" would near $1,928,400 in 2006.
(See Revised Estimated Expenses.)  He arrived at this figure by
comparing actual, historical information from 2004 and 2005.
(See 8-23-11 Tr. at 116-18.)

JH testified, however, that building expenses (1) are
ongoing and (2) vary by occupancy.  Taxes collected on a
property, for example, will vary depending on the percentage of
the property actually occupied.  But there are some expenses
incurred by ownership even of an empty building, such as, inter
alia, fire insurance, general maintenance costs (to prevent
unnecessary depreciation), base taxes, and some utilities.
(8-25-11 Tr. at 79-81.)

### 3.   The Plaintiffs' Other Damages

GFP also attempted to introduce exhibits purportedly
demonstrating its other damages, including but not limited to its
cash outlays, expenses, "out of pocket cash damages", and "hard
cost damages".  (See 8-22-11 Tr. at 58-60, 74-75, 79-81, 87-95;
Exs. P-87, P-88, P-89, and P-91 through P-94.)  Herring objected
to the introduction of each of these exhibits (the "Herring
Objections"), and the Court reserved its ruling upon the Herring
Objections.  (8-22-11 Tr. at 58-60, 74-75, 79-81, 87-95.)

### 4.   Herring Did Not Present Evidence of Expenses

JH testified that he wanted the Ground Rent set in January
of 2006 because, without such rent, Herring could not realize a

return on its purchase of the Land.  (8-25-11 Tr. at 25-26.)
While we recognize that Herring has not derived revenue from the
Land during the rental period at issue, we note that Herring
presented no evidence of related expenses.  Indeed, GFP pays both
the property tax and utility bills.  (See dkt. entry no. 250,
5-24-11 Mem. Op. at 14-15, 17, 26 (noting GFP's claimed elements
of damages).)  Thus, with the possible exception of any financing
costs on Herring's investment in the Subject Property, Herring
does not suffer from the "land eats money" issue recognized and
discussed by Sockler during the Phase I trial.  (Dkt. entry no.
197, 1-14-11 Tr. at 76.)

## II.  Discussion

The parties do not dispute either that the Court has
jurisdiction over this action under 28 U.S.C. § 1332 or that New
Jersey law governs its resolution.  (Compare dkt. entry no. 153,
GFP's Trial Br. (citing to and relying upon New Jersey law) with
dkt. entry no. 154 (same).)[31]  See also Horng Technical Enter.
Co., Ltd. v. Sakar Int'l, Inc., 432 Fed.Appx. 172, 175 (3d Cir.
2011) ("Federal courts exercising diversity jurisdiction
generally apply the substantive law of the state in which they
sit.").

———————————

[31] Although both GFP and Herring are citizens of New Jersey,
we have jurisdiction over this action because (1) jurisdiction
existed when Textron filed suit, and (2) GFP was not an
"indispensable" party at that time.  See Freeport McMoRan, Inc.
v. K N Energy, Inc., 498 U.S. 426, 428 (1991).  "[I]n fact, [GFP]
had no interest whatsoever in the outcome of the litigation until
sometime after suit was commenced."  See id.

## A.   GFP's Breach of Contract Claim

GFP claims that Herring breached the Leases by failing to adhere to the appraisal process set forth in paragraph 4 of the Ground Lease and Section 16 of the Improvements Lease.[32]  For the reasons set forth below, the Court will dismiss GFP's breach of contract claim, the Second Count of the Amended Complaint.

We examine the Leases through the lens of traditional contract interpretation in order to determine whether Herring is liable for breach of contract.  See N'Jie v. Cheung, No. 09-919, 2011 WL 809990, at *3 (D.N.J. Mar. 1, 2011); Mayfair Supermarkets, Inc. v. Acme Mkts., Inc., No. 87-3994, 1989 WL 32133, at *7 (D.N.J. Apr. 3, 1989) ("Historically, a lease was considered a conveyance of an interest in real estate and, consequently, was interpreted under the principles of property law; however, current New Jersey law construes lease agreements under the same guidelines employed to interpret contracts.").  When interpreting the Leases, the Court must ascribe the Leases' terms their plain and ordinary meaning.  Schor v. FMS Fin. Corp., 814 A.2d 1108, 1112 (N.J. App. Div. 2002).  The Court may not read or enforce such provisions in a way that "write[s] a different or better contract for the parties."  Id.

---

[32] Although Textron and NJNB were the original parties to the Leases, Textron assigned its interests in the Leases to GFP and NJNB assigned its interests to Herring.  GFP and Herring thus "stand[] in precisely the same shoes as [their] assignor[s]" with respect to the Leases and any breach thereof.  See Dome Petroleum Ltd. v. Emp'rs. Mut. Liab. Ins. Co. of Wis., 131 F.R.D. 63, 69 n.1 (D.N.J. 1990).

To the extent that the parties waived their contractual
rights, however, the Court must recognize such waiver.  See
Shutte v. Thompson, 82 U.S. 151, 159 (1872); Loria's Garage, Inc.
v. Smith, 139 A.2d 430, 434 (N.J. App. Div. 1958).

> Waiver is the intentional relinquishment of a known
> right.  It implies an election by a party to forego
> some advantage which he might have otherwise demanded.
> It presupposes full knowledge of the right and an
> intentional surrender, and it cannot be predicated on
> consent given under a mistake of fact.  However, an
> intention to waive need not be manifested expressly but
> may be spelled out from a state of facts exhibiting
> full knowledge of the circumstances producing a right
> and continuing indifference to exercise of that right.

Belfer v. Merling, 730 A.2d 434, 442 (N.J. App. Div. 1999)
(citations and internal quotations omitted); see also Salvatore
v. Trace, 262 A.2d 409, 413 (N.J. App. Div. 1969) (conduct may
operate as waiver).  Because waiver involves the subjective
intention of a party to relinquish a known right, "waiver is
basically a question of intention, and usually a matter for the
trier of fact." Farris v. Cnty. of Camden, 61 F.Supp. 307, 338
(D.N.J. 1999) (citing Garden State Bldgs., L.P. v. First Fid.
Bank, N.A., 702 A.2d 1315, 1322-23 (N.J. App. Div. 1997))
(internal quotation marks and citations omitted).

The parties in this matter are bound by both the Ground
Lease and, through its incorporation into the Ground Lease, the
Improvements Lease.  (See Stip. Facts at ¶ K (citing Ground Lease
at ¶ 4(b)).)  The Ground Lease clearly and unambiguously directs

the parties to agree upon annual Ground Rent during the first sixty days after the Determination Date.  (Id.)  "[I]f they fail to agree within such 60 day period," the Ground Lease directs the parties to follow "the appraisal procedure set forth in Section 16 of the Improvement[s] Lease."  (Id.)  Section 16 of the Improvements Lease, in pertinent part, states that the "Lessor and Lessee shall each appoint an appraiser within 10 days of their failure to agree" upon annual Ground Rent.  (Id. at ¶ L (citing Improvements Lease at § 16).)

     The Court acknowledges that the parties failed to agree upon annual Ground Rent during the sixty day term established by Paragraph 4(b) of the Ground Lease, which ended on March 15, 2006.  Under ordinary circumstances, and under a plain and ordinary reading of both Paragraph 4(b) of the Ground Lease and Section 16 of the Improvements Lease, such failure would automatically "start the clock running" on the parties' mutual and off-setting obligations to appoint appraisers within ten days.  (See id.)  GFP claims that Herring breached its contractual obligations by failing to appoint an appraiser within that time frame.  (Am. Compl. at 6-7.)  The Court finds, however, that the parties explicitly waived their rights under Paragraph 4(b) of the Ground Lease by agreeing to set aside the sixty day term and "defer the start of the formal appraisal process". (See 5-10-06 Letter; see also Stip. Facts at ¶¶ K-L (setting forth relevant terms from the Leases).)

44

Even in the absence of an explicit waiver, the Court would find that Textron demonstrated "full knowledge of the circumstances producing a right and continuing indifference to exercise of that right." See Belfer, 730 A.2d at 442.[33]  Textron knew of its rights under the Leases; it reviewed the Leases and, later, Textron acknowledged its agreement not to exercise those rights during Ground Rent negotiations.  (See 1-25-06 Lavoie Letter; 5-10-06 Letter.)  Textron also demonstrated the requisite, continuing indifference to its rights.  After reviewing the Leases, Textron, with counsel, engaged in negotiations that extended months past the March 15, 2010 "drop-dead date".  (See 1-24-06 Herring Letter; 1-25-06 Lavoie Letter; 3-2-06 Lavoie Notes; 3-23-06 Lavoie Notes; see also 8-24-11 Tr. at 28-30, 32-33, 58, 104-07, 119, 121, 167-68 ; 8-25-11 Tr. at 25, 29-47, 58-60, 62, 167-71, 173-76, 240-41.)  Because Textron continued negotiations past March 15, 2006 and, indeed, well into May of 2006, it evinced a definite intent to waive any right it might otherwise have held to demand that Herring appoint its appraiser by March 25, 2006, i.e., within the periods set forth by the Leases.[34]

---

[33] As noted in n.35, supra, GFP stepped into "precisely the same shoes as" Textron.  The Court thus imputes Textron's knowledge of and intent to knowingly waive its rights under the contract onto GFP.  See Dome Petroleum, 131 F.R.D. at 69 n.1.

[34] If the parties had adhered to the letter of the leases, the sixty day period set forth by Paragraph 4 of the Ground Lease

The Court acknowledges, however, that Textron's waiver was not absolute.  Despite its earlier waiver of rights, Textron notified Herring on May 10, 2006 that it was "willing to continue settlement discussions only for an additional two weeks from the date [that] we send you the appraisal."  (See 5-10-06 Letter.) As noted above, Textron, by sending this letter, intended to put Herring on notice that it would unilaterally conclude the parties' negotiations two weeks after sending its appraisal, so that the parties could commence the formal appraisal process addressed by the Leases.  (8-24-11 Tr. at 34-36.)  Textron sent Herring its appraisal, the Sockler Report, on May 22, 2006; in the absence of an agreement, Textron unilaterally concluded the parties' Ground Rent negotiations two weeks later, on June 5, 2006.  (See 5-10-06 Letter.)

June 5, 2006 then represented a critical date for the resolution of the breach of contract claim.  As Textron intended, the parties' negotiations broke down that day; it was the first time that the parties "failed to agree", as that term appears and is used in Section 16 of the Improvements Lease.  (See Stip. Facts at ¶ L (citing Improvements Lease at § 16) (providing that the parties "shall each appoint an appraiser within 10 days of

---

would have ended on March 15, 2006 and both parties would have been obligated to appoint appraisers by March 25, 2006.  (Stip. Facts at ¶¶ K-L (citing Ground Lease at ¶ 4(b) and Improvements Lease at § 16).)

their failure to agree" (emphasis added)).)   If Textron had sued
Herring more than ten days after June 5, 2006, and if Herring had
at that point still failed to produce an appraiser, the Court
would have examined the merits of Textron's claims.

Textron, however, did not wait more than ten days; instead,
it filed suit prematurely and commenced this action on June 8,
2006, when Herring still had one week to appoint its appraiser.
Because we examine the facts attendant to GFP's breach of
contract action as they existed at the time the lawsuit was
filed, and because the lawsuit was filed before Herring was
contractually obligated to appoint its appraiser, GFP's breach of
contract claim fails.   The Court will thus enter an appropriate
Order and Judgment, dismissing GFP's breach of contract claim
(the Second Count of the Amended Complaint) and denying both the
Herring Motions and the Herring Objections as moot.

Before addressing the Second Count of the Counterclaim,
however, the Court also finds that the parties to this action had
a bona fide dispute; they had a fundamental disagreement
concerning the proper method of appraising the Land and
determining the annual Ground Rent.   (Compare Am. Compl. at 2-6
(seeking declaration that the proper method of valuing the HBU of
the Land is with the existing Improvements) with Answer to Am.
Compl. at 4-8 (seeking declaration that the proper method of
valuing the HBU of the Land is as "vacant"; see also 6-29-11 Mem.

47

Op. (resolving dispute regarding valuation methodology).)
Inasmuch as they could not resolve this dispute, the Court agrees
with JH that it "did not make sense" for either party to appoint
an appraiser or produce an appraisal report before either
agreeing to resolve that dispute or seeking resolution from the
Court.  (See 8-25-11 Tr. at 72, 127, 144, 147, 150.)  Without
some resolution of the methodology question, appointing
appraisers or producing appraisal reports would have been a
fruitless endeavor in either May or June of 2006.

**B.   Herring's Counterclaim for Equitable Relief**

Herring has counterclaimed for equitable relief, demanding
that the Court "specifically enforc[e] the provisions of the
Ground Lease for the determination of [Ground] Rent." (Answer to
Am. Compl. at 4.)  In an ancillary demand, Herring also asks the
Court to retain jurisdiction "for the purpose of entering
Judgement in favor of [Herring], and against [GFP], for the full
amount of [Ground] Rent found to be due, together with interest".
(Id.)  Before considering the practical effects of the events and
circumstances revealed in the record, we make the following
observations about the equitable remedy that Herring now seeks,
i.e., enforcement of the Leases' provisions that set forth a
process for determining Ground Rent.  See Marioni v. 94 Broadway,
Inc., 866 A.2d 208, 214-16 (N.J. App. Div. 2005).[35]

---

[35] The Court has repeatedly noted and notes again, here,
that the parties' separately filed requests for relief pertain
only to the five-year period that began on January 14, 2006.

A party seeking specific enforcement of a contract must demonstrate that it has a legal right to relief by showing that: (1) the contract at issue is valid and enforceable; (2) the terms of that contract are sufficiently clear, such that the court can determine, with reasonable certainty, each party's duties and the conditions under which such duties arise; and (3) an order compelling performance would not be "harsh or oppressive".  See Chaudry Corp. v. City of Newark, No. C-32-09, 2011 WL 6782400, at *4 (N.J. App. Div. Dec. 28, 2011); Marioni, 866 A.2d at 214 (citations omitted).

The Court will not, however, enforce a contract upon a mere showing of a legal right to relief; the Court must further examine the "facts, circumstances, and incidents" underlying the parties' dispute to determine whether and how to fashion relief that serves the equities.  See Marioni, 866 A.2d at 214-15; see also Steliga v. Ostrum, No. C-17-04, 2007 WL 1215033, at *5 (N.J. App. Div. Apr. 26, 2007).  Such determination rests in the Court's sound discretion.  Barry M. Dechtman, Inc. v. Sidpaul Corp., 446 A.2d 518, 521-23 (N.J. 1982); Marioni, 866 A.2d at 214-15; Friendship Manor, Inc. v. Greiman, 581 A.2d 893, 897-98 (N.J. App. Div. 1990) ("specific performance is a discretionary remedy resting on equitable principles").  Consideration of the underlying "facts, circumstances, and incidents" may "modify" the relief sought "or, perhaps, entirely prevent its exercise."

Marioni, 866 A.2d at 215 (quoting POMEROY, SPECIFIC PERFORMANCE OF
CONTRACTS § 37 at 115-16 (3d ed., 1926)).

When determining the appropriateness of equitable relief,
the Court must also consider "the respective conduct and
situation of the parties", Friendship Manor, 581 A.2d at 898; the
clarity of the agreement itself, notwithstanding the fact that it
may be legally enforceable, Marioni, 866 A.2d at 215; the
potential impact upon the parties of both the grant or denial of
such relief, id.; and whether the party seeking enforcement of
the contract "stand[s] in conscientious relation to his
adversary", such that "his conduct in the matter [has] been fair,
just and equitable, not sharp or aiming at unfair advantage."
Id. at 216 (citing Stehr v. Sawyer, 192 A.2d 569, 571 (N.J.
1963). Taken together, these considerations "pour content into
what is meant by the 'discretionary' nature of specific
performance. It is not a discretion that depends upon 'the mere
will and pleasure of the judge; nor does it depend upon [the
judge's] own individual opinion, as to'" any such remedy's
"'propriety and feasibility; much less is it a matter of favor.'"
Marioni, 866 A.2d at 216 (quoting POMEROY, supra, § 36 at 114).
"Instead, the court must exercise judicial discretion -- a
discretion 'controlled and governed by the principles and rules
of equity.'" Id.

The Court, in weighing all of these considerations, makes "a conscious attempt to render complete justice to both parties regarding their contractual relationship. In short, a court of equity will often direct performance of such a contract because, when there is no excuse for the failure to perform, equity regards and treats as done what, in good conscience, ought to be done." Marioni, 866 A.2d at 216 (citation omitted and emphasis added).

Applying these precepts to the Counterclaim, we now conclude that Herring has not met the requirement that it first demonstrate a legal right to relief. When Herring filed the Counterclaim, the contractual terms at issue -- that is, the appraisal process set forth by Paragraph 4 of the Ground Lease and Section 16 of the Improvements lease -- were not "sufficiently clear" and "reasonabl[y] certain[]", such that the Court could readily determine "each parties' duties and the conditions under which" they arose. Contra Marioni, 866 A.2d at 215, 216-18. Because Herring fails to satisfy at least one of prerequisite showings necessary to obtain equitable relief, the Counterclaim fails.[36]

---

[36] The New Jersey Supreme Court has cautioned that this prerequisite for equitable relief has been overemphasized, and that "[a]pparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implications of fact." Barry M. Dechtman, 446 A.2d at 521 (quoting 5A ARTHUR L. CORBIN, CONTRACTS § 1174 at 283 (2d ed., 1964)). We note, however, that,

The Court also concludes that the "facts, circumstances, and incidents" underlying the Counterclaim, as demonstrated by the testimony and evidence of record, weigh against granting such relief.

The Court has found that GFP and Herring had a bona fide dispute regarding the methodology to be used when valuing the HBU of the Land.  The Leases do not contain any language defining an appraisal method, and no related evidence contemporaneous to the execution of the contracts has come to light.  Instead, the original parties, i.e., NJNB and Textron, entered into a tax-driven, seventy-five-year land lease, each intending that it would end after the initial rent-free twenty-year period.  They "failed to meaningfully prepare" for the very possibility that did occur -- the need to set a Ground Rent, which arose when NJNB's successor-in-interest, Wachovia, transferred its interests and moved out.  This dispute then led to both opposing claims for the Court to declare the proper appraisal methodology and rather protracted litigation (see generally 5-24-11 Mem. Op. at 5-19 (detailing procedural history of this action)).  Such litigation precluded Herring from immediately recognizing a return on its

---

in this case, common sense could not overcome the issues informing or otherwise involved in the parties' dispute.  The Court, in fact, could not resolve issues related to the contractual terms at issue without first hearing several days of trial testimony, including the expert testimony of three appraisers.  (See 6-29-11 Mem. Op.)

purchase of the Land.[37]  It also precluded Textron and its successor-in-interest, GFP, from attracting tenants, and caused the Buildings to lay fallow.  (See 8-22-11 Tr. at 53-54; 8-23-11 Tr. at 24-27; 8-24-11 Tr. at 53-57, 242.)  Russo testified at length regarding the measures that he undertook to market the Buildings to prospective tenants, but explained that most were concerned by the ongoing litigation.  (See 8-23-11 Tr. at 24-27, 86-87; 8-24-11 Tr. at 242).  Tenants avoided the Buildings because, as Russo testified, they desire stability; in the wake of the parties' ongoing dispute, the Buildings lacked such stability.  It was known in the marketplace that the parties were in the process of litigating their dispute regarding the Ground Rent.  (8-23-11 Tr. at 24-27; 8-24-11 Tr. at 242.)

The Court recognizes that GFP derived some revenue from the Vantage Lease -- the only lease that either Textron or GFP secured during the Ground Lease term at issue -- between February of 2009 and January 13, 2011, when the five-year Ground Lease

---

[37] Herring may, however, have realized some return on its purchase of the Subject Property as a whole.  The Court takes judicial notice of the hotel raised on the Subject Property, on the acreage that no longer is subject to the Ground Lease.  (See dkt. entry no. 206, 2-24-11 Minutes of Proceedings (noting site visit).)  The Court also notes that Herring, despite the immediate inability to collect Ground Rent, maintains an interest in the Improvements, including the Buildings.  Pursuant to the terms of the Ground Lease, title to the Improvements reverts to the Ground Lessor, i.e., Herring, either upon the Ground Lessee's default or upon the end date of the Ground Lease in 2060.  (See n.6, supra, and accompanying text.)

rental period at issue in this case expired.  (See 8-23-11 Tr. at
66; 8-24-11 Tr. at 183.)  But the concessions that GFP made to
secure that lease -- concessions including but not limited to
crafting a lease that only included the HQ, decreasing the rental
price per square foot, allowing Vantage to occupy some portions
of the HQ for free, and permitting Vantage to terminate the
Vantage Lease nearly at will -- undercut its value.  (See 8-22-11
Tr. at 14, 38-42, 144; 8-23-11 Tr. at 67-71.)  In addition, GFP
had to outlay $285,000 in property upgrades to secure the Vantage
Lease.  (8-22-11 Tr. at 40.)

     Despite the limited revenue associated with the Buildings,
Textron and GFP nonetheless bore all of the costs of ownership
for both the Land and the Improvements.  As noted above, Herring
did not produce evidence at the Phase II trial of any costs
relating to its ownership of the Land.  Yet Textron and GFP,
pursuant to the Ground Lease, bore responsibility for the
maintenance costs, taxes, and general carrying costs of the
property.[38]  (See, e.g., 8-23-11 Tr. at 55, 116-17; 8-25-11 Tr.
at 79-81; Rev. Estimated Expenses; see also Ground Lease at ¶ 5.)
Thus, to the extent that GFP might have derived some revenue from
the Vantage Lease, that revenue served only to offset the

---

[38] Though we here reference carrying costs, we do not rely
upon the exhibits offered by GFP that, inter alia, are the
subject of the pending Herring Motions.  We instead rely only
upon the sources cited in the body of this Memorandum Opinion.

continued and burdensome costs of marketing and ownership.  And despite their best marketing efforts and the numerous concessions that they were willing to make for tenants, including decreased rent, "free rent", improvements to the Buildings, and favorable contract terms, the Vantage Lease represented the Ground Lessee's only revenue source related to the Buildings.  (8-23-11 Tr. at 71; see also id. at 86-87 (noting that the ongoing Ground Rent dispute "cost us a couple of deals . . . we could have made, and should have made").)

Herring, by comparison, presented no evidence of costs relating to its ownership of the Land or its interests under the Ground Lease.  Indeed, it appears that Herring did not incur any costs relating to its ownership or landlord interests in this matter, except any purchase price financing costs (that, in any case, are not in evidence and would not affect this ruling if in evidence).  Herring's sole asserted "loss" in this matter is its inability to collect Ground Rent during the five-year period in issue, based on the pendency of this lawsuit.

Taken together, these considerations "pour content" into our decision, because the parties have demonstrated that enforcing the parties' contract as to the rental period in issue would lie against the equities.  See Marioni, 866 A.2d at 216.  The parties' contract was at best poorly drafted and, at worst, incomprehensible on the matter of appraisal where the Subject

55

Property is not vacant but contains substantial Improvements. Because the parties could not agree upon an interpretation of their contract, a bona fide dispute arose.  The parties thereafter spent the entirety of the five-year period at issue trying to resolve that dispute, engaging first in a pattern of discussion and negotiation and, upon an impasse in that negotiation, this lawsuit.  Because the parties could not then fairly interpret or enforce their contract, the Court will not "turn back the clock" and now direct them to do so.

As noted above, "equity regards and treats as done what, in good conscience, ought to be done".  Id.  "Turning back the clock", as it were, might provide some relief to Herring, who suffered no damage and would now reap all of the benefits of the bargain.  It would provide no benefit, however, and, worse, no justice to GFP, who (1) suffered real and measurable loss as a consequence of the parties' bona fide dispute, and (2) for the five-year period that began on January 14, 2006 and ended on January 13, 2011, cannot recover any revenue benefits that it might otherwise have enjoyed.  The Court will thus issue an Order and Judgment, dismissing the Second Count of the Counterclaim. The Court will also deny GFP's outstanding motion to preclude additional appraisers ("GFP Motion") as moot.  (Dkt. entry no. 269, GFP Mot.)

To the extent that the resolution of Herring's request for equitable relief conflicts with our earlier statements, indicating that the parties were free to complete the appraisal process (see 6-29-11 Mem. Op. at 70), the analysis contained in this Memorandum Opinion, and the related Order and Judgment, controls.  When issuing the June 29, 2011 Memorandum Opinion, the Court had not yet conducted the Phase II trial, had not yet adjudicated Herring's request for equitable relief, and thus had not yet received the evidence and weighed the equities relating to this matter.

### CONCLUSION

For the reasons stated above, the Court will issue an Order and Judgment that: (1) dismisses GFP's breach of contract claim, the Second Count of the Amended Complaint; (2) denies the Herring Motions as moot; (3) denies the Herring Objections as moot; (4) dismisses the Second Count of the Counterclaim; and (5) denies the GFP Motion as moot.

    s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Dated: March 30, 2012